**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., UNIVERSAL MUSIC CORP. D/B/A 360 MUSIC, D/B/A UNIVERSAL MUSIC WORKS, SONGS OF UNIVERSAL INC. D/B/A UNIVERSAL MUSIC WORKS, D/B/A UNIVERSAL TUNES, UNIVERSAL MUSIC – MGB NA LLC D/B/A UNIVERSAL MUSIC CAREERS, D/B/A UNIVERSAL MUSIC – MGB SONGS, D/B/A UNIVERSAL MUSIC RIGHTS, POLYGRAM PUBLISHING, INC., UNIVERSAL MUSIC – Z TUNES LLC D/B/A UNIVERSAL MUSIC – Z SONGS, D/B/A UNIVERSAL MUSIC – Z MELODIES, UNIVERSAL MUSICA, INC. D/B/A UNIVERSAL MUSIC WORKS, D/B/A UNIVERSAL MUSICA UNICA,  ABKCO MUSIC, INC., ANTHEM ENTERTAINMENT L.P., BIG MACHINE MUSIC, LLC, BMG RIGHTS MANAGEMENT (US) LLC, HIPGNOSIS SONGS GROUP, LLC, HIPGNOSIS SFH I LIMITED, BIG FAMILY LLC, KOBALT MUSIC PUBLISHING AMERICA, INC., MAYIMBA MUSIC, INC., J&N PUBLISHING, LLC, PEER INTERNATIONAL CORPORATION, PEERMUSIC, LTD., PEERMUSIC III, LTD., PEERTUNES, LTD., SONGS OF PEER, LTD., SOUTHERN MUSIC PUBLISHING CO., INC., RESERVOIR MEDIA MANAGEMENT, INC., SONY MUSIC PUBLISHING (US) LLC, EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC INC., EMI CONSORTIUM SONGS, INC. D/B/A EMI LONGITUDE MUSIC, EMI ENTERTAINMENT WORLD INC. D/B/A EMI FORAY MUSIC, D/B/A EMI POP MUSIC PUBLISHING, and D/B/A EMI POP MUSIC PUBLISHING, INC., EMI MILLS MUSIC INC., EMI U CATALOG INC., FAMOUS MUSIC LLC, JOBETE MUSIC CO., INC., STONE AGATE MUSIC, STONE DIAMOND MUSIC CORP., LYRIC COPYRIGHT SERVICES, LP, THE ROYALTY NETWORK, INC., ULTRA INTERNATIONAL MUSIC PUBLISHING, LLC, GENE AUTRY'S WESTERN MUSIC PUBLISHING CO., RICK'S MUSIC, INC., UNICHAPPELL MUSIC INC., W CHAPPELL MUSIC CORP. D/B/A WC MUSIC CORP., W.C.M. MUSIC CORP., WARNER CHAPPELL MUSIC, INC. D/B/A | Civil Action No.: _____  <br><br> COMPLAINT AND JURY DEMAND |

CHAPPELL & CO., INC. and D/B/A WARNER )
GEOMETRIC MUSIC, WARNER-TAMERLANE )
PUBLISHING CORP., WIXEN MUSIC )
PUBLISHING, INC.
                    Plaintiffs,

       v.

X CORP., D/B/A TWITTER,

       Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs Concord Music Group, Inc., Universal Music Corp. d/b/a 360 Music, d/b/a Universal Music Works, Songs of Universal Inc. d/b/a Universal Music Works, d/b/a Universal Tunes, Universal Music – MGB NA LLC d/b/a Universal Music Careers, d/b/a Universal Music – MGB Songs, d/b/a Universal Music Rights, Polygram Publishing, Inc., Universal Music – Z Tunes LLC, d/b/a Universal Music – Z Songs, d/b/a Universal Music – Z Melodies, Universal Musica, Inc., d/b/a Universal Music Works, d/b/a Universal Musica Unica,  ABKCO Music, Inc., Anthem Entertainment L.P., Big Machine Music, LLC, BMG Rights Management (US) LLC, Hipgnosis Songs Group, LLC, Hipgnosis SFH I Limited, Big Family LLC, Kobalt Music Publishing America, Inc., Mayimba Music, Inc., J&N Publishing, LLC, Peer International Corporation, Peermusic, LTD., Peermusic III, LTD., Peertunes, LTD., Songs of Peer, LTD., Southern Music Publishing Co., Inc., Reservoir Media Management, Inc., Sony Music Publishing (US) LLC, EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Songs, Inc. d/b/a EMI Longitude Music, EMI Entertainment World Inc. d/b/a EMI Foray music, d/b/a EMI Pop Music Publishing, and d/b/a EMI Pop Music Publishing, Inc., EMI Mills Music Inc., EMI U Catalog Inc., Famous Music LLC, Jobete Music Co., Inc., Stone Agate Music, Stone Diamond

Music Corp., Lyric Copyright Services, LP, The Royalty Network, Inc., Ultra International Music Publishing, LLC, Gene Autry's Western Music Publishing Co., Rick's Music, Inc., Unichappell Music Inc., W Chappell Music Corp. d/b/a WC Music Corp., W.C.M. Music Corp., Warner Chappell Music, Inc. d/b/a Chappell & Co., Inc. and d/b/a Warner Geometric Music, Warner-Tamerlane Publishing Corp., Wixen Music Publishing, Inc. (collectively, "Publishers"), by their attorneys, for their Complaint against X Corp., d/b/a Twitter ("Twitter"), allege on personal knowledge as to matters relating to themselves and on information and belief as to all other matters, as set forth below.

## **INTRODUCTION**

1.     This is a civil action seeking damages and injunctive relief for Twitter's willful copyright infringement.  Twitter fuels its business with countless infringing copies of musical compositions, violating Publishers' and others' exclusive rights under copyright law.  While numerous Twitter competitors recognize the need for proper licenses and agreements for the use of musical compositions on their platforms, Twitter does not, and instead breeds massive copyright infringement that harms music creators.

2.     Publishers are major and independent music publishing companies that work with songwriters to create, promote, acquire, license, and otherwise exploit musical compositions. Collectively, Publishers have invested immense resources in developing, marketing, and licensing countless iconic musical compositions and modern hit songs, and their catalogs are extensive and diverse.  All the plaintiffs in this case are member companies of the National Music Publishers' Association ("NMPA"), a trade association whose mission is to protect, promote, and advance the interests of music creators in the United States.

3.     Twitter owns and operates an online social media platform, also called Twitter, available through Twitter's website www.twitter.com and a downloadable software application ("App"), which people access and use on their computers and mobile devices to share and view messages and media.  The Twitter platform, which Elon Musk purchased in 2022 for $44 billion, is rife with copyright infringement.  Both before and after the sale, Twitter has engaged in, knowingly facilitated, and profited from copyright infringement, at the expense of music creators, to whom Twitter pays nothing.

4.     Nashville is a major center for the creation, licensing, and performance of music. Nashville is the home of thousands of songwriters, music publishers, and others whose livelihoods depend on the substantial and lawful ecosystem for using and sharing music.  Indeed, multiple plaintiffs have their principal place of business in this District and the remainder generally either have offices and/or songwriter clients in Tennessee.

5.     The pervasive infringing activity at issue in this case is no accident.  While the Twitter platform began as a destination for short text-based messages, Twitter widened its business model to compete more aggressively with other social media sites for users, advertisers, and subscribers.  By design, the Twitter platform became a hot destination for multimedia content, with music-infused videos being of particular and paramount importance.

6.     Videos draw much higher rates of engagement than posts that merely include text, images, or animated GIFs.  Audiovisual tweets, and especially ones containing Publishers' copyrighted works, attract and retain users to the Twitter platform, drive ad impressions, and advance Twitter's key metrics and economic interests.  The Twitter platform is now awash with infringing videos featuring music, including those uploaded by or streamed to Tennessee residents.

7.     There is a vibrant existing market for social media companies to pay fees for the use of musical compositions. Social media companies behind such well-known platforms as TikTok, Facebook, Instagram, YouTube, and Snapchat have entered into agreements with Publishers and other rights holders that compensate creators of musical compositions for use of their works on those platforms. There are also dynamic existing markets for individuals to receive streams and downloads of music, including recordings embodying Publishers' musical compositions, outside the context of social media. Twitter's conduct complained of herein harms these legitimate markets, thereby depriving Publishers and their songwriters of hard-earned, deserved income from their creative endeavors.

8.     Twitter knows perfectly well that neither it nor users of the Twitter platform have secured licenses for the rampant use of music being made on its platform as complained of herein. Nonetheless, in connection with its highly interactive platform, Twitter consistently and knowingly hosts and streams infringing copies of musical compositions, including ones uploaded by or streamed to Tennessee residents and including specific infringing material that Twitter knows is infringing. Twitter also routinely continues to provide specific known repeat infringers with use of the Twitter platform, which they use for more infringement.

9.     Twitter profits handsomely from its infringement of Publishers' repertoires of musical compositions. The audio and audio-visual recordings embodying those compositions attract and retain users (both account holders and visitors) and drive engagement, thereby furthering Twitter's lucrative advertising business and other revenue streams.

10.     Publishers, through NMPA, have spent significant time and resources to identify specific infringers and specific infringements, and to notify Twitter of them. Those specific infringers (which include Tennessee residents) and specific infringements already number in the

5

hundreds of thousands. Twitter has repeatedly failed to take the most basic step of expeditiously removing, or disabling access to, the infringing material identified by the infringement notices. Twitter has also continued to assist known repeat infringers with their infringement. Those repeat offenders do not face a realistic threat of Twitter terminating their accounts and thus the cycle of infringement continues across the Twitter platform.

