**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

CONCORD MUSIC GROUP, INC. ET AL.,

Plaintiffs,

v.

X CORP., D/B/A TWITTER,

Defendant.

Case No. 3:23-cv-00606
District Judge Aleta A. Trauger

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT X CORP.'S MOTION TO DISMISS**

---

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................. 1

FACTUAL ALLEGATIONS ..................................................... 2

ARGUMENT .......................................................................... 3

   I.    PLAINTIFFS ADEQUATELY ALLEGE THAT X DIRECTLY INFRINGED THEIR PUBLIC PERFORMANCE RIGHTS...................................................3

       A.   The Factual Allegations Are Adequate Under *Aereo* and No More Is Required .......... 3

       B.   Even if Viewing X's Streaming Through the Lens of Volitional Conduct, Which Is Not Required, the Factual Allegations Adequately Support Plaintiffs' Claim ...........7

   II.    PLAINTIFFS ADEQUATELY ALLEGE X's CONTRIBUTORY LIABILITY...........10

       A.   Plaintiffs' Claim Fits Within Well-Established Sixth Circuit Precedent..................... 10

       B.   X's Motion Relies on a Repeatedly Rejected Misreading of Grokster........................ 11

  III.   PLAINTIFFS ADEQUATELY ALLEGE VICARIOUS LIABILITY ...........................14

       A.   X Reaps a Direct Financial Benefit from Infringement................................................ 14

       B.   X Has Unfettered Right and Ability to Police Infringement on its Platform................ 18

## PRELIMINARY STATEMENT

The motion to dismiss filed by Defendant X Corp. ("X") should fail in its entirety.

*First*, the law does not endorse X's sweeping contention that it is entitled to stream copyrighted works with immunity from direct infringement liability absent allegations of its "volitional" conduct. Rather, in analogous circumstances, the U.S. Supreme Court held an online service directly liable for infringing the public performance right by streaming copyrighted audiovisual works, and it did so without viewing the case through the lens of "volitional" conduct. *American Broadcasting Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014). The majority opinion in *Aereo* controls, not the dissent on which X relies. But even if this Court were to find X's "volitional" conduct is required, the facts alleged in the Complaint are more than ample.

*Second*, Plaintiffs' claim that X is contributorily liable comports with governing Sixth Circuit precedent. X attacks the claim only by raising a legal argument that this Court has already rejected. In *Eight Mile Style, LLC v. Spotify USA Inc.*, 535 F. Supp. 3d 738, 746 (M.D. Tenn. 2021) (Trauger, J.), this Court ruled that the Supreme Court's decision in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005) does *not* foreclose a traditional contributory infringement claim based on knowledge and material contribution. Other courts have made the same determination. But even if "intent" were required (as X incorrectly argues), the facts alleged in the Complaint easily suffice.

*Third*, X contests its vicarious liability by disregarding established principles of law and raising fact disputes unresolvable at this stage. As described below, the well pleaded facts plausibly allege that the infringement provides X with numerous direct financial benefits, including advertising revenue. X has discretion to supervise the activities on its platform, but it

1

failed to use its authority to stop or limit further infringement. Plaintiffs have thus sufficiently pled both elements of vicarious liability.

## FACTUAL ALLEGATIONS

Plaintiffs are major and independent music publishing companies that work with songwriters to create, promote, license, and exploit musical compositions. Compl. ¶¶ 2, 18-87. Defendant X owns and operates an online social media platform known as Twitter (or today, "X"). *Id.* ¶¶ 3, 88-89. In its Terms of Service, X purports to prohibit infringement, but that is a charade.

X platform users regularly upload infringing copies of Plaintiffs' copyrighted musical compositions embodied in (or synched to) videos, so that other users can see and hear the audiovisual works, which X itself hosts and transmits (streams) to them from servers that X owns and/or controls. *Id.* ¶¶ 114, 134-41. X encourages users to upload directly to its servers; promotes posts, including posts featuring infringing content, in a variety of ways; and directly streams the audiovisual works posted by its users via a process managed by the acts and decisions of X's employees. *Id.* ¶¶ 107-09, 111, 114-16, 127, 131; *infra* Part I.B.

Plaintiffs' trade association, the National Music Publishers' Association ("NMPA"), has been sending formal infringement notices to X on a weekly basis since December 2021 (the "NMPA Notices"). *Id.* ¶¶ 140-42. Each NMPA Notice identified thousands of specific posts on X's platform containing specific unauthorized copies of Plaintiffs' musical compositions. *Id.* In the aggregate, Plaintiffs have notified X of over 300,000 infringing posts on its platform. *Id.*

X has routinely ignored this infringement, which is merely the "tip of the iceberg[.]" *Id.* ¶¶ 10, 143, 146-69. Indeed, all the works in suit appeared in NMPA Notices *after* the specific users who uploaded those works had already been identified to X in multiple earlier NMPA Notices. *Id.*

2

¶ 146.  For many of these works, X also failed to remove the specific infringing post or, alternatively, delayed weeks, a month, or longer before removing it.  *Id.* ¶¶ 149, 152.[1]

X has absolute control over who can post and access content on its platform, and over the content itself, including through its ability to delete posts and terminate user accounts.  *Id.* ¶¶ 105, 170-71; *infra* Part III.B.  But even when X learned of repeat infringement, X rarely suspended or terminated those accounts, *id.* ¶¶ 160-69, because the infringing activity furthers its financial interests.  In X's own words, "people are more likely to follow a music-related account than any other type of account on [X]," *id.* ¶ 128(a), providing X with popular tweets and accounts to monetize via advertising and which act as a draw to its platform.  *Id.* ¶¶ 6, 126, 129.  X also avoids the license fees that its competitors pay.  *Id.* ¶¶ 7, 101-02, 185; *infra* Part III.A.

