IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CONCORD MUSIC GROUP, INC., et. al.,

        Plaintiffs,

v.

X CORP., D/B/A TWITTER,

        Defendant.

Case No. 3:23-cv-00606

Hon. Aleta A. Trauger

**DEFENDANT X CORP.'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS**

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARGUMENT | | 1 |
| I. | THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE DIRECT INFRINGEMENT | 1 |
| II. | THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE CONTRIBUTORY INFRINGEMENT | 5 |
| III. | THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE VICARIOUS LIABILITY | 8 |
| | A. The Complaint Does Not Allege A Direct Financial Benefit | 8 |
| | B. The Complaint Does Not Allege Supervision | 10 |
| CONCLUSION | | 10 |

# ARGUMENT

## I. THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE DIRECT INFRINGEMENT

Plaintiffs' primary argument is that they need not plead volitional conduct to state a claim for direct infringement because "with respect to the public performance right, the Supreme Court's decision in *Aereo* controls." Opp. 3. Courts have expressly rejected this position. *See, e.g.*, *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1074 (9th Cir. 2023) ("Post-*Aereo*, we have continued to require proof of causation as an element of a direct infringement claim. In such cases we have taken account of *Aereo* and concluded that our volitional conduct requirement is consistent with the *Aereo* majority opinion, and thus remains intact in this circuit.") (quotations, citations and brackets omitted); *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d 42, 49 (2d Cir. 2019) (Walker, J., concurring) ("*Aereo* did nothing to disturb *Cablevision*'s volitional conduct requirement and that requirement continues to apply to cases involving ISPs."); *BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 442 (5th Cir. 2017) ("We likewise conclude that the volitional-conduct requirement is consistent with the *Aereo* majority opinion....") (quotations and brackets omitted); *Millennium Funding, Inc. v. Priv. Internet Access, Inc.*, 2022 WL 7560395, at *11-13 (D. Colo. Oct. 13, 2022) (rejecting argument that *Aereo* eliminated volitional requirement).

Indeed, since *Aereo* was decided, courts continue to treat volitional conduct as an element of direct infringement of the **performance right**. *See, e.g.*, *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 321-22 (2d Cir. 2022) (volition required to prove infringement of performance right via streaming); *Millennium Funding*, 2022 WL 7560395, at *12-15 (granting motion to dismiss for failure to plead volitional conduct infringing performance right); *BMG Rts. Mgmt. (US) LLC v. Joyy Inc.*, 644 F. Supp. 3d 602, 605, 608-09 (C.D. Cal. 2022) (granting motion to dismiss against owners of "a social media platform 'based on user-generated short video content' similar to

TikTok" because "Plaintiff fails to allege volitional conduct by Defendants"); *Bus. Casual Holdings, LLC v. YouTube, LLC*, 2022 WL 837596, at *3-4 (S.D.N.Y. Mar. 21, 2022) (granting motion to dismiss for failure to plead adequately that YouTube engaged in volitional conduct relating to allegedly infringing videos); *Average Joe's Ent. Grp., LLC v. SoundCloud, LTD.*, 2018 WL 6582829, at *2 (M.D. Tenn. Oct. 17, 2018) ("The volition requirement applies regardless of which exclusive right a plaintiff claims the defendant infringed."); *Fox Broad. Co. v. DISH Network LLC*, 2015 WL 13655436, at *12 (C.D. Cal. Jan. 12, 2015) ("If any public performance occurs when subscribers use DISH Anywhere, DISH may be directly liable if it engages in sufficient volitional conduct enabling that performance.").

Notwithstanding this authority, Plaintiffs argue that post-*Aereo* "nothing more is needed" than the allegation that X streams audiovisual content. Opp. 6. But *Aereo* is inapposite because it does not address the volitional conduct requirement. The question in *Aereo* was whether the audiovisual streams generated by the defendant implicated the "public performance" right under Section 106 of the Copyright Act. *Aereo*, 573 U.S. at 451 ("we conclude that Aereo 'perform[s]' petitioners' copyrighted works 'publicly,' as those terms are defined by the Transmit Clause."). That question is ***not*** at issue in this motion, which is premised on a failure to plead volition. Plaintiffs have failed to plead that X was an active participant in the alleged infringement, as opposed to a passive conduit for it. *See* Mot. 4-9.

