# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CONCORD MUSIC GROUP, INC., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 3:23-cv-00606** |
| | ) | **Judge Aleta A. Trauger** |
| **v.** | ) | |
| | ) | |
| **X CORP., d/b/a TWITTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

      X Corp. has filed a Motion to Dismiss (Doc. No. 77), to which the plaintiffs have filed a Response (Doc. No. 79), X Corp. has filed a Reply (Doc. No. 82), and the plaintiffs have filed a Sur-Reply (Doc. No. 86). For the reasons set out herein, the motion will be granted in part and denied in part.

## <u>I. BACKGROUND</u>[1]

      The plaintiffs are publishers of musical compositions. (Doc. No. 1 ¶¶ 2, 18–87.) The defendant, X Corp., operates the social media platform formerly named, and still frequently referred to as, Twitter ("X/Twitter"). (*Id.* ¶¶ 88–89.) As a social media platform, X/Twitter is a venue for posts, often referred to as "tweets," by its users. Much of the time, those tweets consist of the creative work of the users themselves. Other times, however, X/Twitter users post tweets that include the copyright-protected work of others without the rights holders' permission, which is, in many instances, copyright infringement. (*Id.* ¶¶ 3, 103.)

---

[1] Unless otherwise indicated, these facts are taken from the Complaint (Doc. No. 1) and are accepted as true for the purposes of the Motion to Dismiss.

This kind of infringement by users of online platforms is a well-established problem, and Congress has enacted a framework for addressing it, in the form of the Digital Millenium Copyright Act, or "DMCA." The core feature of the DMCA, for these purposes, is its notice-and-takedown framework, which creates a streamlined process through which copyright holders may seek the removal of protected content, and with which a social media site must, broadly speaking, comply in order to avoid liability for its own role in the underlying infringement. *See* 17 U.S.C. § 512(a); *Canvasfish.com, LLC v. Pixels.com, LLC*, No. 1:23-CV-611, 2024 WL 885356, at *10 (W.D. Mich. Mar. 1, 2024) (describing DMCA safe harbor).

The plaintiffs complain that, "[w]hile the Twitter platform began as a destination for short text-based messages," it has since become a "hot destination for multimedia content, with music-infused videos being of particular and paramount importance." (*Id.* ¶ 5.) There are lawful ways for a social media company to offer such media—particularly, by entering into licensing agreements with rights holders, as TikTok, Facebook, Instagram, YouTube, and Snapchat have done. (*Id.* ¶ 7.) Copyright licenses, though, typically must be paid for, and X/Twitter is, the plaintiffs suggest, effectively trying to generate the kind of revenue that one would expect as a lawful purveyor of music and other media, without incurring the cost of actually paying for the licenses. (*Id.*)

It does not appear to be disputed, in this litigation, that X/Twitter users sometimes engage in copyright infringement. What is disputed is the extent to which X Corp. has actively encouraged that conduct, if at all. The plaintiffs identify a few ways in which X Corp., they argue, has been more than merely a bystander to the infringement on its platform. For example, X/Twitter's interface includes a browsing option, or "tab," that specifically allows a user to seek out tweets including audiovisual media, such as videos, images, and sound recordings. (*Id.* ¶ 112.) On a service where all or most of the audiovisual media available was copyright-compliant, that media-

2

focused browsing option would be unproblematic, at least from a copyright standpoint. On a service filled with infringement, however, it is, the plaintiffs argue, effectively a shortcut allowing users to more easily find infringing content. (*Id.*) The plaintiffs also complain that Twitter's methods of recommending and promoting tweets facilitate and encourage infringement. (*Id.* ¶¶ 108–11.) Although these aspects of X/Twitter may have some automated components, the plaintiffs allege that X/Twitter, as a service, remains subject to real-time monitoring and control by X Corp. employees. (*Id.* ¶ 115.)

