**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC. ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> X CORP., D/B/A TWITTER, <br><br> Defendant. | Case No. 3:23-cv-00606 <br> District Judge Aleta A. Trauger |

## JOINT DISCOVERY STATEMENT

# I.    PLAINTIFFS' STATEMENT

## A.  Introduction

This case is about Defendant fueling its business with countless infringing copies of musical compositions, in violation of Plaintiffs' exclusive rights under copyright law. Plaintiffs are major and independent music publishing companies. Defendant owns and operates the social media platform "X" (formerly "Twitter"). To compete with other social media and video sharing sites, Defendant actively hosts, promotes, and streams audiovisual content on X, which is rife with infringing copies of Plaintiffs' musical compositions. Rather than meet its legal obligations, Defendant permits, encourages, and assists these infringements on X, while failing to obtain the necessary licenses that its competitors procure.

In its March 5, 2024 order, the Court dismissed Plaintiffs' claims for direct and vicarious infringement but preserved Plaintiffs' contributory infringement claim in connection with (i) Defendant's preferential treatment to paying users; (ii) Defendant's failure to act on takedown notices in a timely manner; and (iii) Defendant's failure to take reasonable steps in response to serial infringers. ECF 90, at 21 (the "Order"). In dismissing the direct and vicarious infringement claims, the Court made clear that "[t]he ultimate questions presented by this case are whether and to what extent X Corp. may be liable for the infringing acts of users on its platform. *X Corp.'s* ***powers of monitoring and control over users and their tweets*** *are relevant to that inquiry, as are X Corp.'s* ***economic incentives to tolerate infringement****." Id.* (emphasis added).

Obtaining discovery from Defendant has been an arduous process. Plaintiffs served their written discovery on May 15, 2024. For several months, Defendant flatly objected to providing any answers or documents in response to most of Plaintiffs' interrogatories and requests for production. After much work, Defendant backed off some of those positions and compromises

1

were reached. So far, however, Defendant has produced only 139 documents, while Plaintiffs have produced 17,948 documents. Those production numbers are obviously off-kilter, and even more so considering that the bulk of the relevant discovery in infringement actions usually comes from the accused infringer.

At Plaintiffs' request, the Court held a telephone conference on November 14, 2024. The Court directed the parties to confer again, with local counsel participating, and it set a further conference for December 4th. ECF 106. Defendant indicated it was unavailable to confer before November 22nd. As a result, the parties first conferred again on November 22nd, and then again on November 26th. Local counsel for both sides participated. Only some progress was made.

The parties remain at an impasse as to three categories, covering 17 individual requests. They are as follows: (1) requests regarding Defendant's algorithms and other tools to monitor and control content on its platform ("Monitoring & Control Requests"); (2) requests regarding Defendant's economic incentives to tolerate infringement ("Economic Incentives Requests"); and (3) requests regarding Defendant's efforts to garner platform users ("Competitive Analyses Requests"). The discovery sought in each of the categories is relevant and Defendant's unreasonable objections and/or proposed limitations should be overruled.[1]

To be clear, this discovery dispute currently is only about relevance, *not* burden. Defendant consistently cites burden, while not identifying details, not looking into what would be involved to collect documents, and not proposing reasonable alternatives. It is not enough to baldly suggest that requests would lead to "significant" or "vast" discovery—more information must be provided. And, where discovery would be "vast," the appropriate solution is to tailor the collection, not cast

---

[1] **Exhibit A** identifies each Interrogatory ("Rog") and Request for Production ("RFP") at issue, organized according to the three categories described above, Defendant's objections, and the current status of the parties' positions.

2

aside the subject matter of the search. At every stage of the parties' conferrals, Plaintiffs have explained that they are willing to work with Defendant with respect to managing how it approaches collection and production. For instance, for certain requests, it may be that presentations and planning documents are sufficient, without delving into every related document or even email. However, instead of negotiating with Plaintiffs, Defendant refuses to produce *any* documents or information on relevance grounds (except to propose responses so narrowly tailored that they will not result in any production).

Applying a cramped reading of the Order, while also holding Plaintiffs to a "smoking gun" standard, Defendant insists discovery is only *relevant* if the requested documents will alone establish an element of a claim or liability in this case. But that is an unreasonably narrow view of relevance. *Compare Equal Emp. Opportunity Comm'n v. FedEx Ground Package Sys., Inc.*, 2018 WL 1441426, at *3 (W.D. Pa. Mar. 21, 2018) (rejecting attempt to "frame relevancy as a binary test where information is either irrelevant or a 'smoking gun.'"). Such a standard is inconsistent with Federal Rule 26(b). *See Eight Mile Style, LLC v. Spotify USA Inc.*, 2022 WL 20936608, at *4 (M.D. Tenn. Mar. 31, 2022) (there is a "broad definition of relevance for the purposes of discovery"); Fed. R. Civ. Pro. 26(b) advisory committee's note ("a flexible treatment of relevance is required" for discovery purposes). The Order addressed theories of potential liability, not the issues in the case concerning willfulness, damages, or affirmative defenses. As to the contributory claim in suit, the Court clarified that that X Corp.'s powers of monitoring and control over users and their tweets are relevant, as are X Corp.'s economic incentives to tolerate infringement. The Order did not preclude the relevant discovery addressed below.

3

**B. Plaintiffs' Monitoring & Control Requests Are Relevant**

The following requests fall under the umbrella of Defendant's "powers of monitoring and control over users and their tweets" (Order at 21) that this Court already deemed relevant:

- documents sufficient to describe Defendant's algorithms that set how and where posts appear on X and who sees them (RFP No. 47), and identification of the individuals who design and develop such algorithms (Rog No. 24);

- documents sufficient to show Defendant's "tools, programs, or methods [] use[d] to monitor and/or control Platform Users or content uploaded or posted by Platform Users" (RFP No. 56), and identification of individuals with responsibility of such tools, programs or methods (Rog No. 23);

- documents sufficient to show how and where advertisements are placed on X (RFP No. 48); and

- identification of individuals with responsibility over the system used to stream posts (Rog No. 22).

