# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# AT NASHVILLE

| | |
|---|---|
| **CONCORD MUSIC GROUP, INC.** *et al.* ) | |
| ) | Case No. 3:23-cv-00606 |
| v. ) | Judge Trauger |
| ) | Magistrate Judge Holmes |
| **X CORP.** ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the parties' discovery dispute, as described in their joint discovery dispute statement (Docket No. 109), which was referred to the undersigned for disposition. (Docket No. 108.) Based on discussion during the discovery conference held on January 6, 2025 and the parties' joint discovery dispute statement, the Court rules on the discovery issues as discussed and provided for below.

### I. BACKGROUND

This is a copyright infringement action between forty-six Plaintiffs, which describe themselves as "major and independent music publishing companies" and are members of a trade association, the National Music Publishers' Association, and one Defendant, X Corp., which operates the social media platform X, which was formerly named and still frequently referred to as Twitter. (Docket No. 1.) Plaintiffs allege that Defendant has actively encouraged the users of its platform to engage in the infringement of Plaintiffs' copyrighted musical compositions. In the complaint, Plaintiffs sought damages and injunctive relief under three counts: (1) direct infringement, (2) contributory infringement, and (3) vicarious infringement. (Docket No. 1.)

In response to the complaint, Defendant moved to dismiss all three counts. (Docket No. 77.) The Court granted the motion, in part, and dismissed Plaintiffs' first claim for direct infringement and third claim for vicarious infringement. (Docket No. 90.) In dismissing the first

claim, the Court held that Defendant could not be liable for direct infringement because Plaintiffs failed to allege that Defendant does anything more than operate the channel through which its users transmit copyright-protected work. (*Id.* at 13.) The allegations indicated that Defendant does not itself send or receive the work, but rather these actions are undertaken by the users of its platform. (*Id.* at 13.) In dismissing the third claim, the Court held that Defendant could not be liable for vicarious infringement because Plaintiffs failed to allege that Defendant had a level of control over the users of its platform that would be sufficient to turn those users into agents or subordinates. (*Id.* at 20.)

However, the Court did not dismiss the second claim for contributory infringement. (*Id.* at 13–18.) The Court found that Plaintiffs "plausibly alleged that X Corp. engaged in contributory infringement by failing to take meaningful steps to address the actions of severe serial infringers." (*Id.* at 17.) The Court specified that the followings allegations as to Defendant's contributory infringement would remain: (1) Defendant allowed users to pay for more forgiving treatment under its anti-infringement policies through its "verified user" program; (2) Defendant was unreasonably dilatory in its response to notices of infringement; and (3) Defendant failed to take appropriate steps regarding the accounts of severe repeat infringers. (*Id.* at 17–18.)

In its order, the Court stressed that its rejection of the third claim for vicarious infringement did not mean that Plaintiffs would be barred from relying on evidence that could be offered in support of a vicarious infringement theory of liability. (*Id.* at 21.) The Court noted the Supreme Court's acknowledgement that "the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn." (*Id.* (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 n.17 (1984)).) The Court stated:

> The ultimate questions presented by this case are whether and to what extent X Corp. may be liable for the infringing acts of users on its platform. **X Corp.'s**

> **powers of monitoring and control over users and their tweets <u>are relevant to that inquiry</u>, as are X Corp.'s economic incentives to tolerate infringement**—whether or not one resorts to the concept of vicarious, rather than contributory, infringement. The court's decision to permit Count II to proceed with regard to certain challenged policies means that those issues are still part of the case.

(*Id.* (emphasis added).) In other words, the Court's dismissal of Plaintiffs' vicarious infringement claim was not to be construed as a bar on the consideration of all evidence that might support this theory of liability because it is so closely related to a theory of liability for contributory infringement, which is a claim that the Court permitted Plaintiffs to pursue.