11.     Twitter's unlawful conduct has caused and continues to cause substantial and irreparable harm to Publishers, their songwriter clients, and the entire music ecosystem. Twitter's unlawful conduct enriches Twitter at Publishers' and their songwriters' expense and to the detriment of their copyrighted musical compositions. Twitter has rebuffed calls for it to obtain the licenses or other agreements needed for musical compositions to be lawfully used on its platform. Accordingly, Publishers have no choice but to file this lawsuit to stop Twitter's ongoing infringement of Publishers' rights and remedy the significant harm Twitter has caused, which will continue if left unremedied.

## JURISDICTION AND VENUE

12.     This is an action for copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq. This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1338.

13.     This Court has specific personal jurisdiction over Twitter pursuant to Tenn. Code Ann. § 20-2-214. Twitter knowingly and intentionally markets and supplies its services to persons in Tennessee and this District. Twitter has chosen to direct its infringing activities at Tennessee, including entering into agreements with users of the Twitter platform located in Tennessee, enabling and assisting residents of Tennessee to upload infringing audio and video to the Twitter platform, streaming infringing audio and audio-visual recordings (including recordings embodying

Case 3:23-cv-00606   Document 1   Filed 06/14/23   Page 6 of 54 PageID #: 6

Publishers' musical compositions) to residents of Tennessee, and engaging in other activities purposefully directed at Tennessee. The claims asserted herein arise from and relate to those activities and Twitter's contacts therefrom.

14. Twitter provides its highly interactive platform to individuals in Tennessee, including residents of this District. Residents of Tennessee visit Twitter's platform daily—directly, via web searches, and through other online means—and the voluminous acts of infringement for which Twitter is liable require a high degree of interaction between users' computers or other devices and the Twitter platform. Twitter's copyright infringement arises, in part, from accounts and users based in Tennessee. Indeed, while the majority of the accounts that make infringing uploads do not report the location of the account holder on their public-facing account profiles, those that do include accounts where the person is located in Tennessee. Twitter's internal records also reflect that users upload infringing content and receive streams of infringing content while located in Tennessee.

15. Twitter further targets Tennessee residents through its advertising and tracks users' locations including those located in Tennessee. Twitter explains that it "uses several signals—including IP address and GPS signal—for determining whether someone is in a particular geographic location."[1] Twitter's users see ads that vary depending on the user's location, including ads that Twitter chooses to target and specifically direct towards Tennessee residents.

16. Twitter's conduct complained of herein causes Publishers to suffer harm in Tennessee, with most of the Publishers having their principal place of business in Tennessee and/or offices, operations, staff, and songwriter-clients in Tennessee.

---

[1] https://business.twitter.com/en/help/campaign-setup/campaign-targeting/geo-gender-and-language-targeting.html.

17.     Venue is proper in this Court in accordance with 28 U.S.C. §§ 1391(b) and 1400(a) because a substantial portion of the events or omissions giving rise to the claims asserted herein, including those described above, occurred in Tennessee, and much of the harm caused by Twitter is felt in Tennessee.

## THE PARTIES

### A. *Publishers*

18.     The plaintiffs in this case are a group of 17 music publishers.  Several of the publishers have multiple affiliated entities that hold the rights to the copyrights at issue in this action, as organized below alphabetically.

### ABKCO Music

19.     Plaintiff ABKCO Music, Inc. ("ABKCO") is a New York corporation with its principal place of business in New York, New York.

20.     ABKCO is a leading independent music publisher.  Founded over 60 years ago, ABKCO holds rights in the catalogs of countless iconic songwriters, including Sam Cooke (for example, "Twistin' The Night Away," as recorded by Sam Cooke) and Mick Jagger/Keith Richards (for example, "Gimme Shelter," as recorded by the Rolling Stones), among many others. ABKCO has songwriter clients in Tennessee.

### Anthem Entertainment

21.     Plaintiff Anthem Entertainment L.P. ("Anthem") is an Ontario limited partnership with its principal place of business in Toronto, Ontario, Canada.

22.     Anthem is a leading, independent music publisher.  The Anthem music publishing catalog contains world-class songs spanning genres and decades, including works recorded and

performed by Taylor Swift, Beyonce, The Weeknd, RUSH, and many more. Anthem has an office in Nashville and songwriter clients in Tennessee.

**Big Machine Music**

23.     Plaintiff Big Machine Music, LLC ("Big Machine") is a Delaware limited liability company with its principal place of business in Nashville, Tennessee.

24.     Big Machine is a leading, independent music publisher based in Nashville. Founded in 2011 in Nashville, Tennessee, Big Machine catalogs include over 14,000 songs and dozens of #1 hits including numerous leading country artists and songwriters, such as Luke Combs and Brett Young. Big Machine has its headquarters in Nashville and songwriter clients in Tennessee.

**BMG Rights Management**

25.     Plaintiff BMG Rights Management (US) LLC ("BMG") is a Delaware limited liability company, with its principal place of business in New York, New York.

26.     BMG is one of the largest music publishers in the world. BMG is home to songwriters responsible for around one quarter of the songs on Spotify's "Billions Club," the playlist of more than 300 songs which have generated more than one billion plays each on the platform. Some of those hits include "Shape of You" (as recorded by Ed Sheeran) and "Uptown Funk" (as recorded by Bruno Mars). BMG has an office in Nashville and songwriter clients in Tennessee.

**Concord**

27.     Plaintiff Concord Music Group, Inc. ("Concord") is a Delaware corporation with its principal place of business in Nashville, Tennessee.

9

28.     Concord is a global, independent music publisher with rights in over 800,000 copyrighted musical works by some of the world's most celebrated songwriters, composers and lyricists, including, for example, "As It Was" (as recorded by Harry Styles), "First Class" (as recorded by Jack Harlow), and "Fly Over States" (as recorded by Jason Aldean).  Concord has its headquarters in Nashville and songwriter clients in Tennessee.

**Hipgnosis**

29.     Plaintiff Hipgnosis Songs Group, LLC is a Delaware limited liability company with its principal place of business in Encino, California.

30.     Plaintiff Hipgnosis SFH I Limited is a company organized under the laws of England and Wales.

31.     Plaintiff Big Family LLC is a Delaware limited liability company with its principal place of business in Encino, California.

32.     Plaintiffs Hipgnosis Songs Group, LLC, Hipgnosis SFH I Limited, and Big Family LLC are referred to herein collectively as "Hipgnosis."

33.     Hipgnosis is a leading, independent music publisher that holds rights in over one hundred thousand compositions, including "I'll Stand By You" (as recorded by the Pretenders), "The Best Is Yet To Come" (as recorded by Frank Sinatra), "Die A Happy Man" (as recorded by Thomas Rhett), and "Really Really" (as recorded by Kevin Gates.)  Hipgnosis has an office in Nashville and songwriter clients in Tennessee.

**Kobalt**

34.     Plaintiff Kobalt Music Publishing America, Inc. ("Kobalt") is a Delaware corporation with its principal place of business in New York, New York.

35.     Kobalt is a leading, independent music publisher that holds rights to an extensive roster of some of the most well-known songwriters and artists in the world, old and new.  Kobalt has an office in Nashville and songwriter clients in Tennessee.

**Mayimba**

36.     Plaintiff Mayimba Music, Inc. is a New York corporation, with its principal place of business in Pomona, New York.

37.     Plaintiff J&N Publishing, LLC is a Florida limited liability corporation with its principal place of business in Doral, Florida.

38.     Plaintiffs Mayimba Music, Inc. and J&N Publishing, LLC are referred to herein collectively as "Mayimba."

39.     Mayimba is a leading, independent music publisher that holds rights in Spanish-language songs, including "Inmortal" (as recorded by Romeo Santos and Aventura), "Canalla" (as recorded by Romeo Santos and El Chavel de le Bachata), and many other works recorded by Romeo Santos and other major artists in the Latin market such as Tego Calderon, Gilberto Santarosa, Tokischa to name a few.

**Peer**

40.     Plaintiff Peer International Corporation is a New Jersey corporation with its principal place of business in New York, New York.

41.     Plaintiff Peermusic, Ltd. is a New York corporation with its principal place of business in New York, New York.

42.     Plaintiff Peermusic III, Ltd. is a Delaware corporation with its principal place of business in New York, New York.

43.     Plaintiff Peertunes, Ltd. is a Delaware corporation with its principal place of business in New York, New York.

44.     Plaintiff Songs of Peer, Ltd. is a Delaware corporation with its principal place of business in New York, New York.

45.     Plaintiff Southern Music Publishing Co., Inc. is a New York corporation with its principal place of business in New York.

46.     Plaintiffs Peer International Corporation, Peermusic, Ltd., Peermusic III, Ltd., Peertunes, Ltd., Songs of Peer, Ltd. and Southern Music Publishing Co. are referred to herein collectively as "Peer."

47.     The Peer entities are part of peermusic, a leading independent music publisher. Founded over 95 years ago, peermusic holds exclusive rights to seminal classic works and contemporary works alike, including "Yummy" (as recorded by Justin Bieber), "Firework" (as recorded by Katy Perry), and "Mambo No. 5" (as recorded by Lou Bega). Peermusic has an office in Nashville and songwriter clients in Tennessee.