Plaintiffs' well pled facts are to be taken as true at this stage, and they are more than ample.

## ARGUMENT

### I.    PLAINTIFFS ADEQUATELY ALLEGE THAT X DIRECTLY INFRINGED THEIR PUBLIC PERFORMANCE RIGHTS

#### A.  <u>The Factual Allegations Are Adequate Under *Aereo* and No More Is Required</u>

"Copyright infringement … is at its core a strict liability cause of action, and copyright law imposes liability even in the absence of an intent to infringe the rights of the copyright holder."  *Jacobs v. Memphis Convention & Visitors Bureau*, 710 F. Supp. 2d 663, 678 n.21 (W.D. Tenn. 2010) (collecting cases).  With respect to the public performance right, the Supreme Court's decision in *Aereo* controls.  There, the Court made clear that the owner and operator of an online service is directly liable when it streams infringing content to users.  *Aereo* and the cases cited

---

[1] Even before discovery, the facts show that X has done this in thousands of instances.  *Id.* ¶¶ 149-50, 152-53.  The extent of X's malfeasance in response to infringement notices will be established during discovery.  Contrary to X's insinuations, Mot. 3, Plaintiffs have not conceded anything regarding X's removal of infringing posts.

below foreclose X's argument that the automated aspects of its system or the end user's role in selecting which content to upload or access insulate it from direct liability here.

In *Aereo*, the Supreme Court found Aereo liable for infringing the public performance right by providing an automated, web-based service that enabled users "to watch television programs, many of which are copyrighted, almost as they are being broadcast." *Aereo*, 573 U.S. at 442. Contrary to X's argument that "active, knowing, non-automated" conduct is needed, Mot. 1, the Court found direct liability even though Aereo's system was automated and remained "inert" until the user selected a program for viewing. *Aereo*, 573 U.S. at 443.

As the Court elaborated, this holding was supported by the unique legislative history of the public performance right. In reaction to how courts had interpreted that right, Congress deliberately broadened its scope by clarifying that: (i) "*both* the broadcaster *and* the viewer of a television program 'perform,' because they both show the program's images and make audible the program's sounds" and (ii) an entity "performs publicly when it 'transmit[s] … a performance … to the public'" by communicating it via "*any* device or process whereby images or sounds are received beyond the place from which they are sent." *Id.* at 441 (third emphasis added) (quoting 17 U.S.C. § 101). With this history in mind, and despite the protestations in Justice Scalia's dissent, on which X relies, the *Aereo* majority opinion found direct infringement liability without assessing the case through the lens of volitional conduct. *Id.* at 443-44, 451.

Applying *Aereo*, a court recently found an online service directly liable for publicly performing copyrighted music uploaded by users. *Atlantic Recording Corp. v. Spinrilla, LLC*, 506 F. Supp. 3d 1294 (N.D. Ga. 2020). The *Spinrilla* court recognized that streaming of music and television are analogous for purposes of applying *Aereo* and assessing infringement of the performance right. *Id.* at 1311 (relying on "a number of Circuit and district court decisions"

4

including *United States v. Am. Soc'y of Composers, Authors & Publishers*, 485 F. Supp. 2d 438, 446 (S.D.N.Y. 2007) ("The broadcasting of television signals is closely analogous to the streaming of music over the internet."), *aff'd*, 627 F.3d 64 (2d Cir. 2010)). The court explained that "the Supreme Court in *Aereo* rejected the application of the copy shop analogy in the context of a case[] such as this involving infringement of the right of performance by an online streaming service" despite how some courts have cited the *Netcom* case, where the notion of volition originated. *Id.* at 1315 (citing *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.,* 907 F. Supp. 1361, 1367-69 (N.D. Cal. 1995)).[2]

*Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904 (D.C. Cir. 2018) is also instructive. Like the Sixth Circuit, the D.C. Circuit had not previously determined whether a direct infringement claim requires volitional conduct. The *Spanski* court ultimately declined to decide whether there is a formal requirement of volitional conduct. *Id.* at 912. Instead, the court determined that the defendant's conduct in streaming content upon a user's request constitutes infringement of the public performance right under *Aereo.* *Id.* at 911-12 (explaining why the precedential principles from *Aereo* are not a "one-time deal, good for that case only"). The court rejected the defendant's argument that the automated nature of its service or the end user's role in selecting which content to access insulates it from liability. *Id.* at 910.

In sum, automation is not a talisman that precludes direct liability, as X asserts. Rather, in *Aereo*, the Supreme Court distinguished between defendants who "perform" (*e.g.*, an online

---

[2] Fearful of adopting a rule that could "hold the entire Internet liable," in 1995, the *Netcom* court viewed the defendant, Netcom, an Internet access provider, as "not unlike that of the owner of a copying machine who lets the public make copies with it" whose potential liability should be assessed under secondary infringement. 907 F. Supp. at 1369, 1372. This concern was ultimately addressed by the passage of the Digital Millennium Copyright Act ("DMCA") in 1998, providing safe harbors for online service providers in limited circumstances. 17 U.S.C. § 512.

5

service that streams infringing content) and those who, depending on the facts, are akin to a provider of a machine used by others (*e.g.*, "cloud computing [or] [remote storage] DVRs"). *Aereo*, 573 U.S. at 449-51. Here, the facts plausibly allege that X's streaming activity, which falls into the former category, violated Plaintiffs' public performance rights, consistent with the Court's holding regarding similar activity in *Aereo*. Nothing more is needed.