Although the cases cited by Plaintiffs do not expressly discuss volition, the requisite volition was present in each case due to the defendants' active role in the infringements. In *Aereo*, the defendant's business model was designed to ***obtain and supply*** infringing content to customers. *See T & S Software Assocs., Inc.,* 852 F.3d at 442 ("Aereo played an active role in the infringement. That role was to route infringing content to its users. True, its users would request the content, but

they did not merely utilize Aereo's service to store infringing content they obtained elsewhere. Aereo, not its users, provided the means to obtain and transmit copyrighted performances. Aereo's involvement, in other words, was more than passive."). In *Atlantic Recording Corp. v. Spinrilla, LLC*, the defendants **selected and uploaded** the infringing content. 506 F. Supp. 3d 1294, 1300 (N.D. Ga. 2020) ("Defendants concede that [they] uploaded thirty-eight of the forty-five mixtapes"). In *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, the defendant **uploaded** the infringing content and then **directed** it to the United States. 883 F.3d 904, 906 (D.C. Cir. 2018) ("When the owner of a foreign website, acting abroad, uploads video content in which another party holds exclusive United States public performance rights under the Copyright Act and then directs the uploaded content to United States viewers upon their request, does it commit an infringing 'performance' under the Act?"). These acts supplied the required volition.

By contrast, Plaintiffs' Complaint fails to allege that X played an active role in the claimed infringements such that it proximately caused them. Plaintiffs do not allege that X selected, uploaded, previewed, or had any ***direct*** involvement in the alleged infringements. Rather, the conduct that Plaintiffs cite (Opp. 8) is limited to the operation of the platform in general, and is behavior with, at best, an ***indirect*** nexus to the alleged infringements. *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 738 (9th Cir. 2019) ("courts have found no direct liability where an online system responds automatically to users' input without intervening conduct by the website owner.") (quotations and brackets omitted). This is not enough to sustain a claim. *Average Joe's*, 2018 WL 6582829, at *2 ("the volitional conduct element … is a basic requirement of causation: 'As its name suggests, direct liability must be premised on conduct that can reasonably be described as the direct cause of the infringement.'") (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017)).

3

Plaintiffs argue that X is not "insulate[d]…from responsibility" just because certain of X's operations are automated or driven by an algorithm. Opp. 8. X agrees. However, the Complaint fails to allege that X's automated functions can reasonably be considered the ***direct cause*** of the infringement. At best, the automated features cited by Plaintiffs that enable uploading, streaming, indexing, and optimizing constitute "passive participation" by way of general site operation, which is "not sufficient to cross the volitional-conduct line." *Zillow Grp.*, 918 F.3d at 738.

Finally, Plaintiffs incorrectly argue that X's alleged failure to disable some user posts after receiving DMCA notices is itself sufficient to establish volitional conduct. Opp. 9. As discussed in X's opening brief, that argument has been rejected.[1] *See* Mot. 8 (citing cases). The cases cited by Plaintiffs do not hold otherwise. In *Bell v. Wilmott Storage Servs., LLC*, volition was established because defendant ***actively and personally*** managed the website on which the infringing content appeared. 12 F.4th 1065, 1081 (9th Cir. 2021) ("VisitUSA.com did not merely function as an online platform where third-party users independently upload and share materials, but rather a website managed (and updated) by Wilmott itself, which included the data then stored on the website's servers") (citation omitted). In *Dish Network L.L.C. v. Jadoo TV, Inc.*, volition was established because the defendant ***selected*** the infringing content to stream to users. 2023 WL 4004115, at *10 (N.D. Cal. June 13, 2023).[2] Neither of these cases stand for the proposition that a platform's failure to respond expeditiously to DMCA notices itself supplies the

---

[1] Although Plaintiffs incorrectly characterize X's response to their DMCA notices as "abysmal" (Opp. 9), the Complaint implicitly acknowledges that X has removed ***hundreds of thousands*** of posts in response to NMPA's notices as part of its anti-infringement program. Compl. ¶¶ 149, 152.

[2] In *Jadoo*, the district court applied the volitional conduct requirement to the claimed infringement of the performance right, undermining Plaintiffs' argument that no such requirement exists for alleged infringement of the performance right post-*Aereo*. *Id*.

4

necessary volitional conduct to state a claim for direct infringement, and X is aware of no case that does.

## II. THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE CONTRIBUTORY INFRINGEMENT

Plaintiffs argue that the standard for contributory infringement articulated in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ("*Grokster*") does not apply to this case. Rather, Plaintiffs maintain that a claim against X can be stated by pleading "material contribution" under the traditional formulation. Opp. 10-12. This argument ignores the rules articulated by the Supreme Court in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*") and *Grokster*, which apply to cases like this one, where the secondary infringement claims arise out of a defendant's sale of a product or service with a lawful purpose.