As an example of how X/Twitter monetizes infringement, the plaintiffs have identified a tweet by a "known repeat infringer who has been the subject of at least nine infringement notices to Twitter, identifying at least fourteen infringing tweets." (*Id.* ¶ 127.) This allegedly infringing tweet includes what appears to be a streaming video that, according to the plaintiffs, includes a recorded performance of a copyright-protected musical composition that the X/Twitter user was not authorized to share.[2] (*Id.*) For the purposes of X Corp.'s revenue, however, what matters is not the tweet, in and of itself, but everything that X/Twitter has been able to surround the tweet with. Below it is a "promoted" tweet, which is a tweet that a user has paid X/Twitter to promote. (*Id.* ¶¶ 123, 127.) To the right is a button suggesting that a user follow a "promoted" account, which, similarly, is an account that a user has paid X/Twitter to promote. (*Id.* ¶ 127.) That promoted account features a blue check mark next to its name, reflecting the fact that the user is "verified," a status that a user can obtain by paying X/Twitter a monthly fee. (*Id.* ¶¶ 113, 127.)

The plaintiffs are members of a trade association, the National Music Publishers' Association ("NMPA"), that represent their interests. (*Id.* ¶ 2.) Beginning in December 2021, the

---

[2] In other words, the user posted a music video.

NMPA began sending notices of infringement to X/Twitter on a weekly basis.[3] (*Id.* ¶ 140.) The plaintiffs state that those notices have cumulatively identified over 300,000 tweets that included infringing material. (*Id.* ¶ 140.) The plaintiffs do not allege that X/Twitter refuses to acknowledge such notices or that it never acts on them. They do allege, however, that it "often waited weeks, a month, or even longer before removing or disabling access to the noticed infringement." (*Id.* ¶ 149.) The plaintiffs assert that "[t]he precise extent of Twitter's lengthy delays will be the subject of discovery." (*Id.* ¶ 150.)

The plaintiffs also claim that X/Twitter "has not adopted, reasonably implemented, nor informed subscribers or account holders of, a policy to terminate users engaging in repeated acts of copyright infringement." (*Id.* ¶ 154.) According to the plaintiffs, X/Twitter's publicly available copyright policy used to warn users that their accounts could be "terminate[d]" for repeat infringement, but, in August 2018, the company revised the policy to threaten only "suspension." (*Id.* ¶¶ 156–58.) The plaintiffs allege that X/Twitter uses that suspension power sparingly, "suspend[ing] only a small portion of the accounts identified in multiple NMPA [n]otices," and was particularly unlikely to suspend verified accounts with large follower bases, which received "preferential treatment" resulting in "virtually none" of those accounts being suspended (*Id.* ¶¶ 161–62.)

On June 14, 2023, the plaintiffs filed their Complaint in this case. They state three counts—one each for direct, contributory, and vicarious infringement, respectively. (*Id.* ¶¶ 190–214.) On August 14, 2023, X Corp. filed a Motion to Dismiss. (Doc. No. 77.) The plaintiffs oppose the motion in all respects. (Doc. No. 79.)

---

[3] The Complaint does not assert that the NMPA notices of infringement were the first or only such notices that X/Twitter received, and the basic structure of the DMCA suggests that X/Twitter has probably received takedown notices since its inception. The Complaint, however, focuses on the weekly NMPA notices that began in late 2021.

4

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. ANALYSIS

The Copyright Act, broadly speaking, grants the holder of a copyright the exclusive rights to reproduce, perform, and distribute the underlying creative work, subject to some exceptions.

5

*See* 17 U.S.C. § 106. A person becomes liable for copyright infringement if he violates one of those exclusive rights without either permission from the owner or, in the alternative, some legally recognized automatic right of use—such as the right to engage in fair use[4] or the right to an automatic statutory license.[5] *See* 17 U.S.C. § 501.

"Although 'the Copyright Act does not expressly render anyone liable for infringement committed by another,'" courts have long recognized certain "doctrines of secondary liability" drawn from "common law principles" and imputed to the Act. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930–31 (2005) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434 (1984)). Specifically, "[o]ne infringes *contributorily* by intentionally inducing or encouraging direct infringement, and infringes *vicariously* by profiting from direct infringement while declining to exercise a right to stop or limit it." *Id.* at 930 (citing *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)) (emphasis added). The plaintiffs' Complaint asserts that X/Twitter's actions give rise to liability under each of these three theories—direct, contributory, and vicarious infringement. X Corp. argues, however, that none apply. Specifically, X Corp. argues that the plaintiffs have not plausibly alleged that it engaged in direct infringement, because none of the underlying infringement involved affirmative conduct by X Corp. or its employees. Next, X Corp. argues that the plaintiffs have not plausibly

---

[4] The fair use doctrine "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1385 (6th Cir. 1996) (quoting *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577 500 (1994)) (alteration in original).