**Exhibit A** at 1-5.

Defendant contends that "X Corp.'s powers of monitoring and control over users and their tweets" are only relevant if those powers, standing alone, can constitute contributory liability. Defendant would thus withhold documents showing that X's algorithms promote a category of content that is rife with infringing material. *See infra* Def's Statement at 6-7.

But Defendant is not entitled to prevent the Court and jury from understanding how it promotes posts, has insights into those posts, places advertisements along posts, hosts and streams the posts, and/or fails to stop or limit that activity for infringers and infringing content identified in infringement notices. This all goes to how Defendant materially contributes to the infringing activity—an element of contributory infringement. *See*, *e.g.*, *UMG Recordings, Inc. v. Grande Commc'ns Networks, L.L.C.*, 118 F.4th 697, 716 (5th Cir. 2024) (affirming jury instructions that defendant could be liable if it "intentionally continue[d] to provide access to infringing" content where it could "ta[ke] basic measures to prevent further damages to copyrighted works" which

4

included termination of certain services as used in context outside of copyright infringement); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 671 (9th Cir. 2017) (in "online context," defendant "is liable under a material contribution theory of infringement 'if it has *actual* knowledge that *specific* infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works.'" (citation omitted)). This evidence is relevant to liability, willfulness, and statutory damages, including as Defendant continues to engage in that activity for infringing users and content identified in infringement notices.

Defendant's position would hamper the Court, and eventually the jury, from understanding core information commonly relied on in infringement cases like this one. *See, e.g., Capitol Recs., LLC v. Escape Media Grp., Inc.*, 2014 WL 12698683, at *13-14 (S.D.N.Y. May 28, 2014) (describing "Operation and Functionality of Grooveshark.com" and "Storage and Organization of Grooveshark.com Audio Content"); *Arista Recs. LLC v. Usenet.com, Inc*., 633 F. Supp. 2d 124, 129-131 (S.D.N.Y. 2009) *(*describing "The USENET and How It Works" and "Defendants and Their Business"*); EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 86 (2d Cir. 2016) (providing background on "MP3tunes.com and Sideload.com").

Defendant tries to create the veneer of compromise by agreeing to (i) produce "documents sufficient to describe aspects of any algorithm (or technical process for advertising) that promotes infringing content over non-infringing content" in response to RFP Nos. 47 and 48 and identify individuals with knowledge of algorithms or systems "that promote posts containing infringing music or infringing audiovisual content over non-infringing content" in response to Rog Nos. 22 and 24; and (ii) "produce documents sufficient to reflect *its use* of technologies, tools, or devices to detect or limit copyrighted music in posts or live streams by Platform users" in response to RFP

5

No. 56 (emphasis added) and identify individuals "with knowledge of programs or tools to monitor the site for copyrighted music on the platform" in response to Rog No. 23. **Exhibit A** at 1-5. That does not work.

*First*, many infringers do not spell out their infringement. Indeed, Defendant's stated position is that, without a takedown notice, it is not aware whether content is infringing versus non-infringing. Thus, although Plaintiffs are certainly interested in documents that show Defendant has algorithms that specifically promote infringing content over non-infringing content, that should be a floor rather than the ceiling. As they build their case on liability, willfulness, and damages, Plaintiffs are entitled to utilize evidence showing that Defendant's algorithms promote a category of content on its platform that is rife with infringing material, including as the algorithms interact with specific infringers and infringements brought to Defendant's attention. That does not equate to a "theory of general liability" for infringement across the platform, *see infra* Def. Statement at 7, nor would it be impermissible on other fronts..

Defendant's proposal is also unworkable. It puts Plaintiffs in the untenable position of relying on Defendant to determine what constitutes promotion of infringing content, which the parties likely dispute. In fact, Defendant has repeatedly been unable to explain how it would search for documents that depict promotion of only infringing music. Even now, Defendant acknowledges that it has no test for finding documents responsive to its proposal—it simply states that "[i]f X has an internal understanding that it uses to determine whether certain content is infringing", then the documents "will reflect that fact". *See infra* Def. Statement at 8. Plaintiffs should not be beholden to Defendant's "internal understanding" of infringement. Plaintiffs have a right to discovery on what X *does*, not restricted to what X regards as infringement. Contrary to Defendant's contention, its proposal is full of discretionary decisions, *see id.*, starting with X's

6

discretion on what constitutes infringement. For instance, Defendant has contended that it would be irrelevant—and thus Defendant would not produce—any evidence that its algorithm promotes use of popular commercial music on X despite the reality that most of such music is posted on X without authorization.

*Second*, by agreeing to only produce documents on its current use of tools to monitor copyright infringement (if any) and information on persons with knowledge specific to copyright infringement, in response to RFP No. 56 and Rog No. 1, Defendant seeks to preclude discovery on its *powers and capabilities* to reduce infringement that it has chosen not to use. This limitation runs contrary to the Court's guidance that Defendant's "powers of monitoring and control" are relevant, the material contribution element of copyright infringement, and willfulness and damages. *See supra.* Defendant's argument that there is no requirement that it do everything possible to limit infringement is misplaced. *See infra* Def. Statement at 9. The discovery about Defendant's monitoring *capabilities* is relevant to whether Defendant took reasonable steps with respect to specific known infringers and specific known infringements.

Thus, Defendant's proposed "compromise" is not a compromise at all. It is an attempt to avoid producing anything other than the most egregious, smoking-gun documents. Nor has Defendant offered any details on the potential burden of responding to Plaintiffs' requests—only that because Plaintiffs' requests are not relevant, it is too burdensome to conduct related searches. That is the case even for Plaintiffs' interrogatories where Plaintiffs have indicated that they are willing to receive responses in the form of some corporate representatives with pertinent knowledge, and where Defendant has already agreed to produce organizational charts (to the extent they exist) covering the exact same topics. This position simply makes no sense. Defendant will commit to search for an organizational chart or other document sufficient to identify personnel

with material responsibility for a topic but refuses to answer an interrogatory for the same information. And in the case of document requests, Defendant fails to explain how conducting an analysis on X's internal understanding of infringement (however it may be defined) is less burdensome than producing select documents responsive to Plaintiffs' requests.