After Defendant answered Plaintiffs' complaint with respect to the remaining allegation for contributory infringement, the Court held a case management conference and entered an initial case management order. (Docket No. 101.) Under the initial case management order, the parties were ordered to substantially complete the production of documents on or before March 13, 2025 and to complete all written discovery and depose all fact witnesses on or before July 17, 2025. (*Id.* at ¶ F.) The parties were also ordered to confer in good faith with respect to any discovery issues before bringing them to the Court's attention. (*Id.*)

On November 14, 2024, the Court held a telephone conference with the parties to discuss certain discovery issues. (Docket No. 106.) The Court then ordered local counsel for the parties to participate in the resolution of the discovery issues, and set another telephone conference for December 4, 2024. (*Id.*) Even with the participation of local counsel, the parties were not able to resolve their discovery issues prior to December 4, 2024, as a result of which the Court held a conference and ordered the parties to file a discovery dispute statement. (Docket No. 108.) The dispute was referred to the undersigned for disposition. (*Id.*) An in-person conference was held on January 6, 2025, though the parties resolved some issues prior to the conference. (Docket No. 110; Docket No. 111.)

## II. LEGAL STANDARDS

Generally, parties may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case … ." Fed. R. Civ. P. 26(b)(1).[1] Rule 26 sanctions a broad search and the information sought by a party need not be admissible to be discoverable. *Id*. Further, the former provision for discovery of relevant but inadmissible information that appears "reasonably calculated to lead to the discovery of admissible evidence" was deleted in the 2015 amendments to Rule 26 because of the incorrect reliance on that phrase to resist discovery. Instead, the concept of reasonably calculated to lead to the discovery of admissible evidence was replaced by the direct statement that information within the scope of relevancy "need not be admissible in evidence to be discoverable."

However, the scope of discovery has "ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978). It is also "well established that the scope of discovery is within the sound discretion of the trial court." *In re Flint Water Cases*, 960 F.3d 820, 826 (6th Cir. 2020) (quoting *Criss v. City of Kent*, 867 F.2d 259, 261 (6th Cir. 1988)); *see also Crawford-El v. Britton,* 523 U.S. 574, 598–99 (1998) (trial court is afforded broad discretion to control and dictate the sequence of discovery); *Marie v. American Red Cross*, 771 F.3d 344, 366 (6th Cir. 2014) (district courts have broad discretion to manage the discovery process and control their dockets) (internal citations omitted); *McNeil v. Cmty. Prob. Servs., LLC*, No. 1:18-cv-00033, 2019 WL 5957004, *1 (M.D. Tenn. Oct. 29, 2019) (ultimately, the scope of discovery is within the broad discretion of the trial court) (internal citations omitted).[2]

---

[1] Unless otherwise noted, all references to rules are to the Federal Rules of Civil Procedure.

[2] That sentiment has continued throughout revisions to Rule 26 including the most recent ones. The Court also possesses inherent authority to manage litigation. As noted by the First Circuit, "[a]s lawyers became more adept in utilizing the liberalized rules … [t]he bench began to use its inherent powers to take a more active, hands on approach to the management of pending

The trial court is directed to prevent discovery that falls outside the scope of Rule 26(b)(1). Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii). Discovery may be denied if: (i) it is unreasonably cumulative or duplicative or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the requesting party has already had ample opportunity to obtain it; or, (iii) it falls outside the scope of discovery set forth in Rule 26(b)(1). *Id.* Generally, the party seeking discovery is obliged to demonstrate relevance. When the information sought appears to be relevant, "the burden shifts to the party resisting discovery to show, with specificity, why the requested discovery is not proportional to the needs of the case," *Allgood v Baptist Mem'l Med. Grp., Inc.*, No. 19-2323-JTF-tmp, 2020 WL 86455, *1 (W.D. Tenn. Jan. 7, 2020) (citation omitted), or to establish that the information either is not relevant or is so marginally relevant that the presumption of broad disclosure is outweighed by the potential for undue burden or harm. *O'Malley v. NaphCare Inc.*, 311 F.R.D. 461, 463 (S.D. Ohio 2015). Otherwise, the party opposing production generally bears the burden of establishing that the discovery sought falls beyond the purview of Rule 26. *See Shropshire v. Laidlaw Transit, Inc.*, No. 06–10682, 2006 WL 6323288, *2 (E.D. Mich. Aug. 1, 2006) ("The party who resists discovery has the burden to show discovery should not be allowed and has the burden of clarifying, explaining, and supporting its objections.")