**Reservoir Media Management**

48.     Plaintiff Reservoir Media Management, Inc. ("Reservoir") is a Delaware corporation with its principal place of business in New York, New York.

49.     Reservoir is a leading, independent music publisher with a vast catalog that includes over 150,000 copyrights to famous musical works, including, for example, "Take Me Home, Country Roads" (as recorded by John Denver), "Cry Me a River" (as recorded by Justin Timberlake), and "Candy Shop" (as recorded by 50 Cent). Reservoir has an office in Nashville and songwriter clients in Tennessee.

**Sony Music Publishing**

50.     Plaintiff Sony Music Publishing (US) LLC is a Delaware limited liability company with its principal place of business in New York, New York.

51.     Plaintiff EMI April Music Inc. is a Connecticut corporation with its principal place of business in New York, New York.

52.     Plaintiff EMI Blackwood Music Inc. is a Connecticut corporation with its principal place of business in New York, New York.

53.     Plaintiff EMI Consortium Songs, Inc. d/b/a EMI Longitude Music is a New York corporation with its principal place of business in New York, New York.

54.     Plaintiff EMI Entertainment World Inc. d/b/a EMI Foray Music, d/b/a EMI Pop Music Publishing, and d/b/a EMI Pop Music Publishing Inc. is a Delaware corporation with its principal place of business in New York, New York.

55.     Plaintiff EMI Mills Music Inc. is a Delaware corporation with its principal place of business in New York, New York.

56.     Plaintiff EMI U Catalog Inc. is a New York corporation with its principal place of business in New York, New York.

57.     Plaintiff Famous Music LLC is a Delaware limited liability company with its principal place of business in New York, New York.

58.     Plaintiff Jobete Music Co., Inc. is a Michigan corporation with its principal place of business in New York, New York.

59.     Plaintiff Stone Agate Music is a division of Jobete Music Co., Inc.

60.     Plaintiff Stone Diamond Music Corp. is a Michigan corporation with its principal place of business in New York, New York.

61.     Plaintiffs Sony Music Publishing (US) LLC, EMI April Music Inc., EMI Blackwood Music Inc., EMI Consortium Songs, Inc. d/b/a EMI Longitude Music, EMI Entertainment World Inc. d/b/a EMI Foray Music, d/b/a EMI Pop Music Publishing, and d/b/a EMI Pop Music Publishing, Inc., EMI Mills Music Inc., EMI U Catalog Inc., Famous Music LLC, Jobete Music Co. Inc., Stone Agate Music, and Stone Diamond Music Corp. are referred to herein collectively as "Sony Music Publishing."

62.     Sony Music Publishing is one of the largest music publishers in the world, and home to some of the world's best songwriters including Motown, Ed Sheeran, Beyoncé, Lady Gaga, Gabby Barrett, Jay-Z, Miranda Lambert, Pharrell Williams, Rihanna, Sean "Love" Combs, Travis Scott and many more.  Sony Music Publishing has an office in Nashville and has songwriter clients in Tennessee.

**Spirit Music Group**

63.     Plaintiff Lyric Copyright Services, LP, publicly known as Spirit Music ("Spirit") is a Delaware corporation with its principal place of business in New York, New York.

64.     Spirit is a leading, independent music publisher with a deep catalog spanning seven decades and every musical genre, including "Holiday" (as recorded by Madonna), "Africa" (as recorded by Toto), and "Livin' La Vida Loca" (as recorded by Ricky Martin).  Spirit has an office in Nashville and songwriter clients in Tennessee.

**The Royalty Network**

65.     Plaintiff The Royalty Network, Inc. ("Royalty Network") is a New York corporation with its principal place of business in New York, New York.

66.     Royalty Network is a leading independent music publisher representing over 700,000 compositions.  Royalty Network's catalog includes some of the most prolific songwriters,

producers, and artists across a multitude of genres. Royalty Network has songwriter clients in Tennessee.

**Ultra Music Publishing**

67.     Plaintiff Ultra International Music Publishing, LLC ("Ultra") is a New York limited liability company with its principal place of business in New York, New York.

68.     Ultra is a leading, independent music publisher that holds rights to songs performed by Post Malone, Katy Perry, Rihanna, Drake and several others. Ultra has songwriter clients in Tennessee.

**Universal Music Publishing Group**

69.     Plaintiff Universal Music Corp. d/b/a 360 Music, d/b/a Universal Music Works is a Delaware corporation with its principal place of business in Santa Monica, California.

70.     Plaintiff Songs of Universal, Inc. d/b/a Universal Music Works, d/b/a Universal Tunes is a California corporation with its principal place of business in Santa Monica, California.

71.     Plaintiff Universal Music – MGB NA LLC d/b/a Universal Music Careers, d/b/a Universal Music – MGB Songs, d/b/a Universal Music Rights is a California limited liability company with its principal place of business in Santa Monica, California.

72.     Plaintiff Polygram Publishing, Inc. is a Delaware corporation with its principal place of business in Santa Monica, California.

73.     Plaintiff Universal Music – Z Tunes LLC d/b/a Universal Music – Z Songs, d/b/a Universal Music – Z Melodies is a New York limited liability company with its principal place of business in Santa Monica, California.

74.     Plaintiff Universal Musica, Inc. d/b/a Universal Music Works, d/b/a Universal Musica Unica is a Florida corporation with its principal place of business in Santa Monica, California.

75.     Plaintiffs Universal Music Corp. d/b/a 360 Music, d/b/a Universal Music Works, Songs of Universal Inc. d/b/a Universal Music Works, d/b/a Universal Tunes, Universal Music – MGB NA LLC d/b/a Universal Music Careers, d/b/a Universal Music – MGB Songs, d/b/a Universal Music Rights, Polygram Publishing, Inc., Universal Music – Z Tunes LLC, d/b/a Universal Music – Z Songs, d/b/a Universal Music – Z Melodies, and Universal Musica, Inc., d/b/a Universal Music Works, d/b/a Universal Musica Unica are referred to herein collectively as "Universal."

76.     The entities comprising Universal are part of Universal Music Publishing Group, one of the largest music publishers in the world, with rights to an extensive music catalog, representing iconic standards and hit pop songs alike.  Universal Music Publishing Group has an office in Nashville and songwriter clients in Tennessee.

**Warner Chappell**

77.     Plaintiff Gene Autry's Western Music Publishing Co. is a California corporation with its principal place of business in Los Angeles, California.

78.     Plaintiff Rick's Music Inc. is a Delaware corporation with its principal place of business in Los Angeles, California.

79.      Plaintiff Unichappell Music Inc. is a Delaware corporation with its principal place of business in Los Angeles, California.

80.     Plaintiff W Chappell Music Corp. is a California corporation with its principal place of business in Los Angeles, California that also does business as WC Music Corp.

81.     Plaintiff W.C.M. Music Corp. is a Delaware corporation with its principal place of business in Los Angeles, California.

82.      Plaintiff Warner Chappell Music, Inc. is a Delaware corporation with its principal place of business in Los Angeles, California that also does business as Chappell & Co., Inc. and Warner Geometric Music.

83.     Plaintiff Warner-Tamerlane Publishing Corp. is a California corporation with its principal place of business in Los Angeles, California.

84.     Plaintiffs Gene Autry's Western Music Publishing Co., Rick's Music Inc., Unichappell Music Inc., W Chappell Music Corp. d/b/a WC Music Corp., W.C.M. Music Corp., Warner Chappell Music, Inc. d/b/a Chappell & Co., Inc. and d/b/a Warner Geometric Music, and Warner-Tamerlane Publishing Corp. are referred to herein collectively as "Warner Chappell."

85.     The entities comprising Warner Chappell are global music publishing companies within the Warner Music Group and are home to some of the most well-known songwriters spanning all genres, including Lizzo, Katy Perry, the Grateful Dead, Led Zeppelin, Madonna, David Bowie, Van Morrison, and Curtis Mayfield.  Warner Chappell has an office in Nashville and songwriter clients in Tennessee.

**Wixen**

86.     Plaintiff Wixen Music Publishing, Inc. ("Wixen") is a California corporation with its principal place of business in Calabasas, California.

87.     Wixen is a leading, independent music publisher that represents some of the finest songwriters and songs including Janis Joplin, Missy Elliott, Al Green, Sonny and Cher, Tom Petty, The Black Keys, Weezer, and the Doors.  Wixen has songwriter clients in Tennessee.

**B.** *Twitter*

88.    Defendant X Corp., d/b/a Twitter is a corporation organized under the laws of Nevada with its principal place of business in San Francisco, California.

89.    On or about March 15, 2023, Twitter, Inc. merged with X Corp., whereby X Corp. fully acquired Twitter, Inc.  X Corp., a privately held corporation, whose parent company is X Holdings Corp., is the successor in interest to Twitter, Inc. and the owner and operator of the Twitter platform.  X Corp. has successor liability for Twitter, Inc.'s unlawful acts.  Elon Musk controls X Corp. as its president, secretary, treasurer, and director.

## PUBLISHERS AND THEIR COPYRIGHTS

90.    Music publishers, including the plaintiffs in suit, engage in the business of fostering the creation and lawful exploitation of musical compositions.  These are the songs that the world listens to, that artists perform, and that are embodied in musical sound recordings that are streamed, downloaded, and played in any environment or format, including video.