The out-of-circuit cases on which X relies are not to the contrary. They did not involve the public performance right.[3] And the Sixth Circuit has **not** held that a direct infringement claim requires a showing of volitional conduct. X relies on *Average Joe's Ent. Grp., LLC v. SoundCloud, Ltd.*, 2018 WL 6582829 (M.D. Tenn. Oct. 17, 2018) to argue otherwise. Mot. 4. There, the court indicated that the Sixth Circuit requires conduct that is intentional and knowing, citing *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 802 (6th Cir. 2005). But *Bridgeport* does not stand for the proposition cited. The Sixth Circuit, in rejecting a de minimis defense, explained only that sampling (*i.e.*, copying) a sound recording is always an intentional act. *Id.* at 801-02. The court did not hold that intentional or knowing conduct was a prerequisite for direct infringement liability. *Kremer v. Reddit, Inc.*, another case X relies on, also is not instructive. 2022 WL 3702092 (M.D.

---

[3] *See Hunley v. Instagram, LLC*, 73 F.4th 1060, 1067 (9th Cir. 2023) (display of photos); *Long v. Dorset*, 854 F. App'x 861, 863-64 (9th Cir. 2021) (distribution of text and illustrations); *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019) (reproduction, distribution, and display of photos); *Perfect 10, Inc. v. Giganews*, 847 F.3d 657, 667 (9th Cir. 2017) (reproduction, distribution, and display of photos); *Canada Hockey, L.L.C v. Texas A&N Univ. Athletic Dep't*, 2022 WL 445172, at *1-2 (5th Cir. Feb. 14, 2022) (reproduction of literary work); *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 546-47 (4th Cir. 2004) (reproduction, distribution, and display of photos); *Stross v. Twitter, Inc.*, 2022 WL 1843142, at *1 (C.D. Cal. Feb. 28, 2022) (reproduction and display of photos); *Tom Hussey Photography, LLC v. BDG Media, Inc.*, 2020 WL 7481770, at *2 (D. Del., Dec. 18, 2020) (reproduction, distribution, and display of photos); *Parker v. Paypal, Inc.*, 2017 WL 3508759, at *4 (E.D. Pa. Aug. 16, 2017) (reproduction and distribution of book); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 496-98 (E.D. Pa. 2006) (reproduction and distribution of book), *aff'd* 242 F. App'x 833, 835 (3d Cir. 2007); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1110 (D. Nev. 2006) (reproduction and distribution of literary works).

6

Tenn. Aug. 26, 2022), *report and recommendation adopted*, 2022 WL 4241273 (M.D. Tenn. Sept. 14, 2022). *Kremer* was a pro se case, "without any accompanying facts to establish what actions [the defendant] took" to infringe, and the decision merely followed *Average Joe's*. *Id.* at *7.[4]

**B. Even if Viewing X's Streaming Through the Lens of Volitional Conduct, Which Is Not Required, the Factual Allegations Adequately Support Plaintiffs' Claim**

Where courts outside the Sixth Circuit have required volitional conduct, they disagree on what it means. The Fourth and Fifth Circuits have reserved direct liability for "a person who causes in some meaningful way an infringement." *CoStar*, 373 F.3d at 550; *BWP Media USA, Inc. v. T&S Software Assocs.*, 852 F.3d 436, 440 n.1 (5th Cir. 2017) (quoting *CoStar*). The Ninth Circuit has determined that volitional conduct refers to "proximate causation." *Zillow*, 918 F.3d at 731-32 (discussing *Giganews*).[5] And although the Second Circuit views volitional conduct as a requirement, each judge of a three-judge panel expressed differing views on its meaning: Judge Newman opined that "volition" is essentially "causation," *Polyvore*, 922 F.3d at 62; Judge Walker opined that "volition and causation are different concepts . . . volition 'is choosing to engage in an act that causes infringement,'" *id.* at 52 (emphasis omitted) (quoting Patry on Copyright); and Judge Pooler reserved judgment on whether volitional conduct requires causation or a voluntary act but indicated that the question boils down to whether the defendant "is sufficiently tied to the act of copying for direct infringement liability to attach." *Id.* at 69.

Even if this Court were to conclude that volitional conduct is required, and regardless of

---

[4] The *Average Joe's* court may have been led astray by the underlying briefing, which mischaracterized *Bridgeport* and made its way into the opinion verbatim (save a grammatical correction). *Compare* 2018 WL 6582829, at *6-7 *with* Def. Memorandum, *Average Joe's Ent.*, No. 3:16-cv-03294 (M.D. Tenn. Sept. 7, 2018), ECF No. 121, at 13-14.

[5] In *BWP v. Polyvore, Inc.*, 922 F.3d 42, 52-53 (2d Cir. 2019), Judge Walker criticized this standard, noting "'proximate' causation, . . . [is] a negligence concept that has to do with risk and foreseeability" and is "out of place to apply []to a strict liability tort like direct infringement."

7

which view of volition the Court accepts, the allegations of the Complaint suffice. The Complaint alleges numerous instances of X's volitional conduct with a nexus to the specific acts of alleged infringement. In particular, the following facts are pertinent: (a) X created a feature on its platform that streams unlicensed copyrighted content from its servers to users, Compl. ¶¶ 114-15, 135-36; (b) X encouraged users to upload media content to its servers rather than link to third-party sites, *id.* ¶ 131, while controlling who can upload content, *id.* ¶¶ 105, 170-71, and monitoring and removing uploaded content it found objectionable but choosing not to monitor for copyright infringement, *id.* ¶ 172-73; (c) X enhanced, and even instigated, access to the infringing content by indexing it, *id.* ¶ 107, and then selecting it and promoting it to users in feeds to their accounts, *id.* ¶¶ 108-09, 111, 116, 127, 167; (d) with knowledge of the pervasive infringing activity, X's staff made various configuration changes, and other decisions, including optimizing performance of its pertinent streaming activity, *id.* ¶ 115, 144; and (e) X chose to continue hosting, promoting, and streaming the infringing content specifically identified in the NMPA Notices as well as the new infringing uploads by known infringers, *id.* ¶¶ 8, 149-50, 152-53, 165-67. Thus, far from being a mere "passive" provider of a machine used by others, X acted volitionally.