Under the traditional formulation of contributory infringement, a defendant is liable if, with knowledge of the infringing activity, it "induces, causes or materially contributes to the infringing conduct of another." *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 889 (6th Cir. 2004) (quotations omitted). However, the Supreme Court's rulings in *Sony* and *Grokster* ***limited*** the circumstances under which this claim can lie against defendants whose role in the alleged infringement is merely to offer a lawful service. Specifically, *Sony* held that the sale of a product or service does not constitute contributory infringement if it is "capable of substantial noninfringing uses." 464 U.S. at 442. *Grokster* expanded on the *Sony* rule and held the mere sale of a product or service "capable of both lawful and unlawful use" does not constitute contributory infringement ***unless*** there is additional evidence that the defendant acted "with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." 545 U.S. at 918-19. In such situations, it is insufficient to premise a contributory liability claim on "mere knowledge of infringing potential or ***of actual infringing***

5

*uses*." *Id*. at 937 (emphasis added). Rather, a plaintiff must prove the defendant distributed a device or service with the specific intent of *fostering* infringement. *Id*. at 936-37.

Ignoring these rules, Plaintiffs argue that "material contribution" is an "additional pathway" to state a claim for contributory infringement against the purveyor of a service with substantial non-infringing uses. Opp. 11. This argument finds no support in *Grokster*, and Justice Ginsburg's concurrence in that case directly refutes it: "Liability under our jurisprudence may be predicated on actively encouraging (or inducing) infringement through specific acts (as the Court's opinion develops) or on distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses." 545 U.S. at 942. In other words, there are only two ways that a defendant accused of contributory infringement for supplying a product or service to the direct infringer can be liable—by actively encouraging infringement, or by distributing a product not capable of substantial non-infringing uses. Indeed, allowing a claim of contributory infringement based on a "material contribution" alone to lie against a defendant that offers a service with substantial non-infringing uses would create a *third* option—and would completely gut the rules articulated in *Sony* and *Grokster*.

In *Eight Mile Style, LLC v. Spotify USA Inc.* ("*Eight Mile*"), this Court correctly recognized and applied the distinction in the law between contributory liability when it arises in the context of "infringement-enabling technology" versus "the entire range of situations in which secondary liability might occur." 535 F. Supp. 3d 738, 746 (M.D. Tenn. 2021) (Trauger, J.). The Court stated that "if a case falls squarely within *Grokster*, then *Grokster*, of course, applies." *Id*. Here, *Grokster* applies because it is undisputed that the alleged infringement arises from the use of X's platform which is "capable of substantial non-infringing uses." The out-of-circuit decisions cited by Plaintiffs (Opp. 12-13), which fail to recognize this important distinction in the law, cannot be

6

squared with *Sony* or *Grokster*, for the reasons discussed above.[3] To be sure, X does not dispute that the traditional contributory infringement standard continues to apply in certain circumstances. For example, the "material contribution" standard was applied by this Court in *Eight Mile* because there, unlike here, the alleged infringement did not arise from the sale of a product or service capable of substantial non-infringing uses. 535 F. Supp. 3d at 746.

In the alternative, Plaintiffs argue the Complaint satisfies the *Grokster* standard because X allegedly did not terminate the accounts of some users after receiving NMPA's DMCA notices. Opp. 13. This allegation is insufficient under *Grokster* because "mere knowledge of infringing potential or *of actual infringing uses* would not be enough here to subject a distributor to liability." 545 U.S. at 937; *id.* at 932-33 ("the doctrine absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits liability to instances of *more acute fault than the mere understanding that some of one's products will be misused*.") (emphasis added); *id.* at 923 ("Grokster and StreamCast are not, however, merely *passive recipients of information about infringing use*.") (emphasis added). In short, failure to terminate accounts is not "clear expression" or "affirmative steps" by X to promote infringement.

The claim that X intended to foster infringement is particularly implausible in light of X's anti-infringement policies and practices (Mot. 11 and Rose Decl. Ex. A), including that X has removed hundreds of thousands of allegedly infringing posts in response to Plaintiffs' notices.[4]

---

[3] The Fourth and Fifth Circuits are currently hearing appeals concerning the misapplication of *Grokster* in the underlying cases. *See, e.g.*, *UMG Recordings, Inc. v. Grande Commc'ns*, No. 23-50162, ECF 59-1 (5th Cir. 2023); *Sony Music Ent. v. Cox Commc'ns, Inc.*, No. 21-1168, ECF 50 (4th Cir. 2021) (oral argument heard on March 9, 2022).