[5] For example, Congress has created "statutory licenses [that] enable digital audio services to perform copyrighted sound recordings by paying predetermined royalty fees, without separately securing a copyright holder's permission." *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 46 (D.C. Cir. 2018).

6

alleged that it engaged in contributory infringement, because they have not sufficiently alleged that X Corp. induced or intended to foster the alleged infringement by its users. Finally, X Corp. argues that the plaintiffs have not plausibly alleged that it engaged in vicarious infringement, because the plaintiffs have not sufficiently alleged either (1) a direct financial benefit to X Corp. from the underlying infringement or (2) that X Corp. had the practical ability to supervise the alleged infringement. (Doc. No. 77 at 1.)

## A. Direct Infringement

Generally speaking, "[a] claim of copyright infringement requires proof of '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *ATC Distribution Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 705 (6th Cir. 2005) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). As forms of media have proliferated, however, there has been a need to flesh out the concept of what forms of use constitute unauthorized copying of various different types of copyright-protected material. The plaintiffs base their claims on the type of use described in 17 U.S.C. § 106(4), which grants the holder of rights in a "literary, musical, dramatic, [or] choreographic work[]" the exclusive right "to perform the copyrighted work publicly." *Id.* While what X/Twitter does may not appear, on its face, to seem much like "performance," the plaintiffs rely on the Copyright Act's so-called "Transmit Clause," which defines "public performance" to include "transmit[ting] or otherwise communicat[ing] a performance or display of the work to . . . the public, by means of any device or process." 17 U.S.C. § 101.

X Corp. does not dispute that the plaintiffs have sufficiently alleged valid ownership of copyrights. Nor does X Corp. appear to dispute that recorded performances of the plaintiffs' works were "transmitted." X Corp. argues, however, that the plaintiffs have confused the act of

7

transmitting a work, which can give rise to direct liability, with simply operating the means through which transmission occurred, which would be better considered under the paradigm of secondary liability.

The Supreme Court addressed a somewhat similar issue in *American Broadcasting Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014), which involved claims brought by television broadcasters against the operator of a "technologically complex service that [allowed users] to watch television programs over the Internet at about the same time as the programs [were] broadcast over the air." *Id.* at 436. The defendant in that case used "thousands of dime-sized antennas housed in a central warehouse" to receive broadcast television signals, the contents of which were then transmitted to subscribers electronically—in effect, allowing a subscriber to stream broadcast television through a mechanism that the broadcaster did not anticipate or authorize. *Id.* The question presented to the Supreme Court was whether that practice amounted to "perform[ing] the copyrighted work publicly," as that term is used in 17 U.S.C. § 106(4) and the Transmit Clause. The court concluded that it did. *Aereo*, 573 U.S. at 436.

The service at issue in *Aereo*—that is, "Aereo"—was like X/Twitter in that it provided a mechanism through which copyright-protected works were made available to users for private consumption, in a manner not authorized by the owner of the rights to the work. X/Twitter, however, differs from Aereo in some key ways. For one thing, Aereo involved a system designed for the sole purpose of transmitting the subject content and which had no plausible utility, in that configuration, other than the transmission of that content, whereas X/Twitter is a social media site with a range of potential uses. More importantly, for the purposes of the Transmit Clause analysis, Aereo involved the removal of copyright-protected works from their usual channels of distribution *by the defendant*, even if that diversion was only completed when directed by an end user. Aereo

8

effectively inserted itself as an unauthorized intermediary directly between authorized broadcasters and unauthorized viewers. It structured its service to try to support an argument that it was the end users, not Aereo, who were responsible for the underlying acts,[6] but there was no plausible basis for arguing that anyone other than Aereo or the end user was responsible for any alleged infringement. In other words, if anyone other than the end consumer engaged in unauthorized "transmission," it had to be Aereo. Here, in contrast, the infringement was, in each cited instance, initiated by a third party other than either X Corp. or the ultimate consumer of the infringing material. X Corp. argues that the X/Twitter users who selected the copyright-protected material, obtained it, composed the underlying tweets, and chose to post those tweets were the ones doing the transmitting, as that term is used in the Copyright Act, not X Corp.