### C. Plaintiffs' Economic Incentive Requests Are Relevant

The following requests regarding use of music on X fall under the umbrella of Defendant's "economic incentives to tolerate infringement" (Order at 21) that this Court already deemed relevant:

- reports, studies and analyses concerning use of music on X (RFP No. 1);

- plans or strategies for promoting and generating revenue from use of music on X (RFP No. 2);

- strategies and analyses regarding whether or how to license music on the platform (RFP No. 5), and identification of individuals with information on such strategies (Rog No. 2);

- analyses of user demographics and the impact that use of music or audiovisual content on X has on attracting or retaining users (RFP No. 52);

- comparative analyses of user engagement of posts featuring audiovisual content versus posts without such content (RFP No. 53);

- Defendant's encouraging users to upload media content to X rather than link to third-party sites (RFP No. 54);

- Defendant's decision to increase video length limits for posts on X (RFP No. 55); and

- identification of individuals with responsibility for Defendant's efforts relating to use of music on X (Rog No. 1).

**Exhibit A** at 6-12.

Defendant refuses to produce this discovery on the theory that showing a mere functionality of music does not equate to liability. But Defendant's position is a strawman. The relevance of these requests is not merely that providing a particular functionality constitutes liability. Rather,

these requests relate to "economic incentives to tolerate infringement" that the Court deemed relevant. Defendant promotes use of music on X, knowing full well that much, perhaps most, of it is infringing because Defendant does not obtain the licenses that its competitors procure. Defendant has tolerated and embraced such infringement because Defendant understands that use of music, including infringing music, drives user demand on its platform (*i.e.*, is of exceptional value to Defendant). Nonetheless, if one set of documents shows that X knows music on X is overwhelmingly infringing and a separate set of documents shows that Defendant promotes such music on X because it drives engagement and revenue, Defendant would not produce the second set because it alone would not establish X's contributory liability. But the combination of the two speak to economic incentives to tolerate infringement in the context of X's knowledge of infringing uses of music on its platform, including as to the three categories the Court recognized for Plaintiffs' contributory infringement claim.

Defendant's general knowledge that music fuels its business, Defendant's efforts to encourage music uploading (knowing much of it is infringing), and Defendant's considering whether to obtain proper licenses for use of that music are also relevant to both willfulness and damages. It can be considered in connection with whether Defendant acted in reckless disregard to Plaintiffs' copyrights and the need for deterrence. The same is true for Defendant's understanding of the impact of making use of music available on drawing users to X, and the motivation behind changes to the platform that will in turn attract such users (*e.g.*, increase in video length limits to "about three hours long", ECF No. 95, ¶ 125).

True to form, Defendant again offers exceptionally narrow avenues for discovery. Defendant said it will produce documents concerning "the use of infringing music" and X's promotion and support of such infringing music in response to RFP Nos. 1-2, documents showing

9

the impact of use of infringing music or content on attracting users in response to RFP No. 52, documents concerning analyses of user engagement of "posts featuring infringing audiovisual content versus" posts without such content in response to RFP No. 53, and documents concerning X's encouragement of users to upload infringing content in response to RFP No. 54. **Exhibit A** at 6-12. Defendant has also agreed to identify individuals with involvement related to "infringing use of music on the platform" in response to Rog No. 1. *Id*. at 11. As above, Defendant's position, consistently limited to "infringing" music, is too narrow, because many infringers do not expressly spell out how they encourage infringement, and circumstantial evidence is discoverable. And again, even if such direct evidence exists, Plaintiffs should not be forced to rely on Defendant to define the contours of what constitutes infringement, encouraging infringement, or the impact thereof.

In effect, Defendant's position is that Defendant, not the Court or jury, gets to determine what inferences may be drawn from circumstantial evidence concerning Defendant's economic incentives. At best, Defendant has conveniently decided its promotion of use of music generally (and related requests) does not influence its actions to permit continued infringement on its platform. At worst, Defendant knows that discovery into these areas will show the opposite. In any event, Defendant's position is improper.

Defendant again fails to support its contention that Plaintiffs' requests will result in an overly burdensome production. Defendant states that the platform generally contains millions of "posts about music and music related topics" but ignores Plaintiffs' clarification that its requests on "use of music" are targeted to uploading, posting, or streaming of music (e.g., posts that include audio or audio-visual content featuring music), which Defendant concedes makes up a "small portion" of the posts about music. *See infra* Def. Statement at 12. Moreover, the volume of posts

of course does not speak to how many documents Defendant might have to produce, which would be far lower. And, in all events, Plaintiffs' requests here are generally seeking analyses, planning, or strategy documents, not all documents related to music as Defendant contends. Defendant ought not receive credit for imagining burden without assessing it and reducing it through negotiation.

### D.  Plaintiffs' Competitive Analyses Requests Are Relevant

Finally, the last category of at-issue requests includes documents concerning (i) changes made to X to compete with other social media sites; and (ii) competitive analyses, including on entities Defendant views as its competitors. **Exhibit A** at 13-15. These topics are relevant for the multiple reasons discussed below, but Defendant has stonewalled (except for a late offer to produce documents consistent with its theme—documents that reflect optimizing infringing content).

*First*, Defendant updated X to keep up with its competitors and worked to attract its competitors' users to its platform despite knowing that without proper licensing, such steps would increase infringement. For instance, Defendant seeks out users from competing sites who post (licensed) music on those sites, knowing they will make similar posts on X without license, resulting in infringement. That bears directly on Defendant's economic incentives to tolerate infringement that this Court has deemed relevant to liability and that also goes to issues of willfulness and damages. *See supra* at Section I.C.