Although a party should not be denied access to information necessary to prove their contentions, neither should they be "permitted to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive." *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236 (6th Cir. 2016) (citation omitted). "A court must balance the right to

---

litigation." *In re San Juan DuPont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1011 (1st Cir. 1988). "The judiciary is 'free, within reason, to exercise this inherent judicial power in flexible pragmatic ways.'" *Id*. at 1011 n.2 (quoting *HMG Prop. Invs., Inc. v. Parque Indus. Rio Canas, Inc.*, 847 F. 2d 908, 916 (1st Cir. 1988)).

discovery with the need to prevent fishing expeditions." *Id*. at 236–37 (internal quotation omitted) (citation omitted). Objections to broad discovery that requests information without temporal limits that are confined by the specific litigation or that requests such things as identification of all communications or persons with whom communications occurred related to a general topic will be more likely to be sustained.

A party objecting to discovery must state with particularity the grounds for objection and why the request cannot be responded to as is. Boilerplate objections, such as the discovery requests are *overly broad*, are *vague*, are *not proportional to the needs of the case*, are *unduly and substantially burdensome*, or *are not likely to lead to admissible information*, are "legally meaningless and amount to a waiver of an objection." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 569 F.Supp.3d 626, 637 (E.D. Mich. 2021) (internal citation omitted); *see also Davis v. American Highwall Mining, LLC*, 570 F.Supp.3d 491, 495 (E.D. Ky. 2020) (collecting several authorities in support). Boilerplate objections and blanket refusals to search for relevant documents will not be deemed acceptable responses to discovery requests. With these standards and precepts in mind, the Court addresses the specific issues in dispute here.

### III.   DISCOVERY AT ISSUE

The parties present the Court with one overarching issue: to what extent must Defendant respond to certain of Plaintiffs' discovery requests, if at all? The parties' dispute centers on ten requests for production and three interrogatories, which the parties have placed into three categories: (1) monitoring and controls requests (RFP 56, Int. 23); (2) economic incentives

discovery with the need to prevent fishing expeditions." *Id*. at 236–37 (internal quotation omitted) (citation omitted). Objections to broad discovery that requests information without temporal limits that are confined by the specific litigation or that requests such things as identification of all communications or persons with whom communications occurred related to a general topic will be more likely to be sustained.

A party objecting to discovery must state with particularity the grounds for objection and why the request cannot be responded to as is. Boilerplate objections, such as the discovery requests are *overly broad*, are *vague*, are *not proportional to the needs of the case*, are *unduly and substantially burdensome*, or *are not likely to lead to admissible information*, are "legally meaningless and amount to a waiver of an objection." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 569 F.Supp.3d 626, 637 (E.D. Mich. 2021) (internal citation omitted); *see also Davis v. American Highwall Mining, LLC*, 570 F.Supp.3d 491, 495 (E.D. Ky. 2020) (collecting several authorities in support). Boilerplate objections and blanket refusals to search for relevant documents will not be deemed acceptable responses to discovery requests. With these standards and precepts in mind, the Court addresses the specific issues in dispute here.

### III.   DISCOVERY AT ISSUE

The parties present the Court with one overarching issue: to what extent must Defendant respond to certain of Plaintiffs' discovery requests, if at all? The parties' dispute centers on ten requests for production and three interrogatories, which the parties have placed into three categories: (1) monitoring and controls requests (RFP 56, Int. 23); (2) economic incentives

6

Case 3:23-cv-00606   Document 123   Filed 01/15/25   Page 6 of 17 PageID #: 981

discovery with the need to prevent fishing expeditions." *Id*. at 236–37 (internal quotation omitted) (citation omitted). Objections to broad discovery that requests information without temporal limits that are confined by the specific litigation or that requests such things as identification of all communications or persons with whom communications occurred related to a general topic will be more likely to be sustained.

A party objecting to discovery must state with particularity the grounds for objection and why the request cannot be responded to as is. Boilerplate objections, such as the discovery requests are *overly broad*, are *vague*, are *not proportional to the needs of the case*, are *unduly and substantially burdensome*, or *are not likely to lead to admissible information*, are "legally meaningless and amount to a waiver of an objection." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 569 F.Supp.3d 626, 637 (E.D. Mich. 2021) (internal citation omitted); *see also Davis v. American Highwall Mining, LLC*, 570 F.Supp.3d 491, 495 (E.D. Ky. 2020) (collecting several authorities in support). Boilerplate objections and blanket refusals to search for relevant documents will not be deemed acceptable responses to discovery requests. With these standards and precepts in mind, the Court addresses the specific issues in dispute here.