91.    It takes talent, effort, grit, passion, resources, and perseverance to create the copyrighted songs that Twitter infringes.  Music publishers and songwriters rely upon our nation's copyright laws to protect their musical compositions from infringement and to incentivize and afford songwriters the opportunity to earn a living, focus on their craft, and enrich the world with new music.

92.    Publishers' financial incentives to invest in songwriters and the creation and promotion of their musical compositions flow directly from the protections afforded by copyright.  Copyright protection is what enables music publishers to invest substantial money, time, effort, and talent to develop, promote, publish, administer, acquire, license, and otherwise exploit the copyrights in the musical compositions written by the songwriters they represent.

Case 3:23-cv-00606   Document 1   Filed 06/14/23   Page 18 of 54 PageID #: 18

93. Publishers own and/or control in whole or in part the exclusive rights to millions of musical compositions, including the compositions listed on **Exhibit A**, which is an illustrative and non-exhaustive list of the musical compositions that Twitter infringed. Publishers own or exclusively license the copyrights in and to these works in a variety of ways, including pursuant to an agreement with either the songwriter(s) or a predecessor publisher. All the musical compositions listed on **Exhibit A** have been registered with the U.S. Copyright Office. The copyrights in the musical compositions set forth in **Exhibit A** remain valid and subsisting and have been owned and/or controlled by Publishers at all times relevant to the allegations in this Complaint.

94. Each of the Publishers owns and/or exclusively controls rights set forth in 17 U.S.C. § 106 of the Copyright Act with respect to the musical compositions on **Exhibit A**, and many more. Anyone who wants to use the musical compositions owned and/or controlled by Publishers must comply with copyright law by obtaining necessary licenses, such as a mechanical license to reproduce and distribute the musical works, a synchronization license to use musical works in connection with visual images (such as video), and/or a performance license to publicly perform these musical works.

95. Each of the rights under the Copyright Act—including to reproduce the work, prepare derivative works, distribute copies to the public, and perform the work publicly—is a separate right within the bundle of rights that a copyright owner (or holder of an exclusive license) may choose to exploit. These exclusive rights are reserved under copyright law for those that own or control the exclusive rights, and Twitter is not authorized to appropriate them to suit its business model.

96.     Publishers depend on licensing and otherwise exploiting these rights, among others, to earn revenue from their catalogs of musical compositions to ensure that the songwriters they represent are fairly compensated for the use of their songs.

97.     Publishers enter into licenses and agreements for the public performance, reproduction, synchronization, and/or distribution of musical compositions in their catalogs, collect the income arising from such transactions, and pay the songwriters their applicable share of the income. Those songwriters, in turn, rely on that income to support their livelihood so that they can continue to create new songs.

98.     Music publishers have embraced the shift to digital commerce and correspondingly provide their songs and catalogs across an ever-evolving variety of formats, distribution, and access models.

99.     Licensing and agreements for the use of musical compositions—including for use in internet-based media—is a substantial revenue source for music publishers, including Publishers, and a fundamental means by which songwriters earn a living.

100.    Publishers license their musical compositions for use in audio-visual works including film, video games, and television.

101.    Publishers have worked with multiple social media companies to pioneer innovative and highly successful frameworks for social media patrons to make lawful use of Publishers' songs on those platforms. Publishers have entered into agreements with social media companies covering use of Publishers' musical compositions on platforms with which Twitter competes, including, among others, TikTok, Facebook, Instagram, YouTube, and Snapchat.

102.    Publishers, individually and via the Mechanical Licensing Collective ("MLC"), license mechanical rights to numerous digital music streaming platforms, including Spotify,

Apple, Google, and Amazon, among others, so that music fans can listen to recordings of millions of songs and the musical compositions embodied therein.

## TWITTER AND ITS INFRINGING CONDUCT

### A. *The Twitter Platform Generally*

103.     The Twitter platform is directed at and accessible throughout Tennessee and the United States more generally.  The Twitter platform is a highly interactive, internet-based social media service.  Users post various forms of content on the Twitter platform in the form of short public entries known as "tweets."  Tweets can contain photos, videos, audio, links, and text.  Users of the Twitter platform, in Tennessee and elsewhere, then engage with and react to tweets, including by "retweeting" (reposting), "liking" (tapping to indicate a positive reaction), and replying to them.  Other forms of engagement include viewing a video attached to a tweet, enlarging an attached image, or following a link included in the text of a tweet.  Twitter tracks all these forms of engagement.

104.     The Twitter platform is very easy to use, both for users who post content and for those who consume and react to content.

105.     To post tweets on the Twitter platform, a user must register with Twitter via its website or App.  Basic accounts are free, requiring only that the user provide Twitter with a name and either an email address or telephone number.

106.     Each tweet generally is limited to 280 characters or less of text.  A user can include a static image, an animated image in a format such as Graphics Interchange Format (GIF), or a video (including audio) in a tweet.  Audio-visual content posted in a tweet may generally be up to two minutes and 20 seconds in length.  However, tweets and videos can be longer if the user has a paid subscription with Twitter.

107.    A tweet resides on its own page, with its own unique URL, on the Twitter platform. A user with an account has a profile page on the Twitter platform, which provides access to the user's tweets. Twitter also indexes a user's profile and tweets such that they can be found through a search interface on the Twitter platform. Because Twitter publishes tweets on web pages, they also are discoverable through web search engines such as Google. Tweets can be shared via text or email, and embedded into another website or app, via hyperlink.

108.    Users who have Twitter accounts receive tweets via various feeds on the Twitter platform. In one feed, called the "For you" timeline, Twitter provides a user with tweets that Twitter selects for the user from various sources. Twitter's methods for selecting tweets for the "For you" timeline is a function of Twitter's choices as it maintains and operates its platform. These methods have included: (1) tweets from accounts that the user follows; (2) certain tweets within "Topics" that the user follows; and (3) certain tweets within "Topics" that Twitter recommends to the user. When Twitter identifies a tweet, an account to follow, or other content that is popular or relevant, Twitter may proactively add it to a user's "For you" timeline. In another feed, referred to as a user's "Following" timeline, Twitter provides tweets from only the accounts that the user follows. "Following" someone on the Twitter platform means that one user has chosen to receive another user's tweets in their feed.

109.    Twitter uses "Topics" to personalize a user's experience and show them tweets and advertisements that Twitter believes fit the user's interests on the Twitter platform without the user having to follow individual accounts. Topics are categories and subcategories that Twitter creates across various subjects. Twitter then finds tweets relating to those subjects to display to relevant users.

110.    Users of Twitter's platform can include hashtags in their tweets. A hashtag includes a "#" symbol followed by a word or words regarding the content of the tweet. Twitter can categorize users' tweets using the content of the tweet and hashtags included by the user.

111.    Twitter uses its understanding of the content of tweets to recommend tweets to users of its platform. Twitter also uses hashtags and categorizations to populate the "Trending" (or "What's Happening") section of the Twitter platform, which displays popular hashtags and Topics that users are posting about. Twitter facilitates users' discovery of tweets, including tweets regarding musical artists or songs, by allowing users to search according to hashtags or Topics that interest them.

112.    Twitter facilitates users' viewing of videos through the "Media" tab that appears on all users' profile pages on the Twitter platform. The Media tab presents all tweets by the user that include attached media such as images or videos. This allows users to find and engage with a particular user's videos, including videos containing selected musical artists or songs, more quickly and easily.

113.    Certain users of the Twitter platform have a blue checkmark next to their profile name, indicating that the user is "verified." The process of verification and thus the meaning of the checkmark have been subject to substantial change in recent months. For many years, a verified user meant that Twitter confirmed the user's identity. Verification was reserved for notable persons or organizations and aided users in identifying the "real" account of the individual or organization among potential "fake" ones. However, Twitter verified users at its sole discretion, and typically would verify only those users that it wanted to encourage to use the Twitter platform, such as celebrities, athletes, journalists, entertainers, organizations, and influencers who have large followings and would draw others to the Twitter platform. Twitter values these verified accounts

more than unverified accounts because they are more monetizable. In recent months, Twitter has included verification as one of the features of its "Twitter Blue" paid service to which any user may subscribe for a monthly fee.

114. When a user wishes to view tweets that include an attached video, and the video plays, Twitter streams the audiovisual content of the video from servers that Twitter owns or controls to the device with which the user is accessing the Twitter platform.

115. Twitter's streaming activity, including when Twitter streams Publishers' copyrighted musical compositions, is not merely the result of automated activity that occurs as a result of how Twitter designed its platform. Rather, Twitter's streaming activity results from daily acts and decisions by Twitter employees. Twitter has knowledge, visibility, and real-time control over its streaming activity that it uses to make configuration changes, optimize performance, and tap into interactive analytics. In the normal course, a technical operations group at Twitter uses such features and functions to monitor and control performance of video delivery. Twitter also has visibility into the performance of its different algorithms that govern what tweets appear where, who sees them, and how Twitter engages users and keeps them on the Twitter platform. In the normal course, Twitter employees monitor the operation of the algorithms and make changes or adjustments to further Twitter's business.

116. Twitter is not content neutral. Through regular acts and decisions by Twitter employees, Twitter designs, operates, maintains, and adjusts its algorithms to implement and advance Twitter's business model. Twitter advances its business model by selecting and promoting tweets that include video, including those containing recordings embodying Publishers' songs.