X incorrectly contends that because it has designed an "algorithm" to replace aspects of human control of its platform, it did not act volitionally, Mot. 6, but X's choice to act via automated technology does not make its conduct "passive" or insulate it from responsibility for its infringing activity. X's "affirmative act of streaming constitutes direct infringement of the copyright holder's exclusive right of performance regardless of the fact that the streaming occurs at the request of the user." *Spinrilla*, 506 F. Supp. 3d at 1315-16; *see also supra* Part I.A (discussing *Aereo*, *Spinrilla*, and *Spanski*); *see further, e.g.*, *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 147-49 (S.D.N.Y. 2009) (volitional conduct found via defendant's general operation of site with

8

awareness of popularity of digital music, steps taken to enhance infrastructure to host and deliver such content, and exercise of control over content made available to users by policing site to remove spam and pornography); *Stross v. Meta Platforms, Inc.*, 2022 WL 1843129, at *3 (C.D. Cal. Apr. 6, 2022) ("no basis in the law to conclude that [this] active management of a website, which would constitute volitional conduct if performed by a human, fails to meet that element because an algorithm designed by a human engineer manages the website instead"). While Plaintiffs thus do not need to allege that X's streaming mechanisms are "actively and knowingly employed and directed by human beings," Mot. 6, it is alleged. *See, e.g.,* Compl. ¶¶ 115-16.

X incorrectly argues that its failure to take down, timely or at all, the specific infringing material—after receiving weekly infringement notices from Plaintiffs—does not constitute volitional conduct. Mot. 8-9. X focuses on whether its alleged misconduct after receiving an infringement notice "caused the initial infringing act—*i.e.*, the *posting*." *Id*. at 8 (emphasis added). But Plaintiffs' direct infringement claim against X focuses on the *public performances* that occurred because of X's unreasonable response to the NMPA Notices. In other words, Plaintiffs' claim alleges X's streaming (a) the infringing content identified in the NMPA Notices, which X did not remove, in a timely manner or at all; and (b) the subsequent infringing uploads from known repeat infringers. Compl. ¶¶ 8, 10, 146-53, 160-69.

X's abysmal response to the NMPA Notices is volitional conduct. In a relevant case, the Ninth Circuit held that a web site owner acted with volitional conduct when it failed to take down a copyrighted photograph identified in an infringement notice and thereafter continued to display the photo. *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1081-82 (9th Cir. 2021); *accord Dish Network L.L.C. v. Jadoo TV, Inc.*, 2023 WL 4004115, at *10 (N.D. Cal. June 13, 2023) (finding volition satisfied on facts that included failure to limit infringements identified in notices).

9

The cases X relies upon are distinguishable. In *Bus. Casual Holdings, LLC v. YouTube LLC*, 2022 WL 837596 (S.D.N.Y. Mar. 21, 2022), YouTube, unlike X, "actively and diligently policed allegedly infringing activity on its platform" and there were no failures to remove infringing material identified in takedown notices (or unreasonable delay in removals that caused infringement). *Id.* at *4. Indeed, the plaintiff "alleged that after it lodged complaints," YouTube "promptly took those videos off its platform[.]"[6] *Id.*; *accord CoStar*, 373 F.3d at 556 (no volition where, inter alia, "[w]henever CoStar has complained to LoopNet about a particular photograph, LoopNet has removed the photograph"). In *Parker*, a pro se plaintiff sent an email with statements that did not necessarily provide notice as to the infringing activity. 2017 WL 3508759, at *2-3. These scenarios differ from X ignoring copyright infringement while otherwise policing its site, not removing infringements that Plaintiffs properly notified it about, and delaying "weeks, a month, or even longer" to remove others, and continuing to provide service to known infringers.

## II. PLAINTIFFS ADEQUATELY ALLEGE X's CONTRIBUTORY LIABILITY

### A. <u>Plaintiffs' Claim Fits Within Well-Established Sixth Circuit Precedent</u>

X ignores the relevant standard for pleading contributory infringement in this case. The Sixth Circuit has long held that a party is liable for contributory infringement when it, "with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another." *Liberty Toy Co. v. Fred Silber Co.*, 149 F.3d 1183, at *2, n.5 (6th Cir. 1998) (internal citation omitted). Thus, inducement and material contribution are separate theories for finding contributory liability. *Id.* "Courts in this circuit—including the Sixth Circuit itself—have

---

[6] Although the plaintiff later argued that, for a single video, 23-days was too long to effectuate a takedown, and thus reflected volitional conduct, the court disagreed, apparently moved by how the plaintiff pled the case, that an investigation by the defendant may have accounted for the delay, and that there was no allegation of any further infringement (via public performance or otherwise), unlike there is here. *Id.* at 4-6.

cited [the material contribution] test since *Grokster*." *Eight Mile*, 535 F. Supp. 3d at 747 (citing *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 816 (6th Cir. 2008)).