[4] Plaintiffs also allege they have sent X notices of "over 300,000 infringing tweets," but the Complaint concedes there are just "thousands of instances where Twitter waited 30 days or more to remove or disable access to the content identified in the NMPA Notices." *Compare* Compl. ¶ 140 *with* Compl. ¶¶ 149, 152 (emphasis omitted). In other words, the Complaint admits X removed or disabled the *vast majority* of the complained-of content as part of its anti-infringement efforts.

*See Average Joe's*, 2018 WL 6582829, at *6. The allegations in the Complaint (and documents referenced in it) demonstrate: (1) X's Terms of Service prohibits the use of the platform to infringe copyrights (Rose Ex. A at 3); (2) X supplies copyright owners with an automated form to streamline the submission of copyright complaints, along with detailed instructions for copyright owners on how to do so effectively (*id.* at 3-4, 13-14, 25-26); (3) X devotes significant resources to processing copyright infringement complaints and communicating with both copyright holders and users about them (*id.* at 13-14); and (4) X removes complained-of content from the platform and suspends access for users who demonstrate a pattern of repeat infringement (*id.* at 16). Although Plaintiffs allege that X's anti-infringement practices are imperfect, the Complaint acknowledges that these practices exist and are employed by X to *combat* infringement. Compl. ¶¶ 148-152, 155-158, 163-165. Thus, the Complaint fails to plausibly allege "clear expression or affirmative acts" showing that X *encourages* copyright infringement on its platform.

## III. THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE VICARIOUS LIABILITY

### A. The Complaint Does Not Allege A Direct Financial Benefit

The Complaint fails to allege a "causal relationship" between the alleged infringing activity and X's direct financial benefit. *First*, Plaintiffs wrongly claim that "X monetizes infringing posts" based on a screenshot of "an infringing post … surrounded by a promoted tweet and a promoted account." Opp. 14-15. But the Complaint does not allege any *relationship or connection* between the promoted ads and allegedly infringing post. The mere fact that an ad happens to appear near a user post accused of infringement does not mean that the accused post *caused* "money [to] flow[] into [X's] pockets." Opp. 15. To make that conclusion plausible, Plaintiffs must plead facts that would establish that the infringement was the reason X earned money from the ad. The Complaint does not contain any such allegations. Nor does the Complaint allege that a promoted tweet would not appear, or would appear differently, if a post was non-infringing. None of Plaintiffs' cited

8

cases (Opp. 15) suggest that the mere proximity of an ad to an allegedly infringing post is a sufficient causal nexus.[5] *See* Mot. 15. Rather, Plaintiffs' allegations are just as vague and conclusory as those found to be insufficient in *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 500 (E.D. Pa. 2006), *aff'd*, 242 F. App'x 833 (3d Cir. 2007). *See also Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (no direct financial benefit where the "record lacks evidence that AOL attracted or retained subscriptions ***because of*** the infringement or lost subscriptions ***because of AOL's eventual obstruction*** of the infringement").

*Second*, Plaintiffs conclude that "X directly benefits financially because the infringed works … are a draw for new and existing users" (Opp. 15-16) without pleading any factual allegations to support this conclusion. As explained in X's opening brief, these ginned up, made-for-litigation statistics were cited to purportedly establish that infringement appeals to users of X (Compl. ¶ 174), but they reflect only that Plaintiffs chose to send more notices to accounts with larger numbers of followers. Moreover, these statistics do not allege a ***causal link*** between the infringing posts and X's financial benefit. Finally, the cases cited by Plaintiffs in favor of the draw theory (Opp. 16-17) involve materially different facts; in those cases, each defendant accepted money directly for the alleged infringement.[6]

***Third***, Plaintiffs' suggestion that "X has obtained a direct financial benefit for itself by not paying the fees required to license music for the activity at issue" (Opp. 17-18) is "plainly circular."

---

[5] In particular, *Nat'l Photo Grp., LLC v. Allvoices, Inc.*, 2014 WL 280391 (N.D. Cal. Jan. 24, 2014), does not establish that an advertisement appearing near an allegedly infringing image constitutes a direct financial benefit. That court granted the motion to dismiss based on insufficient allegations of control. *Id.* at *8.