In *Aereo*, the Supreme Court acknowledged that "transmission" is an ambiguous concept, and this court agrees. Generally speaking, "transmit" means "[t]o send or transfer (a thing) from one person or place to another" or "[t]o communicate." TRANSMIT, Black's Law Dictionary (11th ed. 2019). Applying that term may be relatively straightforward, when one is considering a purely bilateral transmission by a sender to a recipient. Matters become more complicated, however, when a transmission involves intermediaries. For example, one individual who sends information to another individual by telegraph "transmits" that information. It is, however, consistent with some uses of "transmit" to say that the telegraph system itself "transmitted" the information as well. What, then, about the owners of the telegraph lines or the telegraph machines? Whether these intermediary individuals engaged in "transmission" cannot be resolved simply by looking to the ordinary meaning of the word.

---

[6] Specifically, Aereo (1) never allowed more than one user to receive the signal from a particular antenna and (2) did not transmit continuously, but rather waited until the viewer turned the service on, each of which action supported a colorable—but ultimately rejected—argument that Aereo service was distinguishable from conventional cable providers. *Aereo*, 573 U.S. at 436, 444.

In *Aereo*, the Supreme Court resolved the ambiguity inherent in Congress's chosen terminology by looking to the context of the 1976 adoption of the Transmit Clause, which, it turns out, was not enacted with simply some abstract, inchoate notion of "transmission" in mind. Rather, that amendment, the Court explained, was specifically intended to protect "community antenna television (CATV) systems," whose broadcasts, prior to the amendment, were being received, transmitted, and monetized by cable providers in a practice that the Supreme Court had specifically found to be non-infringing. *Id.* at 439 (discussing *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 391 (1968)). The practice at issue in *Aereo*, then, was virtually identical, in its purpose and intent, to a practice already considered and prohibited by Congress through the Transmit Clause, with the exceptions that the Aereo service (1) involved the internet and (2) involved some unique features that appear to have been implemented as a form of regulatory arbitrage—that is, for no purpose other than to try to evade the Copyright Act. Accordingly, *Aereo* was, in a sense, an easy case. Congress specifically outlawed something, and the defendant was doing more or less that precise thing, with a few superficial tweaks.

The plaintiffs argue that their theory of direct infringement falls squarely within *Aereo*, but it is hard to see how that could be the case. These plaintiffs' allegations, in contrast with the bilateral transmission relationship at issue in Aereo, require the court to consider the respective roles of *three* parties: one who sent protected material, one who received it, and a third party, X Corp., that continuously operated the platform through which that infringement—and numerous other, non-infringing communications—occurred. X/Twitter, unlike Aereo, did not "transmit" any of the allegedly infringing material in the manner of a cable provider, because it was not the party that initially diverted that material from the intended channels of distribution. X/Twitter was more like a telephone company—providing the mechanism for communication between independent

10

communicators—than like a cable company that actively selects material to make available. The purpose of the Transmit Clause, the Supreme Court acknowledged, was to "erase[] the . . . line between broadcaster and viewer," but X/Twitter was neither of those things. *Id.* at 441. It was a carrier.

The *Aereo* majority, moreover, specifically acknowledged that "Congress, while intending the Transmit Clause to apply broadly to cable companies and their equivalents, did not intend to discourage or to control the emergence or use of different kinds of technologies." *Id.* at 449. The Court stressed that it did not intend its "limited holding" to "have that effect." *Id.* That unintended effect, however, is exactly what the plaintiffs would have this court endorse. There is no plausible case that X/Twitter is the "equivalent" of a cable company in the manner that Aereo—which had no meaningful existence other than as a copyright workaround for television broadcasts—was. The *Aereo* majority explained that it was not trying to "answer more precisely how the Transmit Clause or other provisions of the Copyright Act will apply to technologies not before" it, and that is how the court will construe its holding. *Id.* at 451.