*Second*, there is an "existing market for social media companies to pay fees for the use of musical compositions" including with well-known platforms such as TikTok, Facebook, Instagram, YouTube, and Snapchat. ECF No.1, ¶ 7. Those platforms pay licensing fees for Plaintiffs' music and Defendant does not. Defendant's unpaid self-help to the same content and same uses as its competitors is a direct threat to the existing licensing market. *Id*. That Defendant attempts to compete with these platforms while taking a free license for itself is squarely relevant

to the market at issue, the harm Defendant creates (which is in dispute. ECF No. 95, ¶ 7 (denying that Defendant's conduct harms these markets)), and resulting damages.

Once again, Defendant now offers exceptionally narrow areas of discovery in response to these requests. It will produce documents that show changes made to X to "more effectively compete" with other platforms with respect to optimizing "infringing music or infringing audiovisual content" in response to RFP No. 50, and similarly will produce competitive analyses "that relate to the use of infringing copyrighted content" in response to RFP No. 51. For the same reasons described above in Sections I.B and I.C, these positions are designed to ensure that Defendant is unlikely to produce anything in response to these requests, and to force Plaintiffs to rely on Defendant to determine what constitutes infringement. That is improper.

## II.    DEFENDANT'S STATEMENT OF THE DISPUTE

### A.  Introduction

This case concerns whether Defendant X Corp. ("X") can be held liable when users upload infringing copyrighted content onto X's platform in violation of X's Terms of Service.  In its March 5, 2024 Opinion on X's Motion to Dismiss (Dkt, 90, "MTD Decision"), the Court pared down Plaintiffs' expansive secondary liability claims by dismissing Plaintiffs' direct infringement and vicarious  liability claims, and holding that Plaintiffs could proceed against X on a theory of contributory liability based only on three alleged practices by X:  "(1) providing more lenient copyright infringement enforcement to 'verified' users; (2) failing to act on takedown notices in a timely manner; and (3) failing to take reasonable steps in response to severe serial infringers." MTD Decision at 21. The Court also held that evidence pertaining to "X Corp.'s powers of monitoring and control over users and their tweets" and "X Corp.'s economic incentives to tolerate infringement" are relevant to whether X "may be liable for the infringing acts of users on its platform" arising out of the three alleged practices identified by the Court.  *Id*.

Although Plaintiffs' brief casts aspersions, X's approach to discovery has been guided by the Court's analysis in the MTD Decision.  It is true that the parties have spent months negotiating the parameters of discovery, but that is largely because Plaintiffs' initial discovery requests were sweeping in breadth and were not tailored to the needs of the case as narrowed by the Court. Nevertheless, after many hours of discussion, the parties have agreed on the production of documents and information going to the core claims and defenses in the case.  X has agreed to

1

produce a broad range documents and information in response to 46 of 65 requests for production

and 19 of 24 propounded Interrogatories.[2]  This information includes:

- Documents concerning X's DMCA and Copyright policies and practices (RFP Nos. 7-8, 10-11, 25);

- Documents reflecting the application of its Copyright Policies to Verified Users, as well as documents sufficient to identify requirements for becoming a Verified User since December 2021 and documents sufficient to show the changes made to those requirements (RFP Nos. 12-14);

- Documents reflecting (a) every DMCA notice received by X from all rightsholders from June 2021 (six months prior to the date of Plaintiffs' first notice); (b) all actions taken by X in response to DMCA notice received by X from all rightsholders from June 2021; and (c) documents showing all actions taken in response to DMCA notices (such as account suspensions and reactivations, communications to users and right holders, and disabled content) (RFP Nos. 19-20, 22-23, 27-31, 37, 38, 41-43; *see also* ROG Nos. 13-19).

A complete list of discovery requests to which X has agreed to respond to is reflected in **Exhibit**

**B**.  A brief review of this list should alleviate any potential concern that X is unreasonably resisting

discovery in this case.

By contrast, the requests currently in dispute are on the fringe of relevance, and they are

overbroad in that they implicate entire categories of documents that do not pertain to the as-

narrowed claim or relevant defenses.  For each of these requests, wherever possible, X has offered

a compromise that would narrow the documents sought to those that are arguably relevant, and

that would spare X from having to collect and review enormous volumes of documents that pertain

to infringement-neutral policies or practices relating to algorithms, audiovisual files, and/or music

---

[2]   The twenty-four Interrogatories served by Plaintiffs contain multiple subparts, which, when properly counted, actually constitute forty-three interrogatories—three more than what is permitted in the Case Management Order.  Dkt. 101 at 3 ("Local Rule 33.01(b) is expanded to allow 40 interrogatories, including subparts").  Without waiving its objection that Plaintiffs have exceeded the maximum number of Interrogatories allowed by the Local Rules, X will refer to the Interrogatories by Plaintiffs' numbering convention.

that qualify as general features of the platform upon which this Court has already ruled liability cannot be premised. *See* MTD Decision at 15-16.

Plaintiffs argue that X's proposals to narrow the scope of the requests are "designed to avoid any meaningful production." That characterization is unfair and untrue. The Court has said: "It does not appear to be disputed, in this litigation, that X/Twitter users sometimes engage in copyright infringement. What is disputed is the extent to which X Corp. has ***actively encouraged*** that conduct, if at all." *Id.* at 2 (emphasis added). The Court has also said: "The court, accordingly, will dismiss Count II, insofar as it seeks to assert a theory of ***comprehensive general liability for infringement across the X/Twitter platform***, but the court will permit the plaintiffs to proceed with regard to the three potentially unlawful practices that the court has discussed and any instances of infringement attributable to those practices." *Id*. at 17 (emphasis added). X has attempted in good faith to convert Plaintiffs' requests which are directed toward a theory of "general liability for infringement across the X/Twitter platform" into requests targeting evidence that X "actively encouraged" or "tolerates" infringement. If X possesses documents that show it intentionally promoted or tolerated infringement, or had an economic incentive to do so, they will be responsive to X's proposed modified requests and produced in this case.

Plaintiffs are also not correct that "this discovery dispute currently is only about relevance, *not* burden or proportionality." The scope of discovery is properly limited to matters that are relevant "and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The additional burden to X of having to collect, review, and produce vast quantities of irrelevant documents in response to the disputed requests is an important consideration, especially in light of the extensive discovery on the core issues X has already agreed to undertake. *See generally* Exhibit B.