### III.   DISCOVERY AT ISSUE

The parties present the Court with one overarching issue: to what extent must Defendant respond to certain of Plaintiffs' discovery requests, if at all? The parties' dispute centers on ten requests for production and three interrogatories, which the parties have placed into three categories: (1) monitoring and controls requests (RFP 56, Int. 23); (2) economic incentives

requests (RFPs 1, 2, 5, 52, 53, 54, 55, Ints. 1, 2); and (3) competitive analyses requests (RFPs 50, 51).[3]

The parties disagree on the scope of Plaintiffs' requests. Plaintiffs argue that their requests seek information that is relevant to their claim of contributory infringement, and therefore the requests are proper. They contend, however, that Defendant refuses to produce responsive documents or information based on an "unreasonably narrow" view of relevance. (Docket No. 109 at 4.) According to Plaintiffs, Defendant will only produce documents or information if such will "establish an element of a claim or liability," which Plaintiffs characterize as an overly narrow "smoking gun" standard. (*Id.*)

Defendant, on the other hand, argues that Plaintiffs' discovery requests are "on the fringe of relevance" because they seek categories of documents or information that "do not pertain to the as-narrowed claim or relevant defenses." (*Id.* at 15.) Defendant believes that information pertaining to "infringement-neutral" policies and practices – particularly those relating to "general features" of the platform such as algorithms, audiovisual files, and music – are not relevant because the Court has already found that liability cannot be premised on these "general features." (*Id.* at 15–16.) Defendant argues that Plaintiffs' requests focus on whether Defendant is generally liable for infringement, and not whether Defendant has "actively encouraged" or "tolerates" infringement, the latter of which is relevant for a contributory infringement claim. (*Id.* at 16.)

---

[3] Defendant frames the first two categories in a different manner, but frames the third category similarly: (1) general technical operations of the platform requests, specifically regarding content moderation (RFP 56, Int. 23); (2) general features of the platform requests, specifically regarding music as a general feature of the platform (RFPs 1, 2, 52, 53, 54, 55, Int. 1), and regarding music licensing (RFP 5, Int. 2); and (3) competitive analyses requests (RFPs 50, 51). Ultimately, the Court finds that the particular framing of each category is irrelevant to a determination of whether the information sought in each request is discoverable. Accordingly, for the purposes of organizing this memorandum opinion and order, the Court will use the framing presented by Plaintiffs because it is simpler.

7

In sum, the parties' dispute comes down to whether Plaintiffs may seek particular categories of documents or information from Defendant even though the Court dismissed two of Plaintiffs' claims. Did that dismissal narrow the scope of discovery such that Plaintiffs are barred from seeking certain categories of information? Or are Plaintiffs still entitled to seek a broader scope of discovery that is not confined to the one remaining claim?

The Court finds that the answer lies in Judge Trauger's memorandum opinion addressing Defendant's motion to dismiss. As set forth above, Judge Trauger stressed the lack of a clear and distinct line between the theories of direct infringement, contributory infringement, and vicarious infringement. (Docket No. 90 at 20–21.) She held that, although vicarious infringement was not the appropriate *framework* to consider Plaintiffs' claims against Defendant, this did not mean that Plaintiffs could not consider or rely on evidence that might be offered to support a theory of vicarious infringement. (*Id.*) Judge Trauger framed the "ultimate questions" as "whether and to what extent X Corp. may be liable for the infringing acts of users on its platform." (*Id.*) She held that Defendant's "powers of monitoring and control over users and their tweets" and Defendant's "economic incentives to tolerate infringement" were both relevant to the resolution of those "ultimate questions," whether determined through the *framework* of vicarious infringement or contributor infringement. (*Id.*)

On a separate note, the Court takes issues with two general approaches to discovery that Defendant has taken. First, Defendant's position on document production appears to be that it must only produce documents or information regarding the specific features of its platform that relate to or show that it promotes infringing material. In other words, information on its *actual* promotion of infringing material would be discoverable, but information on its *potential* promotion of infringing material would not be. This approach is overly narrow and would allow Defendant to

8

determine what is infringing, which is one of the legal questions at the crux of this litigation. Second, Defendant appears to argue that its prior production of *some* information supports its position that it need not produce *additional* information. However, as the Court stated during the discovery hearing, this case is a fairly complex one and it is no surprise to the Court that Plaintiffs would seek a fairly large breadth of discovery. Accordingly, the Court is not swayed by this argument. Although not rising to the level of clear obstreperousness, these two approaches to discovery responses are unimpressive.