**B.** *Music Fuels Twitter's Business Model*

117.    The Twitter platform was created in 2006 as a website for short, text-only tweets. After experiencing explosive growth, Twitter had its initial public offering in 2013 and was publicly traded until it was acquired by Elon Musk in 2022. Twitter has been privately held since Mr. Musk acquired it.

118.    To attract more users, compete with other social media platforms, and grow its business, Twitter expanded its platform from a text-only social media site to one that encourages users to upload, share, and engage with images and audiovisual content.

119.    Twitter's business model depends upon attracting users to create and maintain accounts, to post and receive tweets, and to engage with the content on the Twitter platform. Tweets also attract viewers who may not hold an account to the Twitter platform.

120.    Core metrics relevant to Twitter's valuation and revenues include the number of tweets, account holders, and non-registered users. The amount of time users spend on the Twitter platform is another core metric for Twitter's corporate valuation and revenues.

121.    Historically, most of Twitter's revenue came from the sale of advertising. In 2021, its advertising revenue totaled $4.51 billion, an increase of 40% compared to 2020; its data licensing and other revenue totaled $571.8 million, an increase of 12% compared to 2020.

122.    Twitter's data partner customers purchase licenses to access, search, and analyze historical and real-time tweets, including infringing tweets.

123.    Twitter courts paying advertisers with a variety of options. Notably, advertisers pay Twitter to reach their desired audience of Twitter users via promoted tweets, promoted accounts, and promoted trends. Twitter's value proposition for selling this advertising rests upon its count of daily active users on the Twitter platform, along with the locations, interests, and other

demographics of its user base. Twitter's Terms of Service require every Twitter account holder to "agree that [Twitter] and [its] third-party providers and partners may place advertising on the [Twitter platform] or in connection with the display of Content or information from the [Twitter platform] whether submitted by [the account holder] or others."

124. Twitter provides geo-targeting options to help advertisers reach their desired audience of Twitter users. The following are screenshots from the Twitter platform on June 12, 2023 (emphasis added in red). They depict how an advertiser can target their advertisement to Twitter users in a particular geography, shown below for Nashville and an even more targeted area around this Court.



125. More recently, Twitter has aimed to increase subscription-based revenue and decrease its reliance on advertising. A "Twitter Blue" paid subscription currently costs between $8 to $11 per month, or $84 to $114.99 per year, for users in the United States.[2] In addition to adding a blue checkmark to the subscriber's account, the subscription includes features that are not accessible to those with a free account. For instance, these paid subscribers can post longer tweets

---

[2] https://help.twitter.com/en/using-twitter/twitter-blue#tbcost.

(up to 10,000 characters), upload longer videos (up to about two hours), and receive boosted attention for their tweets.

126.    Videos with music, including infringing copies of Publishers' songs, attract and retain account holders and viewers, and grow the body of engaging tweets on the Twitter platform. Twitter then monetizes those tweets and users via advertising, subscriptions, and data licensing, all of which serve to increase Twitter's valuation and revenues.

127.    The screenshot below illustrates Twitter's monetization of infringing content. This infringing tweet is from a known repeat infringer who has been the subject of at least nine infringement notices to Twitter, identifying at least fourteen infringing tweets, which contained unauthorized copies of Publishers' musical compositions. Directly below the infringing tweet is a paid "Promoted" tweet selected by Twitter. To the right of the infringing tweet is a paid "Promoted" account recommended by Twitter. Twitter's account recommendations also include another known repeat infringer, Twitter Account A, identified in paragraph 166 below.[3]

---

[3] Identifying information for Twitter accounts is redacted.



128.    Twitter has been outspoken about how important music is to Twitter and users of
its platform.  In its marketing, blogs, or tweets, Twitter stated:

        a.    "[M]usic is the largest community" on Twitter's platform, where "people
are more likely to follow a music-related account than any other type of account on
Twitter."

        b.    The Twitter platform is "the ultimate connection to the music world for fans
and brands."

        c.    "Every day, more than 30 million tweets are published about music around
the world . . . [which is] more than 20,000 every minute."

Twitter even has its own "@TwitterMusic" account on its platform dedicated to top music trends, which has a massive following of 11.5 million users.

129.    Video sharing is also key for Twitter to attract and retain users to its platform. Video content on the Twitter platform is more attractive when it contains music, including infringing copies of Publishers' copyrighted musical compositions.

130.    In its blogs or marketing, Twitter stated:

      a.    Video "drives high levels of engagement. That's why we've seen video take off on the platform".

      b.    Tweets with video "attract 10x more engagements than Tweets without video."

      c.    "[O]n Twitter, 82% of users watch video content."

      d.    "Videos are six times more likely to be Retweeted than photos and three times more likely than GIFs."

131.    Twitter encourages users to upload videos directly to the Twitter platform instead of directing viewers away through an external link because, according to Twitter, "the more screentime users spend looking at a post … the more it is boosted," and "way more time is spent watching a video than clicking on a link."  Because boosted tweets are displayed to more users and are therefore more likely to "go viral," *i.e.*, become extremely popular and be shared by large number of people on the Twitter platform, this arrangement encourages any user who wants more engagement with their tweets to post videos directly to the Twitter platform.

132.    The availability of videos with music, including copies of Publishers' musical compositions, furthers Twitter's financial interests both because it drives user engagement, and thus advertising revenue, and because Twitter does not pay fees to license musical compositions

from Publishers and other music rights holders. Indeed, providing free, unlicensed music gives the Twitter platform an unfair advantage over competing platforms, such as TikTok, Facebook, Instagram, You Tube, Snapchat, and others. The entities operating those competing platforms all pay fees to Publishers and other rights holders for the use of musical compositions on those platforms.

133. Twitter's filings with the U.S. Securities and Exchange Commission specifically indicate that the platforms it competes with "for people's attention and for advertisers' budgets" include Facebook, Instagram, YouTube, Snapchat, and other social media companies. In fact, Mr. Musk recently asserted that "a ban [of TikTok] would benefit Twitter because it may mean more people spending time on [Twitter]."

C. *The Proliferation of Infringing Music on Twitter*

134. To advance its interests, Twitter has made the process of uploading infringing music to its platform extremely easy for users, requiring only a few clicks.

135. When a user uploads a video file containing music, the file and an initial copy is created on a server Twitter owns or controls. Twitter then copies that initial copy into additional formats and to additional Twitter servers in various locations, as well as streams the uploaded video to users.

136. Publishers have not authorized Twitter or users of the Twitter platform to copy, distribute, or publicly perform Publishers' musical compositions at issue in this litigation on the Twitter platform. Likewise, Publishers have not authorized Twitter or users of its platform to synchronize a copy of these compositions in timed relation to video and upload the synchronized video to the Twitter platform. Nonetheless, as Twitter is well-aware, countless audiovisual files

containing Publishers' musical compositions have been and continue to be uploaded and exploited on Twitter's platform.

137.    The tweets at issue in this case containing Publishers' copyrighted music are the kind of quintessential infringement that the Copyright Act strictly forbids.  The obvious and overwhelming purpose for using Publishers' musical compositions on Twitter's platform is to maximize views, make users' posts more compelling, and use the musical compositions for the same purpose for which they were created, not to engage in political or newsworthy speech, or commentary or criticism.

138.    For example, the screenshot below shows a tweet with a video that includes one of the infringed works in this litigation, "Umbrella" (as recorded by Rihanna).  The tweet, which simply states, "15 years ago, rihanna [sic] released 'umbrella' [sic]", contains over two minutes of the official music video for Rihanna's performance of "Umbrella."  The infringing tweet garnered over 221,000 views and nearly 15k "likes."



139. The uses at issue in this case circumvent, undermine, and thus harm, existing markets for Publishers' musical compositions.

**D. *Twitter's Failure to Address Known Infringers and Infringements***

140. Twitter is fully aware of the infringing activity at issue in this litigation, and it has not obtained any licenses or other agreements necessary for Publishers' musical compositions to be lawfully used on its platform. Consequently, the NMPA, acting on behalf of Publishers, began sending formal infringement notices to Twitter on a weekly basis beginning in December 2021 (the "NMPA Notices"). Through the NMPA Notices, Publishers notified Twitter of over 300,000 infringing tweets, in the aggregate.

141. Each NMPA Notice contained thousands of links to specific tweets that include unauthorized copies of Publishers' musical compositions. The infringing material identified in the NMPA Notices generally consisted of unauthorized copies of the official artist music videos, videos with unauthorized recordings of live performances, and/or other video content that was synchronized to Publishers' musical compositions without authorization.

142. Each NMPA Notice sent to Twitter contained (among other things): an electronic signature of a person authorized to act on behalf of Publishers; identification of the infringed musical compositions; contact information for Publishers' representative; a statement that the use of the compositions is not authorized by the associated Publisher; a statement that the information in the notice is accurate and a statement under penalty of perjury that Publishers' representative is authorized to act on behalf of Publishers; and identification of the infringing material in the form of links to specific tweets containing the unauthorized use of Publishers' copyrighted compositions. On an infringement-by-infringement basis, each NMPA Notice provided

information that included the name of the infringed musical composition, the Publisher, and the URL for the tweets containing the infringing material.

143. The infringing tweets listed in the NMPA Notices are just the "tip of the iceberg" in terms of the overall infringement of Publishers' copyrighted works on the Twitter platform. Moreover, the plaintiffs in this case are not the only copyright holders whose works have been and are being exploited without authorization on Twitter. Twitter has received hundreds of thousands of notices or more per year from other copyright holders, including from others who hold rights in musical compositions and from those who hold rights in sound recordings.