Under the material contribution rule, contributory infringement exists with: (1) direct copyright infringement by a third party; (2) defendant's knowledge that the third party was directly infringing; and (3) defendant's material contribution to the infringement. *NCR Corp.*, 512 F.3d at 816. X has not disputed that Plaintiffs' allegations meet this Sixth Circuit standard (nor could it, given the allegations, Compl. ¶¶ 8, 10, 140-71), and thus any argument to that effect in its reply is waived. *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 545 (6th Cir. 2000).

### B. X's Motion Relies on a Repeatedly Rejected Misreading of *Grokster*

X advocates for a repeatedly rejected, incorrect application of *Grokster* that would require inducement in all contributory infringement cases. *Grokster* articulated a pathway for finding contributory infringement under an inducement theory, namely that "one who distributes a device with the object of promoting its use to infringe copyright . . . is liable for the resulting acts of infringement by third parties." *Grokster*, 545 U.S. at 936-37. X argues (incorrectly) that in recognizing this additional pathway, "*Grokster* held that a defendant that offers a service with substantial non-infringing uses can be held liable for contributory infringement ***only*** where there is evidence that it was the defendant's intended purpose . . . to cause infringement." Mot. 10 (emphasis added). But as the excerpt of *Grokster* that X quotes makes clear, the elements of intent and purpose are specific to the inducement test the Supreme Court was establishing. Mot. 9 (quoting *Grokster*, 545 U.S. at 936-37) ("**The inducement rule**, instead, premises liability on purposeful, culpable expression and conduct …") (emphasis added). The Court's entire discussion of intent focused on what was before it—contributory infringement via inducement.

X identifies no support for the proposition that, by recognizing liability under the inducement theory, which requires a demonstration of intent, *Grokster* foreclosed contributory

11

infringement based on material contribution under common law principles. Rather, as this Court has recognized, the Supreme Court cautioned that "its situation-specific holdings in this area should not be assumed to 'displace other theories of secondary liability.'" *Eight Mile*, 535 F. Supp. 3d at 746 (quoting *Grokster*, 545 U.S. at 934) ("[T]he Supreme Court did not intend *Grokster* to be the holistic rewriting of caselaw," "*Grokster* [is] not [] the sole source for defining" contributory liability, and the Court "will not treat [other] precedents [for contributory liability] as implicitly overruled unless there is a strong basis for doing so."). While X acknowledges *Eight Mile* as "a case with similar facts," Mot. 1-2, it ignores that this Court held there that the plaintiff sufficiently pled a claim for contributory infringement based on material contribution, not inducement.

Multiple other courts have also rejected X's reading of *Grokster*. *See, e.g.*, *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1170 n.11 (9th Cir. 2007) ("[T]he Supreme Court in *Grokster* did not suggest that a court must find inducement in order to impose contributory liability under common law principles."); *BMG Rights Mgmt. (US) LLC v. Altice USA, Inc.*, 2023 WL 3436089, at *7 (E.D. Tex. May 12, 2023) (recognizing *Grokster*'s analysis of the inducement rule as one means of liability but not "the only viable theory" and rejecting the notion that "culpable intent is a mandatory requirement"); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 766–67 (W.D. Tex. 2019) ("*Grokster*'s expression that '[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement' should not be taken as writing out of the law liability based on material contribution"); *Michael Grecco Prods., Inc. v. RGB Ventures, LLC*, 2017 WL 4077045, at *8 (M.D. Fla. Sept. 14, 2017) ("contributory infringement may be found based on a material contribution theory in instances where a defendant did not express an intention to foster infringement but provided the means for infringement …") (internal citation omitted). The cases X relies on are distinguishable and of no persuasive value.

12

They discuss other areas of the law or fail to recognize pre-*Grokster* common law principles.[7]

But, even if culpable intent were required here (and it is not), Plaintiffs have plausibly alleged it. Through the NMPA Notices, X had knowledge of specific users using X's platform to infringe, yet it continued to provide services to these users. *See, e.g.*, Compl. ¶¶ 146, 165-68. Multiple courts have recognized such conduct as intent to cause infringement. *See, e.g.*, *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 307-08 and 311-12 (4th Cir. 2018) (intent to cause infringement may be presumed where a company provides a service that has lawful uses but to specific customers that the company knows use the service to infringe); *RCN*, 2020 WL 5204067, at *9 (service provider's "failure to take remedial action against repeat copyright infringers is tantamount to encouraging infringement"); *Grande*, 384 F. Supp. 3d at 767-68 (same). *See also Disney Enters., Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *35 (S.D. Fla. Sept. 20, 2013) ("where the defendant knows of specific infringing content available on its system yet fails to remove it—that defendant may be liable, by operation of law, just as if he had actually intended to infringe under *Grokster*"); *Jadoo TV*, 2023 WL 4004115, at *14 (defendant induced infringement by failing to limit the infringement identified in notices).

---

[7] For example, *Tierra Intellectual Borinquen, Inc. v. ASUS Computer Int'l, Inc.* is not a "copyright case[]" as X alleges, Mot. 11; it addressed patent infringement claims arising under an inducement theory, not a material contribution theory. 2014 WL 894805 (E.D. Tex. Mar. 4, 2014). *King v. Amazon Corp.* dismissed the claims of a pro se plaintiff who failed to respond to a motion for summary judgment, and it did not consider the Sixth Circuit's pre-*Grokster* contributory infringement precedent. 2019 WL 6404882, at *6 (W.D.N.C. Nov. 27, 2019). This Court has already rejected *Average Joe's* interpretation of *Grokster*, *Eight Mile*, 535 F. Supp. 3d at 746 n.1, and the plaintiff there presented "no evidence … Defendants knew about or actively fostered copyright infringement," which Plaintiffs have here. While *Cobbler Nevada, LLC v. Gonzales* correctly observes that "common law principles establish that intent may be imputed," 901 F.3d 1142, 1148 (9th Cir. 2018) (citing *Perfect 10*, 508 F.3d at 1170-71), multiple courts have recognized that *Cobbler* is a case brought against a *user* of a service and is irrelevant to contributory infringement claims against a service provider itself. *See Grande*, 384 F. Supp. 3d at 767 n.6; *UMG Recordings, Inc. v. RCN Telecom Servs., LLC* ("*RCN*"), 2020 WL 5204067, at *10 n.5 (D.N.J. Aug. 31, 2020).