[6] *Warner Recs. Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069 (D. Colo. 2020) and *BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*, 2023 WL 3436089 (E.D. Tex. May 12, 2023), involved Internet Service Providers that had allegedly infringing subscribers who paid fees directly to the defendants. *Bennett v. Navarre Corp.*, 2008 WL 11510552 (M.D. Tenn. Jan. 17, 2008) involved a defendant selling copyrighted recordings.

*Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 830 (9th Cir. 2019). As explained by the Ninth Circuit, "the direct infringer's avoidance of fees alone cannot satisfy the requirement of a direct financial benefit to the vicarious infringer. Otherwise, the requirement of a direct financial benefit would be rendered meaningless, since—at least where, as here, licenses are for sale—a direct infringer necessarily saves money by failing to obtain a license." *Id.* The lone case cited by Plaintiffs on this point is distinguishable: *Broad. Music, Inc. v. Mirage Images, Inc.,* 2005 WL 6580656, at *2-5, 10 (E.D. Tenn. Nov. 2, 2005), involved a nightclub that failed to pay fees for ***its own use*** of the copyrighted music. By contrast, X is accused of failing to pay a license fee to cover alleged infringement ***by users*** that is expressly prohibited by X's Terms of Service.

### B. The Complaint Does Not Allege Supervision

Plaintiffs do not dispute that X lacks the practical ability to determine whether any specific posts violate third party copyrights given the tremendous volume of user posts to the site each day. Mot. 17-18. Rather, Plaintiffs wrongly equate X's enforcement options (Opp. 18-20), such as its ability to remove posts or terminate accounts, with the ability to *supervise* what users do on X's platform. But courts have held that a mere right to terminate does not show the right and ability to supervise. Mot. 18-19 (citing cases). That infringement could "continue even after termination" (Opp. 20) in those cases does not alter the analysis; here, the "subsequent infringement" Plaintiffs are concerned about could continue or reappear—on X or on other platforms.

### CONCLUSION

For the foregoing reasons, X respectfully requests that the Court dismiss the Complaint in its entirety.

Dated: October 6, 2023

Andrew H. Schapiro (*pro hac vice*)

Respectfully Submitted,

By: */s/ Aubrey B. Harwell III*
Aubrey B. Harwell III (No. 017394)

| | |
|---|---|
| QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>191 N. Wacker Drive, Suite 2700<br>Chicago, IL 60606<br>Telephone: (312) 705-7400<br>andrewschapiro@quinnemanuel.com<br><br>Alex Spiro (*pro hac vice*)<br>Jessica A. Rose (*pro hac vice*)<br>Dylan I. Scher (*pro hac vice*)<br>D. Seth Fortenbery (*pro hac vice*)<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: (212) 895-2500<br>alexspiro@quinnemanuel.com<br>jessicarose@quinnemanuel.com<br>dylanscher@quinnemanuel.com<br>sethfortenbery@quinnemanuel.com | William J. Harbison II (No. 33330)<br>Olivia Arboneaux (No. 40225)<br>NEAL & HARWELL, PLC<br>1201 Demonbreun Street, Suite 1000<br>Nashville, Tennessee 37203<br>Telephone: (615) 244-1713<br>Facsimile: (615) 726-0573<br>tharwell@nealharwell.com<br>jharbison@nealharwell.com<br>oarboneaux@nealharwell.com<br><br>David Eiseman (*pro hac vice*)<br>Linda J. Brewer (*pro hac vice*)<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>50 California Street, 22nd Floor<br>San Francisco, California 94111<br>Telephone: (415) 875-6600<br>davideiseman@quinnemanuel.com<br>lindabrewer@quinnemanuel.com<br><br>*Attorneys for Defendant* |

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on October 6, 2023 with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system.

Steven A. Riley
John R. Jacobson
Tim Harvey
Grace C. Peck
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 320-3700
sriley@rjfirm.com
jjacobson@rjfirm.com
tharvey@rjfirm.com
gpeck@rjfirm.com

Scott A. Zebrak
Matthew J. Oppenheim
Keith Howell
Meredith Stewart
OPPENHEIM +ZEBRAK, LLP
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
scott@oandzlaw.com
matt@oandzlaw.com
khowell@oandzlaw.com
mstewart@oandzlaw.com

Alexander Kaplan
Carly Rothman
Andrew Guerra
Matthew Cooper
OPPENHEIM + ZEBRAK, LLP
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
carly@oandzlaw.com
andrew@oandzlaw.com
mcooper@oandzlaw.com

*Attorneys for Plaintiffs*

By: */s/ Aubrey B. Harwell III*
Aubrey B. Harwell III