The broader body of copyright caselaw, moreover, confirms the importance of the distinction between active participants in infringement and parties that merely provide the means through which infringement is accomplished. Although the precise boundaries of infringement are, in some cases, unclear, numerous courts have acknowledged that direct infringement typically "requires *conduct* by a person who causes in some meaningful way an infringement." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (emphasis in original). That approach does not mean that a passive participant in infringement will necessarily be free from liability, because theories of contributory and/or vicarious infringement might still be available. If, however, a plaintiff wishes to pursue a claim of infringement without establishing the "additional elements[,]

such as knowledge," that secondary liability often demands, then the plaintiff must establish that the defendant actually *did something* that could, itself, be considered infringement. *Id.*; *see also Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) ("[D]irect infringement requires the plaintiff to show causation (also referred to as 'volitional conduct') by the defendant.") (citation omitted); *BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 440 (5th Cir. 2017) ("[E]very circuit to address this issue has adopted some version of Netcom's reasoning and the volitional-conduct requirement.") (citations omitted); *Stokes v. Brinor, Inc.*, No. 1:22-CV-973, 2023 WL 4593776, at *6 (N.D. Ohio July 18, 2023) ("Liability for direct infringement . . . requires 'volitional conduct' by the alleged infringer.").

The plaintiffs point out that the Sixth Circuit, unlike many other courts, has not expressly adopted a "volitional conduct" requirement for all direct infringement cases. This court, however, is not called on to adopt or reject a holistic test applicable to all claims of direct infringement, only to determine whether the plaintiffs have plausibly alleged the particular type of unauthorized use on which their claims rely: public performance through transmission. Whether or not there is some kind of "volitional conduct" requirement for all claims of direct infringement, the fact that courts have widely considered direct infringement to apply chiefly, if not exclusively, to active conduct is relevant to the narrower question of whether X Corp.'s alleged actions fall within the Transmit Clause.

The Supreme Court, faced with that clause's ambiguity, looked at the particular activity that the Transmit Clause was intended to prevent and concluded that the activity at issue in *Aereo* was of the same fundamental character. This court asks the same questions about the conduct alleged here, and it reaches the opposite answer: X/Twitter's activity, whatever its legality, is qualitatively distinct from the kind of "transmission" at issue in the Transmit Clause and is much

12

better-suited to the tools of secondary liability. *See Tom Hussey Photography, LLC v. BDG Media, Inc.*, No. CV 20-404-MN, 2020 WL 7481770, at *2 n.1 (D. Del. Dec. 18, 2020) (stating that there is "a long line of copyright cases against internet service providers, in which courts have routinely held that passively hosting infringing works . . . does not rise to the level of . . . direct copyright infringement").

As the Supreme Court explained in *Aereo*, the Transmit Clause was adopted with the specific purpose of ensuring that both the "broadcaster" and the "viewer" of an audiovisual work could, where appropriate, be held liable for direct infringement of the type involved in the transmission of broadcast television through cable systems. *Aereo*, 573 U.S. at 441. That purpose is consistent with the conclusion that "transmission" refers to the actions of the sender and/or ultimate recipient of a copyright-protected work—not those of the operators of the channels through which that transmission was accomplished. Claims against such a third party continue to be appropriate for consideration in connection with theories of secondary liability, not direct infringement. The court, accordingly, will dismiss Count I.

## B. Contributory Infringement

The Supreme Court most recently addressed the issue of contributory copyright infringement in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 914 (2005), which involved the potential liability of the developers of software that enabled widespread peer-to-peer filesharing. The court concluded that "one who distributes a device"—including a piece of software—"with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Id.* at 919. That description does not capture exactly what is alleged in this case, because, among other things, the plaintiffs allege that X/Twitter is a product that

13

became increasingly more infringement-friendly over time, not one that was distributed, in the first instance, to enable piracy. The fact that X Corp.'s actions differ somewhat from those captured by the particular theory of liability that prevailed in *Grokster* is not, however, necessarily grounds for dismissal of Count II. As this court has previously held, *Grokster* was not intended to be a comprehensive statement of the boundaries of contributory infringement under the Copyright Act, but rather a response to the specific pattern of behavior before the Court. *See Eight Mile Style, LLC v. Spotify USA Inc.*, 535 F. Supp 3d 738, 746 (M.D. Tenn. 2021).