Although not relevant to the instant dispute, Plaintiffs accuse X of being dilatory in its discovery obligations because it has only produced 139 non-custodial documents to date. However, as Plaintiffs are aware, X has been preparing a massive database containing millions of datapoints that reflect all DMCA notices received by X from rightsholders, and includes information on actions and communication taken in responses to those notices, among other information sought by Plaintiffs (e.g., Exhibit B, RFP Nos. 19-20, 22-23, 27-31, 37-38, 41, 43; ROG Nos. 13-19 ). Compiling this data has taken tremendous time and resources. And although this dataset will only count as one document in Plaintiffs' tally, it is responsive to many discovery requests and represents months of work by X and its counsel.

### B. X's Narrowed Requests On The General Technical Operations Of The Platform Are Appropriate

This group of requests, which Plaintiffs call "monitoring and control" requests, fall into two distinct categories: (1) requests related to the technical functioning of X's algorithms and (2) requests related to X's ability to monitor content posted by users to the Platform. Each is discussed in turn below.

### 1. Requests About Algorithms That Govern User Feeds

| Plaintiffs' Request | X's Proposed Compromise |
|---|---|
| **RFP NO. 47:** Documents sufficient to describe the Platform's algorithms that govern what posts appear where, who sees which posts, how posts are selected for any given Platform User's "For you" timeline, how posts are selected for inclusion under "Topics" for any given Platform User, how the "Trending" or "What's happening" section of Platform is populated, how the "Who to follow" section of the Platform is populated, and placement of "Promoted Ads," "Follower Ads," "Promoted-only Posts" or | X is willing to produce documents sufficient to describe aspects of any algorithm (or technical process for advertising) that promotes **infringing** content over non-infringing content. |

4

| | |
|---|---|
| any other advertised or promoted content on the Platform. | |
| **RFP NO. 48:** Documents sufficient to show or describe the technical process by which advertisements or promoted content are placed on the Platform, including factors considered in where the advertisement will be placed (such as targeted geographic location or demographic) and the steps taken to actually place the advertisement. | X is willing to produce documents sufficient to describe aspects of any algorithm (or technical process for advertising) that promotes **or monetizes infringing** content over non-infringing content. |
| **ROG NO. 22:** Identify the persons, including current and former employees, with responsibility for or involvement in designing, developing, implementing, operating, or maintaining the system used to stream posts or uploaded files featuring music or audio-visual content on the Platform. | X will identify persons with knowledge of systems that promote posts containing **infringing** music or **infringing** audiovisual content over non-infringing content. |
| **ROG NO. 24:** Identify the persons, including current and former employees, with responsibility for or involvement in Your algorithms, including the design, development, operation, and maintenance of your algorithms that govern how posts are selected for any given Platform User's "For you" timeline, how posts are selected for inclusion under "Topics" for any given Platform User, how the "Trending" or "What's happening" section of Platform is populated, how the "Who to follow" section of the Platform is populated, and how and where advertisements or other promoted content are populated on the Platform. | X will identify persons with knowledge of algorithms that promote posts containing **infringing** music or **infringing** audiovisual content over non-infringing content. |

Plaintiffs greatly over-read the Court's instruction that "X Corp.'s powers of monitoring and control over users and their tweets" are relevant to whether X "may be liable for the infringing acts of users on its platform" arising out of the three alleged practices by X identified by the Court. MTD Decision at 21. A host of features of the X platform that can be broadly described as relating to "monitoring or control" have nothing to do with the remaining issues in this case. To take just

5

one example, RFP No. 47 demands documents concerning "what posts appear where, who sees which posts, how posts are selected for any given Platform User's 'For you' timeline, how posts are selected for inclusion under 'Topics' for any given Platform User, how the 'Trending' or 'What's happening' section of Platform is populated, how the 'Who to follow' section of the Platform is populated, and placement of 'Promoted Ads,' 'Follower Ads,' 'Promoted-only Posts' or any other advertised or promoted content on the Platform." Information such as this, about how X's algorithms operate generally to organize content in user's feeds, will not shed light on alleged infringement and is not a proper subject of discovery in the wake of the Court's MTD decision. Beyond that, as Defendant has explained to Plaintiffs, this information about X's proprietary algorithms is highly sensitive competitive information that lies at the heart of X's business operations.

In an effort to tailor these requests to the needs of the case, X has limited their scope to infringing content. This approach makes sense. For example, how X matches advertisements to posts (RFP No. 48) would demonstrate an intent to profit from known infringement only if X treated infringing content differently than non-infringing content and matched it to ads. MTD Decision at 15 ("[W]hile the plaintiffs make much of X/Twitter's monetization of infringing tweets by surrounding them with paid-for promoted material, there is no allegation that those practices were meaningfully different than those X/Twitter applied to monetize popular, but entirely non-infringing, tweets."). The cases cited by Plaintiff concerning material contribution support this view—as they all recognize that material contribution requires knowledge of ***specific infringing*** content.

Plaintiffs argue that X's proposal "does not work" because it is unlikely that X's algorithms are specifically designed to promote infringing content. Instead, Plaintiffs say, they are entitled to

6

"build their case" with "evidence that Defendant's algorithms promote a category of content that is rife with infringing material."  In other words, Plaintiffs want to build a case against X on a theory of general liability—namely, because X allows users to post audiovisual content, some of which contains unlicensed music, X is contributorily liable if its algorithms, policies or practices promote  music or  audio visual content as a general category.  ***The Court has rejected this theory of general liability.***  MTD Decision at 15. ("Insofar as the plaintiffs are seeking to pursue a broad theory that X Corp. is liable for all of the infringement done on its platform because it has, in effect, created a straightforward, intentional infringement facilitation device, like the peer-to-peer filesharing applications that led to *Grokster* and similar litigation, the plaintiffs have failed to allege that theory in a manner consistent with either *Grokster* or the general law of secondary liability."); *id.* 17 ("The court, accordingly, will dismiss Count II, insofar as it seeks to assert a theory of comprehensive general liability for infringement across the X/Twitter platform, but the court will permit the plaintiffs to proceed with regard to the three potentially unlawful practices that the court has discussed and any instances of infringement attributable to those practices."); *id.* 15-16 ("Any feature that makes a service easier for all of its users will, by definition, also make the service easier for bad actors. The plaintiffs have not identified any basis for concluding that X Corp. was obligated to make its service worse for everyone, just to punish the people who misuse it."); *id.* 15 ("The plaintiffs, however, have not identified any caselaw or statutory law suggesting that merely hosting infringing content, until it is subject to a takedown notice, constitutes 'materially contributing' to infringement under current law.").