With the broad scope of discovery authorized under Rule 26 and the direction from Judge Trauger in mind, the Court analyzes the three categories of requests as follows:

**1. Monitoring and Controls Requests (RFP 56, Int. 23)**

Plaintiffs seek information regarding Defendant's oversight of uploaded content and the people who are involved with this task through the following discovery requests:

Request for Production No. 56

Documents sufficient to show or describe Your visibility into, awareness of, and oversight of content uploaded or posted by Platform Users, including any monitoring programs or tools used to flag certain Platform Users or certain content uploaded by Platform Users and use of certain content uploaded by Platform Users and use of "shadow banning", and/or "deamplification".

Interrogatory No. 23

Identify the persons, including current and former employees, with responsibility for or involvement in oversight of content uploaded or posted by Platform Users, including any monitoring programs or tools used to flag certain content uploaded by Platform Users and use of tools such as "visibility filtering", suppression of posts, "shadow banning", and/or "deamplification".

(Docket No. 109-1 at 4–5.) Plaintiffs argue that these requests "go[] to how Defendant materially contributes to the infringing activity," which is an element of contributory infringement. (Docket No. 109 at 5.) They contend that these are relevant to understanding what tools Defendant may

9

Case 3:23-cv-00606   Document 123   Filed 01/15/25   Page 9 of 17 PageID #: 984

have to respond to specific infringers and infringement. During the discovery hearing, Plaintiffs clarified that they are seeking only "summary level documents" in response to these requests, and not more granular documents such as detailed email communications.

In response, Defendant argues that the scope of these requests is so broad that they are no longer relevant to the question of contributory infringement. It asserts that not all monitoring that it conducts of its platform – for example, monitoring of issues such as hate speech, child pornography, or election interference – is relevant, but these requests nevertheless seek an overly broad spectrum of irrelevant information.

The Court agrees with both parties, to some degree. The Court finds that the information sought by Plaintiffs in these requests is largely relevant, but that the scope of the requests as written is too broad and must be appropriately narrowed. There appears to be no dispute that Plaintiffs are uninterested in Defendant's oversight of posts with certain types of content (i.e. hate speech, child pornography, election interference) and only seek information related to Defendant's oversight of posts with content related to music and other copyrighted entertainment content. There also appears to be no dispute that Plaintiffs are uninterested in granular documents such as detailed email communications and only seek "summary level documents" such as PowerPoint Presentations or guides.

Accordingly, given the broad discretion afforded to this Court to control discovery, *Crawford-El*, 523 U.S. at 598–99, and the broad scope of discovery authorized under Rule 26, the Court finds that information requested in RFP 56 and Int. 23 regarding Defendant's oversight of uploaded content and the people who are involved with this task is discoverable, but only with respect to posts with content related to music and other copyrighted entertainment content. Further, Defendant need only produce "summary level documents" in response to RFP 56.

At this juncture, the Court will not rewrite these requests to reflect these directions. Instead, the Court will order the parties to confer over the precise language to be used in these requests and the subsequent scope of production.

## 2. Economic Incentives Requests (RFPs 1, 2, 5, 52, 53, 54, 55, Ints. 1, 2)

Plaintiffs seek information regarding Defendant's "economic incentives to tolerate infringement" on its platform, and believe the following requests seek this information:

Request for Production No. 1

All documents and communications, including reports, studies, research, presentations, surveys, or analyses, concerning the use of music on the Platform.

Request for Production No. 2

All documents and communications, including reports, studies, research, presentations, or analyses, concerning Your plans or strategies, actual or considered, for promoting, supporting, generating user engagement from, generating revenue from, or profiting from the use of music on the Platform.

Request for Production No. 5

All documents and communications concerning any strategies, decision-making, presentations, or analyses by You concerning whether or how to license music for use on the Platform, including any requirement or terms.

Request for Production No. 52

All presentations, summaries, and analyses of Platform User insights and analytics, including analyses on Platform User demographics, how Platform Users use the Platform, what draws Platform Users to the Platform, what Platform Users want to use the Platform for, and the type of customer, user, or subscriber You aim to attract to the Platform.