144. Through its receipt of these notices, Twitter knows that there is rampant, unauthorized use of music, including Publishers' musical compositions, across its platform. And, of course, the infringing content is readily apparent to Twitter as it reviews and maintains its platform.

145. Twitter tells the world that it respects rightsholders and acts expeditiously to remove unauthorized uses of copyrighted works. For example, Twitter claims that it "unequivocally opposes copyright infringement and has invested in tools to assist rightsholders' content protection efforts." L. Culbertson, Letter to U.S. Representatives (Aug. 27, 2021). Twitter further claims that it "[e]xpeditiously remov[es] content in response to valid claims, nearly always within hours of initial reports, if not in minutes." *Id*.

146. But the reality is that Twitter routinely ignores known repeat infringers and known infringements, refusing to take simple steps that are available to Twitter to stop these specific instances of infringement of which it is aware. Indeed, all the musical compositions listed on **Exhibit A** appeared in NMPA Notices after the specific users who uploaded those works had already been identified to Twitter in multiple earlier NMPA Notices. Moreover, **Exhibit A**

includes many musical compositions that were identified to Twitter in NMPA Notices, but as to which Twitter did not expeditiously remove or disable access.

### 1. Twitter Delayed or Failed to Take Down Specific Infringing Material

147. Twitter's policies and its response to the NMPA Notices make clear that Twitter does not take its legal obligations with respect to copyright infringement seriously.

148. Twitter's policies demonstrate that Twitter views itself, not the law, as the arbiter of what content is permitted on the Twitter platform. Twitter makes case-by-case determinations as to whether to remove content from the Twitter platform in response to a copyright infringement notice. For example, Twitter's "Copyright policy" speaks in the conditional, advising, "*[i]f we decide* to remove or disable access to the material."[4] (Emphasis added.)

149. Despite claiming to take down tweets in response to an infringement notice within hours or minutes, Twitter routinely waits much longer before acting, if it acts at all. Indeed, from the time Twitter received the NMPA Notices, Twitter often waited *weeks, a month, or even longer* before removing or disabling access to the noticed infringement in the NMPA Notices. There are *thousands of instances* where Twitter waited 30 days or more to remove or disable access to the content identified in the NMPA Notices.

150. The precise extent of Twitter's lengthy delays will be the subject of discovery and analysis, including through a review of Twitter's records. In the meantime, by way of an example, the musical composition "What a Wonderful World," written by Bob Thiele and George David Weiss and performed by Louis Armstrong, is a timeless classic, chosen by *Rolling Stone* in September 2021 as one of the top 200 songs of all time. Unauthorized audio and audio-visual recordings that embody "What a Wonderful World" are rampant on the Twitter platform, and

---

[4] https://help.twitter.com/en/rules-and-policies/copyright-policy.

Twitter has failed repeatedly to take them down in an expeditious manner. Across all the NMPA Notices sent to Twitter that identified the musical composition for "What a Wonderful World" by name, along with precise URLs for the tweets containing the infringing uses of that composition, Twitter failed to take down at least 240 infringing tweets incorporating "What a Wonderful World" within 14 days after the NMPA Notice was sent. Even more troubling, over 120 of those tweets were still available at least a month after the associated NMPA notice was sent to Twitter, and more than two dozen tweets were still available on Twitter over two months after NMPA sent a notice identifying them as infringing.

151. Twitter's incentive not to act expeditiously is clear. Twitter wants to maximize the benefit it receives from the infringing content on its platform before the tweet is deleted. As a general proposition, the value to Twitter of a tweet decreases over time.

152. Many times, Twitter also failed entirely to take down infringing content identified in the NMPA Notices. Since December 2021, there have been *thousands of instances* of infringing tweets identified in NMPA Notices for which Twitter has *failed entirely to remove, or disable access to*, the infringing material. In none of these thousands of examples that Publishers are relying on herein did the Twitter user who posted the infringing material submit a counter-notice.

153. The precise extent of Twitter's refusals to takedown specific infringing material of which it was aware will be the subject of discovery and analysis, including through a review of Twitter's records. In the meantime, by way of an example, infringement of the composition "Heat Waves," written by Dave Bayley and recorded by Glass Animals, is rampant on Twitter. "Heat Waves" is one of the most popular compositions of the past few years. The recording spent an astounding ninety-one weeks on the Billboard Hot 100, peaking at number one, a position it held for five weeks. Twitter's efforts to stop or limit the infringement of "Heat Waves" in response to

the NMPA Notices have been abysmal. Twitter has failed to remove at least 95 separate infringing tweets featuring "Heat Waves" that were specifically identified in NMPA Notices, along with the URLs as to their location on Twitter's platform. These notices date back over a year, with the oldest sent on March 7, 2022, over 450 days ago.

### 2. Twitter Failed to Implement a Policy to Terminate Repeat Infringers

154.    Twitter has not adopted, reasonably implemented, nor informed subscribers or account holders of, a policy to terminate users engaging in repeated acts of copyright infringement.

155.    In Twitter's Copyright policy, Twitter addresses issues concerning copyright complaints, including what happens to accounts that receive one or more copyright complaints. From 2019 through to today, Twitter's Copyright policy has <u>not</u> included a warning to users that they may be "terminated" for repeat copyright infringement.

156.    Notably, prior to 2019, Twitter's Copyright policy included language advising users that their account could be terminated if that account was repeatedly used to infringe. Twitter's Copyright policy as it existed in December 2017 included language that informed subscribers and account holders that "[u]nder appropriate circumstances, Twitter may suspend and warn repeat violators, and in more serious cases, permanently terminate user accounts."[5] That same language remained in place through roughly August 2, 2018.[6]

157.    In August 2018, however, Twitter revised its Copyright policy to warn only of suspension for copyright infringement, removing the reference to the word "terminate." Twitter's Copyright policy as it existed beginning on or about August 9, 2018 informed subscribers and

---

[5] https://web.archive.org/web/20171222023438/https://help.twitter.com/en/rules-and-policies/copyright-policy.
[6] https://web.archive.org/web/20180802202225/https://help.twitter.com/en/rules-and-policies/copyright-policy.

account holders that "[i]f multiple copyright complaints are received Twitter may lock accounts or take other actions to warn repeat violators. These warnings may vary across Twitter's services. Under appropriate circumstances we may suspend user accounts under our repeat infringer policy."[7]

158. Since August 2018, Twitter's Copyright policy has not included the words "terminate" or "termination" when informing subscribers and account holders of the potential consequences for repeat infringement.[8] Instead, Twitter's Copyright policy refers only to suspensions.

159. Where Twitter suspends an account for receiving multiple copyright infringement complaints, that does not mean that Twitter has permanently ended or discontinued the account. Access to the accounts is merely interrupted temporarily. Over the past several years, Twitter routinely restores access to accounts it suspends for receiving multiple copyright infringement complaints. Twitter also informed its users early this year that "we have been proactively reinstating previously suspended accounts," and that "anyone can request that we review a suspended account for reinstatement."

160. Twitter rarely suspends an infringing account, even when the account is repeatedly the subject of infringement notices.

161. Twitter has suspended only a small portion of the accounts identified in multiple NMPA Notices.

162. Twitter suspended virtually none of the verified accounts identified in the NMPA Notices and which have large follower bases. Twitter gives them preferential treatment, viewing

---

[7] https://web.archive.org/web/20180809020739/https://help.twitter.com/en/rules-and-policies/copyright-policy.
[8] https://help.twitter.com/en/rules-and-policies/copyright-policy.

accounts that are verified and have large follower bases as more valuable and monetizable than accounts that are unverified and have a small number of followers.

163.    Twitter has told users of its platform that "[w]e don't suspend users for posting reported content unless it is clear that the user knew the content was illegal."[9]  But Twitter's practice is unreasonable and contrary to law.  Infringement occurs as a matter of law.  Direct infringement is a strict liability offense, without any requirement that the infringer know the content they post is illegal.

164.    Even on the rare occasions where Twitter suspends an account used to infringe repeatedly, Twitter often reactivates that account after a short period of time.  Twitter has suspended and reactivated certain accounts multiple times.  When deciding to reactivate a suspended account of a user caught repeatedly infringing the copyrights of others, Twitter gives more lenient treatment to accounts with larger followings, as such accounts are more valuable to Twitter.

165.    Put simply, users who repeatedly infringe copyrights do not face a realistic prospect of permanently losing access to their accounts on the Twitter platform.  Rather than terminating access to specific users brought to its attention as infringers, which would have stopped or limited their infringement and deterred others from infringing, Twitter has operated its platform to be a haven for infringing activity.  Twitter has consistently assisted the specific users of its platform that Twitter knows are using it for infringement to continue to infringe.

---

[9] https://twitter.com/ellagirwin/status/1619740623564832768?lang=en.

166.    The following are but a handful of examples from the *thousands of repeat-infringer accounts* listed in the NMPA Notices. Twitter has failed to take reasonable steps to limit these accounts, and many other accounts, from being used for ongoing, repeated infringement.[10]

- Twitter Account A is an account created in 2009. Twitter Account A regularly posts unauthorized copies of Publishers' musical compositions synchronized to videos. Because of this repeated infringing conduct, Twitter Account A has been the subject of at least 24 separate NMPA Notices identifying at least 37 infringing tweets. Twitter Account A never served a counter-notification relating to these NMPA Notices and it remains active as of the filing of this Complaint.