13

### III.    PLAINTIFFS ADEQUATELY ALLEGE VICARIOUS LIABILITY

#### A.    <u>X Reaps a Direct Financial Benefit from Infringement</u>

"For vicarious liability to exist, the financial benefit need not be substantial. . . . there must only be a ***causal relationship*** between the infringing activity and ***any*** financial benefit defendant reaps." *Joe Hand Promotions, Inc. v. Griffith*, 2023 WL 4752375, at *6 (E.D. Tenn. July 25, 2023) (emphasis added); *see also Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (same). Here, X reaps a financial benefit from infringement by users of its platform in multiple ways.

*First*, X gains advertising revenue directly from the infringing use of the works in suit.    Here, the Complaint alleges that X monetizes infringing posts, as well as the accounts of known repeat infringers.    Rather than making "a vague reference to [X's] 'monetization of infringing content,'" Mot. 14, the Complaint includes a specific example of an infringing post (highlighted in blue in the image to the right) surrounded by a promoted tweet and a promoted account (highlighted in orange).    Compl. ¶ 127 (emphasis added); *see also id.* ¶¶ 121, 123, 126.



The *Parker* case X relies on is inapposite.    Mot. 14-15.    There, unlike the allegations here, the plaintiff made only vague and conclusory statements about a relationship between the infringing activity and the number of users and advertising revenue such activity bore.    422 F. Supp. 2d at 500.    The causal relationship between the infringement of Plaintiffs' works and X's profits could not be more direct.    When X runs ads in connection with infringing video content,

14

money flows into its pockets.  *See Cheairs v. Thomas*, 2023 WL 1442956, at *4 (W.D. Tenn. Feb. 1, 2023) (payment to defendant supported vicarious infringement claim); *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011) (denying dismissal of vicarious claim where defendant "profited from its ability to attract infringing users, including through increased advertising revenue").  X disputes that "the allegedly infringing content itself is being monetized," Mot. 14, but Plaintiffs allege exactly that, backed by visual evidence.  *Supra* at 14; *see also Nat'l Photo Grp., LLC v. Allvoices, Inc.*, 2014 WL 280391, at *8 (N.D. Cal. Jan. 24, 2014) (financial benefit sufficiently alleged based on "advertisements displayed near the infringing photographs").

X invents its own pleading standard, arguing that "Plaintiffs do not assert that the advertisement was placed [directly next to the infringing material] by [X] ***because of*** the allegedly infringing content."  Mot. 14.  The question is only whether X profits from infringement, without requiring more.  *See Broadcast Music, Inc. v. Meadowlake, Ltd.*, 754 F.3d 353, 355 (6th Cir. 2014) ("ignorance about the infringement or the performances does not blunt vicarious liability").

*Second*, X directly benefits financially because the infringed works—nearly 1,700 musical compositions by some of the world's most popular songwriters—are a draw for new and existing users, Compl. ¶¶ 126, 138, 174, satisfying one (and not the only) test for financial benefit: that "the availability of infringing material 'acts as ***a*** '***draw***' for customers.'"  *Ellison*, 357 F.3d at 1078 (emphasis added) (internal citation omitted) (recognizing draw as ***a*** means for establishing financial benefit).  The "ability to engage in infringing conduct need not be the primary draw of defendant's services, but only *a* draw."  *Warner Recs. Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1074 (D. Colo. 2020).

Plaintiffs plausibly allege that the infringing use of their works is a draw.  As shown through the NMPA Notices, hundreds of thousands of copies of Plaintiffs' works have been found

15

on X's platform. X claims "[t]here is no allegation that any user joined X or continued to use its service because of the [works in suit]," Mot. 14, but that is not true. Plaintiffs allege that posts "containing Publishers' copyrighted works[] attract and retain users to [X's] platform." Compl. ¶ 6; *see also id.* ¶ 10. The ability to view and post infringing content draws users to X's platform, the increased engagement brings X more advertising revenue, and X's service would be less attractive if it properly policed infringement on its platform. *Id*. ¶¶ 9, 129. Further, Plaintiffs allege "[a]ccounts that repeatedly make unauthorized use of Publishers' [works] are more popular on [X's] platform, and thus are more profitable for [X], than accounts that do not." *Id*. ¶ 174. The Complaint even includes data showing a direct relationship between an account's use of Plaintiffs' works and its increased popularity on X's platform, with the heavier repeat infringers having nearly 20 times more followers than accounts caught infringing on fewer occasions.[8] *Id.*

These are not "conclusory" or "boilerplate" allegations, Mot. 14-15; they are plausible inferences drawn from the facts alleged. *See Charter*, 454 F. Supp. 3d at 1077 (finding direct financial benefit based on "hundreds of thousands of specific instances" of infringement and allegation that a "failure to police motivated subscribers to join"); *Altice*, 2023 WL 3436089, at *4 (finding adequate direct financial benefit where complaint alleged that if an ISP "exercised [] its authority to limit or terminate service for infringers, its services would be less attractive to prospective infringing customers"); *Bennett v. Navarre Corp.*, 2008 WL 11510552, at *7 (M.D. Tenn. Jan. 17, 2008) ("[T]urning a blind eye to detectable acts of infringement for the sake of