The Sixth Circuit has recognized liability for contributory infringement where a party knowingly "induces, causes, or materially contributes to the infringing conduct of another*." Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 398 (6th Cir. 2007) (quoting *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004)). Courts in this circuit—including the Sixth Circuit itself—have cited that test since *Grokster. See, e.g.*, *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 816 (6th Cir. 2008); *Bell v. Worthington City Sch. Dist.*, No. 2:18-CV-961, 2020 WL 2905803, at *11 (S.D. Ohio June 2, 2020). Courts in other circuits have agreed that similar principles of secondary liability can be applied under the Copyright Act, including post-*Grokster. See, e.g.*, *Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 995 (9th Cir. 2009); *Oppenheimer v. Scarafile*, No. 2:19-CV-3590-BHH, 2020 WL 6710864, at *5 (D.S.C. Nov. 16, 2020). This court, accordingly, will continue to apply the Sixth Circuit's ordinary test, with the understanding that it must be construed consistently with *Grokster*.

The Complaint alleges that X Corp. caused or materially contributed to infringement on the X/Twitter platform in the following ways:

> Twitter facilitates, encourages, and materially contributes to . . . infringement, including by continuing to host and transmit known infringing content and continuing to provide its services and facilities to users known to be repeat infringers engaged in infringement. Twitter has the means to take simple steps not

14

> to materially contribute to the specific infringing activity but fails to do so. Instead, Twitter continues to provide the site and facilities necessary for these users of its platform to commit direct infringement, and actively facilitates the ongoing infringement, including via the actions described above.

(Doc. No. 1 ¶ 199.) The plaintiffs, however, have not identified any caselaw or statutory law suggesting that merely hosting infringing content, until it is subject to a takedown notice, constitutes "materially contributing" to infringement under current law. Nor do the plaintiffs identify any authority that would support an argument that the operator of a social media platform materially contributes to infringement simply because there are some preventive steps that the operator could have taken but did not.

Insofar as the plaintiffs are seeking to pursue a broad theory that X Corp. is liable for all of the infringement done on its platform because it has, in effect, created a straightforward, intentional infringement facilitation device, like the peer-to-peer filesharing applications that led to *Grokster* and similar litigation, the plaintiffs have failed to allege that theory in a manner consistent with either *Grokster* or the general law of secondary liability. Many of the supposedly problematic practices that the plaintiffs identify are unremarkable features of X/Twitter generally that X Corp. has simply failed to fence off completely from infringers. For example, while the plaintiffs make much of X/Twitter's monetization of infringing tweets by surrounding them with paid-for promoted material, there is no allegation that those practices were meaningfully different than those X/Twitter applied to monetize popular, but entirely non-infringing, tweets. The plaintiffs complain that it is too easy to upload infringing audiovisual files onto X/Twitter, but, again, the plaintiffs are simply discussing a general feature of the platform. They do not allege that it is easier to post an infringing file than a non-infringing one. Any feature that makes a service easier for all of its users will, by definition, also make the service easier for bad actors. The plaintiffs have not

identified any basis for concluding that X Corp. was obligated to make its service worse for everyone, just to punish the people who misuse it.

The plaintiffs' discrete allegations regarding some specific practices, however, much more plausibly fall into the category of materially contributing to infringement. Particularly striking is the allegation that X Corp. enforces its copyright policies less stringently against individuals willing to pay for its "verified" service. If X Corp. truly did allow some users to effectively purchase the right to be able to infringe with less severe consequences, then that was plausibly an instance of "promoting" X/Twitter's "use to infringe copyright, as shown by . . . affirmative steps taken to foster infringement," which *Grokster* acknowledged as a sufficient basis for liability. *Grokster*, 545 U.S. at 936–37.

Similarly, if X Corp. engaged in egregious delays in responding to valid takedown notices, or outright ignored some notices that were both facially and actually valid, that could support liability. The plaintiffs have not identified any basis for concluding that X Corp. had an obligation to respond to notices of infringement either blindly or instantaneously. In fact, a company that instantly complied with every takedown notice filed, without scrutinizing it at all, would run the risk of enabling abusive, anticompetitive takedown practices—a danger that the DMCA itself acknowledges. *See* 17 U.S.C. § 512(f) (creating liability for some abusive takedown practices). The fact that some delay may be appropriate, however, is not an unlimited license to drag one's feet inordinately or forever. If, in fact, X Corp. allowed delays to extend beyond what was reasonably necessary to process takedown requests, in order to make the platform a more attractive tool to infringers, that improper extension of delays would plausibly amount to "purposeful, culpable . . . conduct" intended to enable infringement, capable of supporting secondary liability. *Grokster*, 545 U.S. at 937.