As for Plaintiffs' argument that this evidence is relevant to damages, if liability cannot be premised on a theory of general liability for infringement-neutral features, surely the same evidence cannot be the basis for a finding of "willful infringement" for the purposes of awarding

7

statutory damages.  *See Joe Hand Promotions, Inc. v. Truong*, 2020 WL 7014303, at *7 (M.D. Tenn. May 20, 2020) (factors relevant to statutory damages are "the expenses saved and profits reaped by the defendants in connection with the infringements, the revenues lost by the plaintiffs as a result of defendants' conduct, and the infringers' state of mind whether willful, knowing, or merely innocent").

Plaintiffs' argument that narrowing the requests to "infringing" content requires "Defendant to determine what constitutes promotion of infringing content" should be rejected.  If X has an internal understanding that it uses to determine whether certain content is infringing— and its algorithms or systems are designed to identify and promote that content—then the documents in its files will reflect that fact.  No discretionary decisions will need to be made.

Plaintiffs also argue that how X's algorithm organizes content in user's feeds is necessary background information.  X disputes this premise.  Plaintiffs do not need to know precisely how X's highly proprietary algorithms operate to effectively litigate this case. Moreover, general background information about how the site works is publicly available on X's website.  *See X Trends FAQ*, available at https://help.x.com/en/using-x/x-trending-faqs (last visited Nov. 30, 2024).

## 2. <u>Requests About Content Moderation</u>

| Plaintiffs Request | X's Proposed Compromise |
|---|---|
| **RFP NO. 56:** Documents sufficient to show or describe the tools, programs, or methods You use to monitor and/or control Platform Users or content uploaded or posted by Platform Users, including as it relates to copyright, copyright infringement, and/or actual or potential violations of Your Acceptable Use Policy. | X will produce documents sufficient to reflect its use of technologies, tools, or devices to detect or limit **copyrighted music** in posts or live streams by Platform users. |

8

| | |
|---|---|
| **ROG NO. 23:** Identify the persons, including current and former employees, with responsibility for or involvement in oversight of content uploaded or posted by Platform Users, including any monitoring programs or tools used to flag certain content uploaded by Platform Users and use of tools such as "visibility filtering", suppression of posts, "shadow banning", and/or "deamplification". | X will identify persons with knowledge of programs or tools used to monitor the Platform for **copyrighted music**. |

Plaintiffs argue this set of requests fall within the Court's directive that discovery into X's "powers of monitoring and control over users and their tweets" are relevant to the contributory liability claim. However, not all monitoring conducted by X is relevant to this case. For example, documents concerning tools or tactics used by X to monitor the platform for violent content, hate speech, child safety, content related to suicide, or pornographic content, for example, would not bear on the question of X's secondary liability for copyright infringement.

X has modified Plaintiffs' requests to focus on monitoring of copyright infringement. Plaintiffs argue that X's formulations are too narrow because they do not extend to the "powers and capabilities to reduce infringement that [X] has chosen not to use." As this Court has recognized, "plaintiffs [have not identified] any authority that would support an argument that the operator of a social media platform materially contributes to infringement simply because there are some preventive steps that the operator could have taken but did not." MTD Decision at 15. There is no requirement in the law that X do everything in its power, or the power of any Internet company, to reduce infringement, and the DMCA expressly states that platforms hosting user generated content are not required to affirmatively monitor their platforms for copyright infringement to obtain safe harbor. *See* 17 U.S.C. § 512(m). Accordingly, any "voluntary undertaking" by X "to monitor videos for infringement" should not "deprive it of the statutory

9

privilege not to monitor for infringement of music." *Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 98 (2d Cir. 2016).

### C. X's Positions On Requests About General Features Of The Platform Are Appropriate

The parties dispute the appropriateness and scope of nine discovery requests that Plaintiffs characterize as concerning Defendant's "economic incentives to tolerate infringement." X disputes this characterization because these requests implicate a tremendous volume of information concerning *infringement-agnostic* aspects of the platform that the Court has said cannot form the basis of contributory liability. MTD Decision at 15. These requests fall into two distinct categories, which are discussed below in turn: (1) requests that relate to the use of music as a general feature of the platform and (2) requests about whether X has considered licensing music as a feature of the platform.

#### 1. Requests Concerning Music As A General Feature Of X's Platform

| Plaintiffs' Request | X's Proposed Compromise |
|---|---|
| **RFP NO. 1:** All documents and communications, including reports, studies, research, presentations, surveys, or analyses, concerning the use of music on the Platform. | Documents and communications, including reports, studies, research, presentations, surveys, or analyses, concerning the use of **infringing** music on the Platform. |
| **RFP NO. 2:** All documents and communications, including reports, studies, research, presentations, or analyses, concerning Your plans or strategies, actual or considered, for promoting, supporting, generating user engagement from, generating revenue from, or profiting from the use of music on the Platform | Documents and communications, including reports, studies, research, presentations, or analyses, concerning X's plans or strategies, actual or considered, for promoting, supporting, generating user engagement from, generating revenue from, or profiting from the use of **infringing** music on the Platform |
| **RFP NO. 52:** Presentations, summaries, and analyses of: (a) the demographics of Platform Users; and (b) the impact that use of music or audiovisual content on the Platform has on | Presentations, summaries, and analyses of: (a) the demographics of Platform Users; and (b) the impact that use of **infringing** music or **infringing** audiovisual content on the |