Request for Production No. 53

All documents and communications concerning comparative analyses of Platform User engagement (including metrics such as likes, views, time spent viewing posts, reposts, and replies) of posts featuring audiovisual content versus posts without audiovisual content.

Request for Production No. 54

All documents and communications concerning Your encouragement for users to upload media content to Your servers rather than link to third-party sites.

Request for Production No. 55

All documents and communications concerning Your decision(s) to increase video length limits for posts on the Platform.

Interrogatory No. 1

Identify the persons, including current and former employees, with responsibility for or involvement in Your efforts relating to use of music on the Platform, including any effort to promote, support, research, analyze or generate user engagement or revenue from use of music on the Platform.

Interrogatory No. 2

Identify the persons, including current and former employees, with responsibility for or involvement in Your decision-making with respect to whether or how to license music for use on the Platform, including as to any requirements or terms.

(Docket No. 109-1 at 8–13.) Plaintiffs argue that Judge Trauger's order squarely permitted inquiry into Defendant's "economic incentives to tolerate infringement" and that these requests seek such information. (Docket No. 109 at 9–11.) Plaintiffs contend that Defendant views this category too narrowly because Defendant will only provide responsive information about whether it promotes *infringing* music. Plaintiffs argue, however, that the proper inquiry is whether Defendant promotes music and to what extent Defendant knows that music is infringing. In other words, Plaintiffs believe that a narrow restriction of discovery into music that is *de facto* infringing would not properly address Defendant's "economic incentives to tolerate infringement." In addition, during the discovery hearing, Plaintiffs clarified that they are interested in Defendant's "use of music" only with respect to uploads of music or streaming of music by platform users, and not with respect to users' discussions of music on the platform.

In response, Defendant asserts that these requests seek information concerning "infringement-agnostic aspects of the platform that the Court has said cannot form the basis of contributory liability." (Docket No. 109 at 23.) Defendant believes that the first sub-category of requests – those concerning music as a general feature of the platform – implicate a "breathtakingly broad" set of information, which they describe as "all documents concerning the use of music on the platform." (*Id.* at 24.) As for the second sub-category of requests – those concerning music licensing – Defendant contends that these are not relevant either. It argues that these shed no light on its "economic incentives to tolerate infringement" or whether it has engaged in the three potentially unlawful practices that Judge Trauger specified in her order:

> (1) allowed users to pay for more forgiving treatment under its anti-infringement policies through its "verified user" program, (2) was unreasonably dilatory in its response to notices of infringement, and (3) failed to take appropriate steps regarding the accounts of severe repeat infringers.

(Docket No. 90 at 17–18.)

Just as with the first broad category of information, the Court finds that both parties' positions are correct to an extent. The Court finds that the information sought by Plaintiffs in these requests is largely relevant, but that the scope of the requests as written is too broad and must be appropriately narrowed. There appears to be no dispute that Plaintiffs' interest in the "use of music" is confined to music uploads or streaming, and not to mere discussions of music on the platform. In other words, Plaintiffs want to know about posts that have audio or audio-visual content embedded or attached in some way, and not posts that reference music more generally. There also appears to be no dispute that Plaintiffs are uninterested in granular documents such as detailed email communications and only seek "summary level documents" such as PowerPoint Presentations, reports, consumer surveys, or strategy documents.

13

Accordingly, given the broad discretion afforded to this Court to control discovery, *Crawford-El*, 523 U.S. at 598–99, and the broad scope of discovery authorized under Rule 26, the Court finds that information requested in RFPs 1, 2, 52, 53, 54, 55 and Int. 1 regarding the "use of music," i.e., the use of audio or audio-visual content that is embedded or attached in some way to posts on the platform, and the people who are involved with this task is discoverable; and that information requested in RFP 5 and Int. 2 regarding Defendant's strategies or decision to license music is discoverable. Further, Defendant need only produce "summary level documents" in response to these RFPs.

Again, at this juncture, the Court will not rewrite these requests to reflect these directions. Instead, the Court will order the parties to confer over the precise language to be used in these requests and the subsequent scope of production.