- Twitter Account B is an account created in 2011. Twitter Account B regularly posts unauthorized recordings of live performances of Publishers' musical compositions and other videos synchronized to Publishers' musical compositions. Because of this repeated infringing conduct, Twitter Account B has been the subject of at least 23 NMPA Notices identifying at least 64 infringing tweets. Twitter Account B never served a counter-notification relating to these NMPA Notices and it remains active as of the filing of this Complaint.

- Twitter Account C is an account created in 2007. Twitter Account C regularly posts unauthorized reproductions of Publishers' musical compositions synchronized to videos. Because of this repeated infringing conduct, Twitter Account C has been the subject of at least 23 separate NMPA Notices identifying at least 39 infringing tweets. Twitter Account

---

[10] The names of the accounts have been anonymized in this publicly filed complaint, but Twitter is aware of these accounts from the NMPA Notices.

C never served a counter-notification relating to these NMPA Notices and it remains active as of the filing of this Complaint.

167.    Notwithstanding the NMPA Notices, Twitter continues to monetize the accounts of known repeat infringers. The screenshot below is but one example, showing a tweet from known repeat infringer Twitter Account B in the bottom left. Directly above Twitter Account B's tweet is a paid "Promoted" tweet selected by Twitter. Directly to the right of Twitter Account B's tweet is a paid "Promoted" account recommended by Twitter. Twitter continues to reap revenue from advertisements associated with tweets from known repeat infringers.



168.    The foregoing examples are not exhaustive, and there are many others demonstrating Twitter's failure to meet its legal obligations to terminate or limit access to repeat infringers in a meaningful or consistent fashion. Discovery will uncover many more.

169.    Twitter also allows subscribers and account holders to sign up for new accounts as a means of circumventing any prospect of losing even temporary access to the Twitter platform

for infringement.  For instance, Twitter Account D posted unauthorized copies of music videos and recordings of live concerts that included Publishers' musical compositions.  Twitter Account D's tweets typically comprised only an infringing video and text identifying the song title and artist, along with hashtags designed to maximize the reach of the infringing tweets.  Twitter Account D appeared in at least 10 separate NMPA Notices identifying at least 12 infringing tweets. The user of Twitter Account D never submitted any counter-notifications.  Twitter did not suspend Twitter Account D until after Twitter Account D appeared in at least 10 separate NMPA Notices identifying at least 12 infringing tweets.  Even then, Twitter allowed the user of Twitter Account D to simply sign up for a new account with a nearly identical Twitter handle, replacing only a "1" at the end of the original handle with a "2."  Using this new account, the user of Twitter Account D has continued their infringing conduct and has amassed more than 2,000 followers in less than six months.

### 3. *Twitter's Right and Ability to Supervise and Control its Users' Activity*

170.    There is no question that Twitter has the right and ability to supervise and control the infringing activities occurring through use of the Twitter platform, yet it refuses to exercise that right.  Twitter has absolute control over the content on its servers and access to that content. Twitter can delete postings from the servers that it controls, filter the content being posted to its servers with available technology to stop the ongoing infringement, and terminate the access of account holders uploading infringing content.

171.    Twitter makes clear to its users that it has a variety of enforcement options.  These options include tweet-level enforcement such as limiting a tweet's visibility, preventing the tweet from having ads adjacent to it, or removing the tweet altogether.  Twitter may also take account-level actions like suspending an account or preventing an account from making tweets or

interacting with other tweets. Twitter also has the ability and the right to place a tweet behind a notice, restrict views of tweets based on age, or withhold access to certain tweets or accounts by country. And, of course, Twitter also has the legal and practical right and ability to terminate an account. Indeed, Twitter's Terms of Service indicate that Twitter reserves the right to terminate an account "at any time for any or no reason…"

172. Twitter monitors and blocks or removes content it deems unsuitable for the Twitter platform, including violent speech, content from violent or hateful entities, child sexual exploitation material, abusive or harassing content, hateful conduct, excessively gory content, posts in furtherance of illegal activities, posts that contains other people's private information, posts that mislead or deceive other Twitter users about the identity of the poster, manipulated media, or post that include any third party advertising content. Twitter engages in these monitoring and blocking activities in a variety of ways, including through actions by Twitter employees and contractors.

173. But Twitter refuses to stop the rampant infringement of copyrighted music, including Publishers' musical compositions, because it knows that the Twitter platform is more popular and profitable if Twitter allows such infringement.

174. Accounts that repeatedly make unauthorized use of Publishers' musical compositions are more popular on Twitter's platform, and thus are more profitable for Twitter, than accounts that do not. For example, across the NMPA Notices, Twitter accounts in fewer than three notices had roughly 17,000 followers on average, whereas accounts identified in three or more notices had more than 34,000 followers on average. The likely popularity of an account only grows with further infringement, as accounts identified in 10 or more notices had nearly 110,000 followers on average, while accounts identified in 15 or more notices had nearly 300,000 followers

on average.  The more infringing content posted to an account, the more followers that account obtains, and the more engagement there is on the Twitter platform, all of which drives Twitter's advertising revenue.

175.    Twitter knows which accounts have been identified as infringing by Publishers in NMPA Notices and Twitter maintains information relating to these accounts, including the number of followers.  Twitter is aware of the connection between an account holder's unauthorized use of Publishers' musical compositions and the popularity of their account on Twitter's platform.

176.    Twitter permits and encourages infringement, including of Publishers' musical compositions, so that it can continue to reap huge profits from the availability of unlicensed music without paying the necessary licensing fees for it, giving it a valuable and unfair advantage over its properly licensed competitors.

### E.  *The Infringing Activity Is Only Worsening*

177.    Twitter's change in ownership in October 2022 has not led to improvements in how it acts with respect to copyright.  On the contrary, Twitter's internal affairs regarding matters pertinent to this case are in disarray.

178.    Despite the general rise in infringement notices Twitter received over the last several years, Twitter chose to significantly reduce several of its critical departments involved with content review and policing terms of service violations, including both the legal and the trust and safety teams.  Public reports indicate that Twitter has fewer than 2,000 remaining employees out of the over 7,500 employees that Twitter had at the time of the change of control in October 2022.

179.    Twitter's former head of trust and safety, Yoel Roth, who had been with the company for more than seven years, implementing vital safety measures like "exposing government-backed troll farms meddling in elections" and introducing tools for handling

dangerous misinformation, resigned in November 2022. Roth told *The New York Times* that he could not support "a Twitter whose policies are defined by edict." Roth's successor, Ella Irwin, who took over the trust and safety team beginning in November 2022, resigned from Twitter in May 2023.

180. Instead of grounding decisions on sound policy development and reasonable implementation, Twitter has outsourced trust and safety decisions to Twitter polls, *i.e.*, votes among users of the Twitter platform, through a feature on the platform used for polling.

181. By way of another example, a user tweeted that Twitter should not suspend accounts for receiving multiple copyright notices but rather should only disable the copyrighted videos. That user asserted that the user does not earn money from the videos they share, or understand that they are copyrighted, and that copyright owners should ask Twitter users to remove the videos rather than submit notices to Twitter. Twitter replied publicly to this user, but without asking the user not to infringe, without referring the user to Twitter's Copyright policy, and without telling the user that copyright infringement is unlawful regardless of whether the user makes money from it or realizes that a particular video is infringing. Instead, Twitter suggested that the user "consider turning on subscriptions"—a feature of Twitter Blue that garners revenue for Twitter, enables the user to receive payments from other users of the Twitter platform, and, because the infringing tweets are behind a paywall, makes it more difficult for copyright owners to find.

182. Twitter's most senior executive has previously described the Digital Millennium Copyright Act ("DMCA")—a statute that, among other things, provides for notice and takedown of infringing copyrighted material—as a "plague on humanity."



This statement and others like it exert pressure on Twitter employees, including those in its trust and safety team, on issues relating to copyright and infringement.

**G.** *The Harm to Publishers*

183. Twitter's conduct complained of herein denies Publishers of the revenues to which they are entitled and deprives their songwriters of an important source of income.

184. Publishers exploit and license widely popular songs on behalf of themselves and their songwriters, from which they derive their revenues and by which songwriters earn a living. Without Publishers' permission, Twitter is unilaterally exploiting existing markets, and new potential markets, while exercising rights that it does not possess, causing Publishers and the songwriters of the works substantial irreparable harm. The harm is at least three-fold.

185. First, the uses being made of Publishers' works cause harm to Publishers' licensing market for derivative works (*e.g.*, synchronized videos). Publishers have entered into agreements for use of their musical compositions on social media platforms, including to enable users of those

platforms to synchronize Publishers' songs with videos they post to these platforms. Twitter bypasses this market when it should obtain licenses and pay Publishers an appropriate license fee.

186. Second, the unauthorized availability of recordings of Publishers' musical compositions on the Twitter platform could act as a direct substitute for listening to recordings of those musical compositions on a paid or ad-supported social media platform or streaming service, or paying for a digital download, vinyl record, or compact disc. It is impossible for Publishers and legitimate services to compete with the free infringing content Twitter provides.