---

[8] X disputes whether the observed relationship between infringing content and engagement on X's platform is indeed causal and whether this connection is driven more by X's policies and its users' behavior or by "Plaintiffs' notice-sending behavior." Mot. 16 (emphasis omitted). But these are factual questions subject to expert analysis and ultimately for the jury to decide; they are not resolvable on a motion to dismiss. *See Eight Mile*, 535 F. Supp. 3d at 748-49 (noting at the Rule 12(b)(6) stage, the court must "take the plaintiffs at their word").

profits gives rise to [vicarious] liability.").  Music is valuable and social media users are more

likely to use a platform where they can post and view videos embodying popular songs.  As *X*

*acknowledged in its motion*: if Plaintiffs' works were only available through properly licensed

social media sites, "users would be drawn away from X and toward other social media platforms

that have this feature" (authorized access to a "library of musical compositions").  Mot. 15.[9]

*Third*, X has obtained a direct financial benefit for itself by not paying the fees required to

license music for the activity at issue.  There is an established market for licensing the use of

musical compositions on social media sites, and X's primary social media rivals have all entered

into "agreements . . . covering use of Publishers' musical compositions," Compl. ¶¶ 1, 7, 101-02,

185.  X has received direct financial benefit from skirting these licensing payments.  *Broadcast*

*Music, Inc. v. Mirage Images, Inc.*, 2005 WL 6580656, at *10 (E.D. Tenn. Nov. 2, 2005) (finding

defendant "obtained a direct financial benefit from [the] infringement, since it played songs in

Plaintiff BMI's repertoire for free, rather than paying BMI's requested license fee").

X's argument that it does not benefit from infringement because its platform "offers a wide

range of legitimate uses to subscribers" is a non sequitur.  Mot. 13-14.  The question is whether X

profits from infringement (it has), not whether it also profits from other activities.  *See, e.g.*,

*Giganews*, 847 F.3d at 673 ("the size of the draw relative to a defendant's overall business is

immaterial") (internal quotation marks and citation omitted); *Charter*, 454 F. Supp. 3d at 1075

("the proportion of the defendant's business that comes from infringing use is not relevant to

---

[9] X relies on *UMG Recordings, Inc. v. Bright House Networks*, LLC, 2020 WL 3957675, at *3-*7
(M.D. Fla. July 8, 2020), which held that infringement must be the "main draw" to allege financial
benefit.  Mot. 13.  However, as subsequent cases have recognized, this case is against the weight
of authority and is inconsistent with the requirement that plaintiffs need only allege "a causal
relationship" between the infringement and a financial benefit to the alleged infringer.  *See Altice*,
2023 WL 3436089, at *4-5 (rejecting the reasoning of *Bright House*).

17

whether the defendant received a financial benefit").

### B. X Has Unfettered Right and Ability to Police Infringement on its Platform

"Vicarious liability . . . shift[s] the costs of copyright enforcement from the holder of the copyright to those in a better position to police the infringing conduct." *Meadowlake*, 754 F.3d at 355. Here, that is X, which has "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Zillow*, 918 F.3d at 746. X has control over infringing activity due to its numerous enforcement options. Compl. ¶¶ 171-73. These options include both "tweet-level enforcement[s]," including "removing the tweet altogether," and "account-level actions," such as "suspending" or "terminat[ing]" an account "at any time for any or no reason," or preventing it from making further posts. *Id.* ¶ 171; *see also* Dkt. 78-2 (Ex. A) at 6; Mot. 18 (X has "the contractual right to terminate a user's account.").

X's reliance on the *Tur*, *Veoh*, and *YouTube* cases is misleading. Mot. 16, 18 (citing *Tur v. YouTube, Inc.*, 2007 WL 1893635, at *3 (C.D. Cal. June 20, 2007); *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008); *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 522 (S.D.N.Y. 2010)). These cases addressed the right and ability to control the infringing activity as the concept is used in the DMCA under 17 U.S.C. § 512(c), not under common law vicarious liability, which is a different standard. *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 37-38 (2d Cir. 2012) (the DMCA "control provision 'dictates' a departure from the common law vicarious liability standard," requiring "something more" (citation omitted)).[10]

---

[10] X also incorrectly argues that, under *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 431 (1984), Plaintiffs' claim should "be narrowly construed" because Congress did not have an opportunity to balance the competing interests implicated by "new technology." Mot. 12-13. *Sony* was about contributory infringement, a doctrine that the Supreme Court expanded in *Grokster*, a case that involved new technology. *See supra* Part II.B. And post-*Sony*, Congress already balanced the competing interests by enacting the DMCA. *See supra* Part I.A n.2; *accord Spanski*, 883 F.3d at 912.

18

Applying the applicable law, an ability to remove infringing content and "block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001); *see also Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 389 (3d Cir. 2016) (affirming judgment of vicarious liability where defendant had "contractual right to impose a range of disciplinary sanctions" on infringers, including "terminating a distributorship agreement"); *Dish Network LLC v. Datacamp Ltd.*, 2023 WL 4549528, at *4 (N.D. Ill. July 14, 2023) ("When the defendant can terminate its users' access to the system to prevent infringement, the defendant has the ability to stop infringement."); *Charter*, 454 F. Supp. 3d at 1086 (finding right and ability to control where defendant's terms of service reserved right to terminate users' accounts for piracy); *Capitol Records, LLC v. Escape Media Grp., Inc.*, 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015) (finding right and ability to control infringement where terms of service gave defendants the right to "terminate accounts, revoke privileges, and remove user-submitted content at its discretion"). X's ability to delete infringing content and terminate service to repeat infringers distinguishes this case from those on which X relies. For example, in *Navarro*, the defendant lacked the right to terminate, discipline, or supervise the conduct of the alleged direct infringer. *Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 753-54 (S.D. Ohio 2021).