Finally, the plaintiffs have plausibly alleged that X Corp. engaged in contributory infringement by failing to take meaningful steps to address the actions of severe serial infringers. Nothing in the Complaint is sufficient to plausibly suggest that a social media platform like X/Twitter has an obligation to suspend or terminate the account of every person who infringes more than once, or even every user who infringes a number of times. Like delays, however, recidivism can exist in degrees. The plaintiffs have alleged that there was an identifiable subset of X/Twitter users who openly and obviously used the service as a tool for repeatedly posting infringing content, but X Corp. affirmatively declined to take reasonable steps in response to those users' actions. Again, there is no basis in the law for concluding that the operator of a social media platform will face liability simply because it was less draconian in its enforcement than copyright holders would prefer. If, however, there was a class of X/Twitter users who were brazenly using the platform as an infringement tool, and X Corp. made the decision to unreasonably withhold enforcement of its own policies against those users, with the foreseeable consequence of ongoing infringement, then X Corp. could plausibly be held contributorily liable. *See BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 308 (4th Cir. 2018) (recognizing potential for liability for contributory infringement based on continuing to serve "specific customers" known to be infringers).

The court, accordingly, will dismiss Count II, insofar as it seeks to assert a theory of comprehensive general liability for infringement across the X/Twitter platform, but the court will permit the plaintiffs to proceed with regard to the three potentially unlawful practices that the court has discussed and any instances of infringement attributable to those practices. Specifically, the court will not dismiss Count II as to allegations that X/Twitter (1) allowed users to pay for more forgiving treatment under its anti-infringement policies through its "verified user" program, (2)

17

was unreasonably dilatory in its response to notices of infringement, and (3) failed to take appropriate steps regarding the accounts of severe repeat infringers.

## C. Vicarious Infringement

Generally speaking, a party "infringes vicariously by profiting from direct infringement while declining to exercise the right to stop or limit it." *Grokster*, 545 U.S. at 914. Applying that definition becomes difficult, however, when the defendant is not a party with a conventional relationship of formal control over the infringer—such as an employer or corporate parent—but rather simply the provider of a product or service that is often used in infringement. For example, a company that sells internet-capable personal computers will know, as a matter of basic common sense, that some (likely considerable) portion of its customers will use their computers for copyright infringement. The seller would, moreover, have the power to stop that particular infringement—by not selling its computers to anyone. Technically speaking, then, such a party does, in fact, knowingly profit from infringement that it could have stopped. A broad interpretation of the "right to stop or limit" infringement, therefore, would support liability.

The Supreme Court has recognized, however, that the Copyright Act does not require the seller of a useful, lawful product to scrap its entire business just to spite infringers. The Court faced that very dilemma in connection with the rise of videocassette recorders—that is, VCRs—in 1994, and it held that vicarious liability does not arise merely because a company "sold [a product] with constructive knowledge of the fact that [its] customers may use that [product] to make unauthorized copies of copyrighted material." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. at 439. When the caselaw involving vicarious infringement discusses a defendant's "right to stop or limit" infringement, then, it means something more than simply the right to refuse to distribute one's product to possible infringers.

18

The fact that one type of control is not sufficient to establish liability, however, does not resolve the issue of what level of control would be adequate. To answer that question, the court must look to well-established general principles of vicarious liability, with the understanding that vicarious infringement is not some unique, *sui generis* concept, but rather an application of the same principles of "vicarious liability . . . imposed in virtually all areas of the law." *Id.* at 435. Most relationships that have been found to give rise to vicarious liability, however, do not resemble X Corp.'s relationship to X/Twitter users. Rather, vicarious liability most often arises in a situation involving an actual right of control, such as when a principal, employer, or controlling business owner is held liable for the actions of his agent, employee, or controlled business. *See* Restatement (Third) of Torts: Apportionment Liab. § 13 (2000). Vicarious liability is not strictly limited to those contexts, but, where "the defendant lacked the formal, contractual ability to control the direct infringer," courts typically require something comparably significant, such as "pervasive participation" in the underlying activity. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996).