10

| | |
|---|---|
| attracting or retaining Platform Users, driving engagement, and adding subscribers. | Platform has on attracting or retaining Platform Users, driving engagement, and adding subscribers. |
| **RFP NO. 53:** All documents and communications concerning comparative analyses of Platform User engagement (including metrics such as likes, views, time spent viewing posts, reposts, and replies) of posts featuring audiovisual content versus posts without audiovisual content. | Documents and communications concerning comparative analyses of Platform User engagement (including metrics such as likes, views, time spent viewing posts, reposts, and replies) of posts featuring **infringing** audiovisual content versus posts without **infringing** audiovisual content. |
| **RFP NO. 54:** All documents and communications concerning Your encouragement for users to upload media content to Your servers rather than link to third-party sites. | Documents and communications concerning X's encouragement for users to upload **infringing** media content to X's servers rather than link to third-party sites. |
| **RFP NO. 55:** All documents and communications concerning Your decision(s) to increase video length limits for posts on the Platform. | Discovery should be denied. |
| **ROG NO. 1:** Identify the persons, including current and former employees, with responsibility for or involvement in Your efforts relating to use of music on the Platform, including any effort to promote, support, research, analyze or generate user engagement or revenue from use of music on the Platform. | X is willing to identify individuals with responsibility or involvement related to the **infringing** use of music on the Platform. |

This set of requests implicates a breathtakingly broad set of documents and information concerning the use of music as a general feature of X's platform. In effect, these requests seek all documents concerning the use of music on the platform.

The Court already has rejected Plaintiffs' theory that X can be held secondarily liable for user posts merely because X offers neutral functionality (such as the ability to upload audiovisual files that contain music) that is used to infringe. MTD Decision at 15-16. In denying Plaintiffs' bid to premise liability on this theory, the Court explained: "[m]any of the supposedly problematic

11

practices that the plaintiffs identify are unremarkable features of X/Twitter generally that X Corp. has simply failed to fence off completely from infringers." *Id.* at 15. Plaintiffs' plans to premise its case against X on "Defendant's general knowledge that music fuels its business" have been foreclosed by the Court's prior decision.

Plaintiffs' argument is that if X promotes the use of music (as a general category) on the platform, this demonstrates an "economic incentives to tolerate infringement." That argument is flawed because it wrongly equates the use of ***music*** on the platform with the use of ***infringing music*** on the platform. They are not equivalent. The platform contains millions—if not billions—of user posts about music and music related topics, only a small portion of which attach audiovisual content. Moreover, there are many ways that users incorporate music into posts without infringing: for example, the music could be in the public domain, the use of the music could be de minimis, the use of the music could qualify as a fair use, and/or the music could be licensed or owned by the user. In fact, artists often post about their music on X, including releasing new songs on the platform.

X is generally not in a position to know whether a particular use of sound in an audiovisual file is infringing. In *Capitol Records., LLC v. Vimeo, LLC,* 826 F.3d 78, 96 (2d Cir. 2016), the Second Circuit considered whether video-hosting platform Vimeo could be found to have knowledge of infringement when employees of the platform viewed videos that contained popular music synched to video. The Court held: "the fact that music is 'recognizable' … or even *famous* … is insufficient to demonstrate that the music was in fact recognized by a hypothetical ordinary individual who has no specialized knowledge of the field of music." *Id.* The court vacated the district court's ruling denying summary judgment to Vimeo, expressly rejecting the idea that the

mere presence of music in a user-posted video would be sufficient to for employees of the Platform

to identify infringement:

> Even assuming awareness that a user posting contains copyrighted music, the
> service provider's employee cannot be expected to know how to distinguish, for
> example, between infringements and parodies that may qualify as fair use. Nor can
> every employee of a service provider be automatically expected to know how likely
> or unlikely it may be that the user who posted the material had authorization to use
> the copyrighted music. Even an employee who was a copyright expert cannot be
> expected to know when use of a copyrighted song has been licensed. Additionally,
> the service provider is under no legal obligation to have its employees investigate
> to determine the answers to these questions.

*Id.* at 97.

This Court ruled that evidence that X encourages ***infringement*** on the platform, that X has

an economic incentive to tolerate ***infringement*** by users or that X monitors or controls user posts

such that it could be said to have knowledge of user ***infringement,*** are relevant to this case. MTD

Decision at 21.  In line with this ruling, X has appropriately tailored Plaintiffs' requests to seek

evidence that X promotes or capitalizes infringement itself, as opposed to merely promoting or

capitalizing on infringement-agnostic general categories or features (such as the use of music or

use engagement with audiovisual files).

Plaintiffs argue that X's proposed compromise is too narrow and will result in the

production of no documents because "infringers do not typically spell out their policy plans."  This

concern is not warranted.  If X has adopted policies or practices designed to deliberately encourage

or capitalize on known infringement, there will be documents in X's files reflecting these actions.

For example, documents reflecting analyses by X of DMCA notices from music rightsholders

would be relevant to show X's knowledge of infringement.

Responding to Plaintiffs' broad requests about music would add to X's already significant

document collection obligations an entirely new, massive category of documents that would likely

involve additional custodians that would not otherwise be implicated in the litigation. The additional burden to X of having to collect this overbroad set of documents is significant, and is a relevant consideration in this dispute.

## 2. Requests Concerning Music Licensing Are Irrelevant

| Plaintiffs Request | X's Position |
|---|---|
| **RFP NO. 5:** All documents and communications concerning any strategies, decision making, presentations, or analyses by You concerning whether or how to license music for use on the Platform, including any requirement or terms | Discovery should be denied. |
| **ROG NO. 2:** Identify the persons, including current and former employees, with responsibility for or involvement in Your decision-making with respect to whether or how to license music for use on the Platform, including as to any requirements or terms. | Discovery should be denied. |

These requests seek discovery into whether and to what extent X has considered affirmatively licensing music to offer a platform feature that would enable users to incorporate music licensed by X into their posts. This inquiry sheds no light on whether X has engaged in any of the three practices identified by the Court that could support liability, nor does it concern X's economic incentives to tolerate infringement related to the three practices. MTD Decision at 21 ("Count II will be dismissed, except with regard to the following practices: (1) providing more lenient copyright enforcement to 'verified' users; (2) failing to act on takedown notices in a timely manner; and (3) failing to take reasonable steps in response to severe serial infringers.").

Plaintiffs argue this information is relevant because X "know[s] full well" that some users post content to X that is licensed on other platforms. Again, the Court has rejected a general theory of liability based on the premise that X is aware that its platform may be used by some to infringe.

14

MTD Decision at 15-17; *see Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 937 (2005) ("[M]ere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability. Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in themselves.").  In effect, Plaintiffs would like to argue to a jury that X is a bad actor who should be punished because it failed to license music for its platforms when other companies have done so.

X has already agreed to produce documents concerning any policies, programs, or initiatives by X to capitalize on known infringement or infringing accounts, *see, e.g.*, Exhibit B, RFP Nos. 7, 10-11, 23, 25, 35-36,  and X's proposed compromised contained herein. This more than covers the landscape of possible documents that could show X intended to capitalize on infringement through the three practices outlined in the MTD Decision. Adding this irrelevant category of documents to X's discovery burdens is not proportional to the needs of this case.

### D.  X's Proposals To Narrow Requests About X's Competitive Analyses Are Appropriate

| Plaintiffs' Request | X's Proposed Compromise |
|---|---|
| **RFP NO. 50:** All documents and communications concerning changes to the Platform in order to more effectively compete with other social media sites including with respect to optimizing the uploading, sharing and streaming of posts featuring music or audiovisual content. | Documents and communications concerning changes to the Platform in order to more effectively compete with other social media sites with respect to optimizing the uploading, sharing and streaming of posts featuring **infringing** music or **infringing** audiovisual content. |
| **RFP NO. 51:** All documents and communications concerning competitive analyses, including analyses of the entities or companies You view as Your competitors and analyses on how You and the Platform will compete with such entities and their | Documents and communications concerning competitive analyses that **relate to the use of infringing copyrighted content**, including analyses of the entities or companies X views as its competitors and analyses on how X and the Platform will compete with such entities and their competing services concerning |

| competing services, including concerning music or audiovisual content. | **infringing** music or **infringing** audiovisual content. |
|---|---|

RFP Nos. 50 and 51 seeks the production of an enormous category of documents and information concerning X's competitive business strategies that have little or nothing to do with this case. These documents do not on their face appear to relate to X's economic incentives to "(1) provid[e] more lenient copyright enforcement to 'verified' users; (2) fail[] to act on takedown notices in a timely manner; and (3) fail[] to take reasonable steps in response to severe serial infringers." MTD Decision at 21. Plaintiffs do not explain how the broad-based information they seek relates to the contributory claim as narrowed by the Court.

To the extent X has made changes to its platform intended to facilitate copyright infringement related to these areas, X has already agreed to produce such documents, including through its proposed modifications to RFP Nos. 50-51. *See, e.g.*, Exhibit A, RFP Nos. 47-48, 54. Requiring X to collect virtually all documents relating to its strategies to compete with other platforms is unreasonable and not in keeping with the needs of the case.

Dated: December 3, 2024

Respectfully submitted,

/s/ William J. Harbison II w/permission
Aubrey B. Harwell III (No. 017394)
William J. Harbison II (No. 33330)
Olivia Arboneaux (No. 40225)
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite
1000 Nashville, Tennessee 37203
Telephone: (615) 244-1713
tharwell@nealharwell.com
jharbison@nealharwell.com
oarboneaux@nealharwell.com

/s/ Steven A. Riley
Steven A. Riley (No. 6258)
John R. Jacobson (No. 14365)
Tim Harvey, (No. 21509)
Grace C. Peck (No. 38558)
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 320-3700
sriley@rjfirm.com
jjacobson@rjfirm.com
tharvey@rjfirm.com
gpeck@rjfirm.com

16

Alex Spiro (*pro hac vice*)
Jessica A. Rose (*pro hac vice*)
Dylan I. Scher (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10011
Tel: (212) 849-7000
alexspiro@quinnemanuel.com
jessicarose@quinnemanuel.com
dylanscher@quinnemanuel.com

Andrew H. Schapiro (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 705-7400
andrewschapiro@quinnemanuel.com

David Eiseman (*pro hac vice*)
Linda J. Brewer (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Tel: (415) 875-6600
davideiseman@quinnemanuel.com
lindabrewer@quinnemanuel.com

*Attorneys for Defendant*

Scott A. Zebrak (*pro hac vice*)
Matthew J. Oppenheim (*pro hac vice*)
Keith Howell (*pro hac vice*)
Meredith Stewart (*pro hac vice*)
OPPENHEIM +ZEBRAK, LLP
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
scott@oandzlaw.com
matt@oandzlaw.com
khowell@oandzlaw.com
mstewart@oandzlaw.com

Alexander Kaplan (*pro hac vice*)
Carly Rothman (*pro hac vice*)
Andrew Guerra (*pro hac vice*)
OPPENHEIM + ZEBRAK, LLP
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
carly@oandzlaw.com
andrew@oandzlaw.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2024, I authorized the electronic filing of a true and exact copy of the foregoing with the Clerk of the Court using the CM/ECF system, which sent notice of such filing to counsel of record below:

Andrew H. Schapiro
Quinn Emanuel Urquhart & Sullivan, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
andrewschapiro@quinnemanuel.com

Alex Spiro
Jessica A. Rose
Dylan I. Scher
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
alexspiro@quinnemanuel.com
jessicarose@quinnemanuel.com
dylanscher@quinnemanuel.com

Aubrey B. Harwell III
William J. Harbison II
Olivia Arboneaux
Neal & Harwell, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
tharwell@nealharwell.com
jharbison@nealharwell.com
oarboneaux@nealharwell.com

David Eiseman
Linda J. Brewer
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
davideiseman@quinnemanuel.com
lindabrewer@quinnemanuel.com

/s/ Steven A. Riley

18