**3.      Competitive Analyses Requests (RFPs 50, 51)**

Plaintiffs seek information regarding Defendant's efforts to garner platform users, including what changes Defendant made to its platform to compete with other social media sites and the competitive analyses it has in its possession:

Request for Production No. 50

All documents and communications concerning changes to the Platform in order to more effectively compete with other social media sites including with respect to optimizing the uploading, sharing and streaming of posts featuring music or audiovisual content.

Request for Production No. 51

All documents and communications concerning competitive analyses, including analyses of the entities or companies You view as Your competitors and analyses on how You and the Platform will compete with such entities and their competing services, including concerning music or audiovisual content.

(Docket No. 109-1 at 15–16.) Plaintiff argues that these requests are relevant because they go to Defendant's economic incentives to tolerate infringement, and specifically to how Defendant licenses music on its platform (or does not license music) to make itself more competitive. Plaintiffs contend that they are not seeking all documents about how Defendant competes with other social media companies, but rather are seeking only documents about Defendant's strategies and analyses that concern its decision to engage or not engage in practices to license music.

Defendant argues in response that these categories are too broad and essentially seek information related to competitive business strategies that are irrelevant to this litigation. It states that it has offered a compromise, but Plaintiffs have rejected it. In the proposed compromise, Defendant would produce documents about changes it has made to compete with other social media companies "with respect to optimizing the uploading, sharing and streaming of posts featuring infringing music or infringing audiovisual content" and would produce competitive analyses "that relate to the use of infringing copyrighted content." (Docket No. 109-1 at 15.) In other words, Defendant is willing to produce a narrowly construed set of documents related to what is deems to be *infringing* materials.

Once again, the Court finds that the information sought by Plaintiffs in these requests is largely relevant, but that the parties should confer on the scope of the requests in an attempt to narrow them.

Given the broad discretion afforded to this Court to control discovery, *Crawford-El*, 523 U.S. at 598–99, and the broad scope of discovery authorized under Rule 26, the Court finds that information requested in RFPs 50 and 51 regarding Defendant's competitive practices and analyses with respect to the use of audio or audio-visual content that is embedded or attached in some way to posts on the platform is discoverable.

15

As with respect to the preceding two categories, the Court will not, at this juncture, rewrite these requests to reflect these directions. Instead, the Court will order the parties to confer over the precise language to be used in these requests and the subsequent scope of production. The parties must also confer about the type of documents that Plaintiffs seek. It was not clear to the Court that Plaintiffs would be satisfied with "summary level documents" in response to these RFPs, and the parties must, therefore, discuss and clarify this issue.

## IV. CONCLUSION

For these reasons, the Court **ORDERS** the parties to meet and confer over the discovery disputes at issue as directed above. This meeting must take place **in person by no later than February 7, 2025**. By "in person," the Court means that lead counsel for each party (i.e. at least one lead counsel for Plaintiffs and at least one lead counsel for Defendant) must be in the same room at the same time discussing these issues. Local counsel are not required to be physically present, but they are expected to participate, whether in person or telephonically. Specifically, during the in-person meeting, the parties must:

1. Confer over the precise language for modification of RFP 56 and Int. 23, consistent with the Court's directions above, and the subsequent scope of production;

2. Confer over the precise language for modification of RFPs 1, 2, 5, 52, 53, 54, and 55 and Ints. 1 and 2, consistent with the Court's directions above, and the subsequent scope of production; and

3. Confer over the precise language for modification of RFPs 50 and 51, consistent with the Court's directions above, and the subsequent scope of production, including whether Plaintiffs are seeking "summary level documents."

If the parties are not able to reach an agreement over the precise language and scope of the discovery requests at issue, the parties may file a joint discovery dispute statement and a motion for a follow-up discovery conference **by no later than February 21, 2025**. The joint discovery dispute statement may include no more than 3 pages per affected party for each of the three issues discussed above. The parties must clearly identify and describe the specific discovery request(s) in dispute and must detail their respective positions with supporting facts, including any necessary declarations or affidavits as to any proportionality considerations, and must provide supporting legal authority. The joint discovery dispute statement must certify that lead counsel for all parties conducted the required in-person meeting and made a good faith effort to resolve each discovery dispute presented in the statement. No discovery conference will be held until a compliant joint statement is filed.

It is SO ORDERED.

_____
BARBARA D. HOLMES
United States Magistrate Judge