187. Third, by unilaterally engaging in and assisting the infringing use of Publishers' musical compositions for free, Twitter is devaluing the licensing and lawful exploitation of Publishers' musical compositions to social media companies and other platforms generally. This activity interferes with Publishers' relationships with the other social media companies that enter into proper licenses or other agreements. Relatedly, everyday users of Twitter will view Publishers' musical compositions and the recordings embodying those works as freely usable, grow increasingly immune to what it takes to produce these valuable works and, ultimately, become less willing to pay fair value for them.

188. In sum, Twitter is seizing for itself an artificial competitive advantage against companies that are not violating copyright law, undercutting existing markets, cheapening the value of music, and undermining Publishers' well-established business models.

189. Twitter's infringement undermines the incentive for songwriters to create high-quality songs and for Publishers to invest in, license, and exploit those creative efforts, thereby hindering songwriters' ability to earn a living from their trade.

# CLAIMS FOR RELIEF

## Count I – Direct Copyright Infringement

190.     Publishers repeat each and every allegation contained in Paragraphs 1-189 as if fully set forth herein.

191.     As detailed above, Twitter, without permission or consent from Publishers, has made and is making unauthorized public performances of musical compositions for which Publishers are the legal or beneficial copyright owners, including as to those works listed within **Exhibit A**, and many others, and including with respect to specific tweets and specific repeat infringer accounts already identified to Twitter in the NMPA Notices.  The foregoing activity constitutes direct infringement by Twitter in violation of 17 U.S.C. § 106(4) and 501 et seq.  The list of works on **Exhibit A** is a non-exhaustive, illustrative list of works infringed and will be amended as the case proceeds.

192.     The infringement of Publishers' rights in each of their copyrighted works constitutes a separate and distinct act of infringement.

193.     Twitter's acts of infringement are willful, intentional, and purposeful, in disregard of and with indifference to Publishers' rights.

194.     As a direct and proximate result of Twitter's wrongful conduct, which is ongoing, Publishers have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination.  Publishers have no adequate remedy at law.  Unless restrained by this Court, Twitter will cause further irreparable injury to Publishers.  Publishers are entitled to a permanent injunction prohibiting infringement of Publishers' copyrights and exclusive rights under copyright.

195.     As a direct and proximate result of Twitter's infringement of Publishers' copyrights and exclusive rights, Publishers are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Publishers' election, pursuant to 17 U.S.C. § 504(b), Publishers shall be entitled to their actual damages, including Twitter's profits from infringement as will be proven at trial.

196.     Publishers are also entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

### Count II – Contributory Infringement

197.     Publishers repeat each and every allegation contained in Paragraphs 1-196 as if fully set forth herein.

198.     As detailed above, users of the Twitter platform have unlawfully reproduced, distributed to the public, performed to the public, and/or prepared derivative works based upon, musical compositions for which Publishers are the legal or beneficial copyright owners, including those copyrighted works listed on **Exhibit A**, and many others.  The foregoing activity, which is ongoing, constitutes direct infringement or an unauthorized act in violation of 17 U.S.C. §§ 106 and 501 by users of Twitter's platform.

199.     Twitter is contributorily liable for these direct infringements by users of its platform as described herein.  As discussed above, through the NMPA Notices and others' infringement notices, Twitter has knowledge that it is hosting infringing content on a massive scale and of specific infringing tweets and specific users engaged in repeated acts of infringement.  Nevertheless, Twitter facilitates, encourages, and materially contributes to such infringement, including by continuing to host and transmit known infringing content and continuing to provide its services and facilities to users known to be repeat infringers engaged in infringement.  Twitter

has the means to take simple steps not to materially contribute to the specific infringing activity but fails to do so. Instead, Twitter continues to provide the site and facilities necessary for these users of its platform to commit direct infringement, and actively facilitates the ongoing infringement, including via the actions described above.

200. Accordingly, Twitter is contributorily liable for the infringement of Publishers' copyrighted musical compositions, including but not limited to those listed on **Exhibit A**, in violation of Publishers' copyrights and exclusive rights under the copyright laws of the United States. The list of works on **Exhibit A** is a non-exhaustive, illustrative list of works infringed and will be amended as the case proceeds.

201. Each infringement of Publishers' copyrighted musical compositions constitutes a separate and distinct act of infringement.

202. The foregoing acts of infringement by Twitter have been willful, intentional, and purposeful, in disregard of Publishers' rights.

203. As a direct and proximate result of Twitter's wrongful conduct, which is ongoing, Publishers have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination. Publishers have no adequate remedy at law. Unless restrained by this Court, Twitter will cause further irreparable injury to Publishers. Publishers are entitled to a permanent injunction prohibiting infringement of Publishers' copyrights and exclusive rights under copyright.

204. As a direct and proximate result of Twitter's infringement of Publishers' copyrights and exclusive rights, Publishers are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c). Alternatively, at Publishers' election, pursuant to 17 U.S.C.

§ 504(b), Publishers shall be entitled to their actual damages, including Twitter's profits from infringement as will be proven at trial.

205.    Publishers are also entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

### Count III – Vicarious Infringement

206.    Publishers repeat each and every allegation contained in Paragraphs 1-205 as if fully set forth herein.

207.    As detailed above, users of the Twitter platform have unlawfully reproduced, distributed to the public, performed to the public, and/or prepared derivative works based upon musical compositions for which Publishers are the legal or beneficial copyright owners, including those copyrighted works listed on **Exhibit A**, and many others.  The foregoing activity, which is ongoing, constitutes direct infringement or an unauthorized act in violation of 17 U.S.C. §§ 106 and 501 by users of Twitter's platform.

208.    Twitter is vicariously liable for these direct infringements by users of its platform as described herein.  As discussed above, Twitter had the legal right and practical ability to supervise and control the infringing activities that occur on the Twitter platform, and at all relevant times has derived a direct financial benefit from these users' infringement of Publishers' copyrighted musical compositions.  Twitter has refused to take reasonable steps to prevent the widespread infringement by these users of its platform.

209.    Accordingly, Twitter is vicariously liable for the infringement of Publishers' musical compositions, including but not limited to those listed on **Exhibit A**, in violation of Publishers' copyrights and exclusive rights under the copyright laws of the United States.  The list

of works on **Exhibit A** is a non-exhaustive, illustrative list of works infringed and will be amended as the case proceeds.

210. Each infringement of Publishers' copyrighted musical compositions constitutes a separate and distinct act of infringement.

211. The foregoing acts of infringement by Twitter have been willful, intentional, and purposeful, in disregard of Publishers' rights.

212. As a direct and proximate result of Twitter's wrongful conduct, which is ongoing, Publishers have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination. Publishers have no adequate remedy at law. Unless restrained by this Court, Twitter will cause further irreparable injury to Publishers. Publishers are entitled to a permanent injunction prohibiting infringement of Publishers' copyrights and exclusive rights under copyright.

213. As a direct and proximate result of Twitter's infringement of Publishers' copyrights and exclusive rights, Publishers are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c). Alternatively, at Publishers' election, pursuant to 17 U.S.C. § 504(b), Publishers shall be entitled to their actual damages, including Twitter's profits from infringement as will be proven at trial.

214. Publishers are also entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, Publishers pray for judgment from this Court against Twitter as follows:

a.  For a declaration that Twitter has willfully infringed musical works owned and/or controlled by Publishers in violation of the Copyright Act;

b.  For statutory damages pursuant to 17 U.S.C. § 504(c) in an amount up to the maximum provided by law, arising from Twitter's willful violations of Publishers' rights under the Copyright Act, including in an amount up to $150,000 per work infringed; or in the alternative, at Publishers' election pursuant to 17 U.S.C. § 504(b), Publishers' actual damages and Twitter's profits from the infringement, in an amount to be proven at trial;

c.  For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Publishers' copyrights, including a permanent injunction requiring that Twitter and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Publishers' exclusive rights under copyright, including without limitation in the musical compositions in **Exhibit A**;

d.  For the award of Publishers' reasonable attorneys' fees and costs in this action pursuant to 17 U.S.C. § 505;

e.  For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Twitter; and

f.  For such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Publishers hereby demand a trial by jury of all issues that are so triable.

Date: June 14, 2023

Respectfully submitted,

s/ *Steven A. Riley*
Steven A. Riley (No. 6258)
John R. Jacobson (No. 14365)
Tim Harvey, (No. 21509)
Grace C. Peck (No. 38558)
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 320-3700
sriley@rjfirm.com
jjacobson@rjfirm.com
tharvey@rjfirm.com
gpeck@rjfirm.com

Scott A. Zebrak
Matthew J. Oppenheim
Keith Howell
Meredith Stewart
(*pro hac vice* applications to follow)
OPPENHEIM +ZEBRAK, LLP
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
scott@oandzlaw.com
matt@oandzlaw.com
khowell@oandzlaw.com
mstewart@oandzlaw.com

Alexander Kaplan
Carly Rothman
Andrew Guerra
Matthew Cooper
(*pro hac vice* applications to follow)
OPPENHEIM + ZEBRAK, LLP
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
carly@oandzlaw.com
andrew@oandzlaw.com
mcooper@oandzlaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERIVCE**

I hereby certify that a true and correct copy of the foregoing document was provided to a private process server for personal service on the following and also sent via U.S. Certified Mail (with return receipt requested) on the 14th day of June 2023 to the following:

X Corp. d/b/a Twitter
C T Corporation System
c/o Matthew Taylor
701 S. Carson St. Suite 200
Carson City, NV 89701

*Registered Agent for Defendant*

*s/ Steven A. Riley*