X argues that it cannot be held vicariously liable if it does not have the right or ability to "supervise the content users post before they post it" and "reliably ascertain whether the use of music in a particular post is unlawful." Mot. 17-18 (discussing *Sports Illustrated* and *Ludvarts* cases). But X's argument is inapposite. Plaintiffs' claims do not center only on X's failure to prevent infringing uploads generally. Plaintiffs allege that they repeatedly notified X of the specific infringers and the specific infringements, and X failed to meet its obligations in response,

19

resulting in significant subsequent infringement. X cites no authority for limiting vicarious infringers only to those with the ability to preclude the first act of infringement. Unsurprisingly, this is not the standard. *See supra* Part III.B at 19*; see also, e.g.*, *Altice*, 2023 WL 3436089, at *7 (rejecting argument "that termination of subscriptions after-the-fact would not stop the complained of infringing activity"). A vicarious infringer need not be able to prevent all infringement before it occurs, it need only be able to "stop *or limit*" it. *Grokster*, 545 U.S. at 930 (emphasis added).

X argues that "the ability to terminate a user's account is not the same as the ability to supervise the infringement." Mot. 18. But X's cases are readily distinguishable in that they involved infringement that would nonetheless continue even after termination. *See Routt v. Amazon.com, Inc.*, 584 F. App'x 713, 715 (9th Cir. 2014) (no allegation that by terminating Amazon could stop participants in its affiliate-marketing program from infringing on their third-party websites); *Music Force, LLC v. Sony Music Holdings Inc.*, 2020 WL 5733258, at *3 (C.D. Cal. Aug. 12, 2020) (no allegation that the record label's contract with the artist, or termination of it, would enable the label to stop the artist from distributing allegedly infringing material on third-party websites); *Lopez v. Bonanza*, 2019 WL 5199431, at *23-24 (S.D.N.Y. 2019) (dismissing vicarious claim based on vague, conclusory allegations). Here, X can remove infringing posts and prevent repeat infringers from committing further infringement. Compl. ¶¶ 171-73.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny X's Motion in its entirety. Each of the three claims in suit is viable, uniquely important, and should proceed.

Dated: September 22, 2023

Respectfully submitted,

Scott A. Zebrak (*pro hac vice*)
Matthew J. Oppenheim (*pro hac vice*)
Keith Howell (*pro hac vice*)
Meredith Stewart (*pro hac vice*)
OPPENHEIM +ZEBRAK, LLP
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
scott@oandzlaw.com
matt@oandzlaw.com
khowell@oandzlaw.com
mstewart@oandzlaw.com

Alexander Kaplan (*pro hac vice*)
Carly Rothman (*pro hac vice*)
Andrew Guerra (*pro hac vice*)
Matthew Cooper (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
carly@oandzlaw.com
andrew@oandzlaw.com
mcooper@oandzlaw.com

s/ *Steven A. Riley*
Steven A. Riley (No. 6258)
John R. Jacobson (No. 14365)
Tim Harvey, (No. 21509)
Grace C. Peck (No. 38558)
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 3203700
sriley@rjfirm.com
jjacobson@rjfirm.com
tharvey@rjfirm.com
gpeck@rjfirm.com

*Attorneys for Plaintiffs*

21

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 22, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses on the attached Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to any non-CM/ECF participants indicated on the attached Notice List.

<u>*s/ Steven A. Riley*</u>

Steven A. Riley

# Mailing Information for a Case 3:23-cv-00606 Concord Music Group, Inc. v. X Corp

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Olivia Rose Arboneaux**
  oarboneaux@nealharwell.com,mbyerly@nealharwell.com

- **Linda Jane Brewer**
  lindabrewer@quinnemanuel.com

- **Matthew Cooper**
  mcooper@oandzlaw.com

- **David Eiseman**
  davideiseman@quinnemanuel.com

- **Donald Seth Fortenbery**
  sethfortenbery@quinnemanuel.com

- **Andrew Guerra**
  andrew@oandzlaw.com

- **William J. Harbison , II**
  jharbison@nealharwell.com,nnguyen@nealharwell.com

- **Timothy G. Harvey**
  tharvey@rjfirm.com,ethomas@rjfirm.com

- **Aubrey B. Harwell , III**
  tharwell@nealharwell.com,kberkheimer@nealharwell.com

- **Keith Howell**
  khowell@oandzlaw.com

- **John R. Jacobson**
  jjacobson@rjfirm.com,jgutierrez@rjfirm.com

- **Alexander Kaplan**
  alex@oandzlaw.com

- **Matthew J. Oppenheim**
  matt@oandzlaw.com

- **Grace Peck**
  gpeck@rjfirm.com,paralegal@oandzlaw.com,jgutierrez@rjfirm.com

- **Steven Allen Riley**
  sriley@rjfirm.com,dgibby@rjfirm.com

- **Jessica Anne Rose**
  jessicarose@quinnemanuel.com

- **Carly Rothman**
  carly@oandzlaw.com

- **Andrew H. Schapiro**
  andrewschapiro@quinnemanuel.com

- **Dylan I. Scher**
  dylanscher@quinnemanuel.com

- **Alex Spiro**
  alexspiro@quinnemanuel.com

- **Meredith Stewart**
  mstewart@oandzlaw.com

- **Scott A. Zebrak**
  scott@oandzlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`