The plaintiffs have not alleged that X Corp. had a classic employer/employee or principal/agent relationship with X/Twitter's infringing users, but they allege that X Corp. is nevertheless liable vicariously because it "had the legal right and practical ability to supervise and control the infringing activities." (Doc. No. 1 ¶ 208.) The plaintiffs' argument, however, stretches the definitions of "supervise" and "control" beyond their breaking points. The plaintiffs do not allege that X Corp. had the power to oversee users' actual drafting of the relevant tweets. Nor do they allege that X Corp. had the power to oversee users' efforts, if any, to obtain authorization from copyright holders before tweeting. *See Tur v. YouTube, Inc.*, No. CV064436 FMC AJWX, 2007 WL 1893635, at *3 (C.D. Cal. June 20, 2007) (suggesting that the "right and ability to

19

control" standard "presupposes some antecedent ability to limit or filter copyrighted material"). The plaintiffs also do not allege that X/Twitter had editorial control over the content of tweets, other than making the yes-or-no decision of whether or not to remove a tweet after it was posted and brought to X Corp.'s attention. *Cf. Masck v. Sports Illustrated*, No. 13-10226, 2013 WL 2626853, at *7 (E.D. Mich. June 11, 2013) (agreeing with argument that large e-commerce platform "cannot be expected to examine every product posted by a third-party and determine whether or not it is infringing"). That narrow authority falls far short of the level of control typically required for vicarious liability to arise. *See, e.g.*, *Creech v. Addington*, 281 S.W.3d 363, 373–74 (Tenn. 2009) (discussing requirements of vicarious liability in Tennessee).

X Corp. undoubtedly had some power over X/Twitter's users—the way that a company that provides a valued service always has power over the customers who rely on it—but that does not turn customers into even loose equivalents of agents or subordinates. *See Music Force, LLC v. Sony Music Holdings Inc.*, No. CV 19-6430 FMO (RAOx), 2020 WL 5733258, at *3 (C.D. Cal. Aug. 12, 2020) ("[T]he right to terminate services or a contract with an infringer does not amount 'to a right and ability to supervise the infringing conduct.'") (quoting *Routt v. Amazon.com, Inc.*, 584 F. App'x 713, 715 (9th Cir. 2014)). As with the issue of direct infringement, the plaintiffs are trying to force X Corp's actions into a category not intended to account for the actual character of the relationships at issue, when there is a tool—the doctrine of contributory infringement—uniquely suited to the job.[7]

The court stresses, however, that its rejection of vicarious infringement as the appropriate framework for considering the plaintiffs' claims does not mean that the plaintiffs are barred from

---

[7] Because the court finds that X Corp. had insufficient control over its users to support vicarious liability, there is no need to resolve the question of whether the economic benefits it allegedly reaped from tolerating infringement were sufficiently direct to support such a theory.

relying on the evidence that they would offer in support of such a theory, as a means of supporting a claim for contributory infringement under Count II. As the Supreme Court has acknowledged, "the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn." *Sony Corp.*, 464 U.S. at 435 n.17 (quoting *Universal City Studios, Inc. v. Sony Corp. of Am.*, 480 F. Supp. 429, 458 (C.D. Cal. 1979)). The ultimate questions presented by this case are whether and to what extent X Corp. may be liable for the infringing acts of users on its platform. X Corp.'s powers of monitoring and control over users and their tweets are relevant to that inquiry, as are X Corp.'s economic incentives to tolerate infringement—whether or not one resorts to the concept of vicarious, rather than contributory, infringement. The court's decision to permit Count II to proceed with regard to certain challenged policies means that those issues are still part of the case. Insofar as Count III purports to assert a distinct theory of liability, however, it fails and will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, X Corp.'s Motion to Dismiss (Doc. No. 77) will be granted in part and denied in part. Counts I and III will be dismissed, and Count II will be dismissed, except with regard to the following practices: (1) providing more lenient copyright enforcement to "verified" users; (2) failing to act on takedown notices in a timely manner; and (3) failing to take reasonable steps in response to severe serial infringers.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge