# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

CONCORD MUSIC GROUP, INC., *ET AL.*,

      *Plaintiffs*,

  v.

X CORP., D/B/A TWITTER,

      *Defendant*.

Case No. 3:23-cv-00606

District Judge Aleta A. Trauger

## DEFENDANT X CORP.'S MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

    A.   Plaintiffs' Initial Material-Contribution Theory Of Contributory Copyright Infringement............................................................................................................... 3

    B.   *Cox* Rejects The Material-Contribution Theory ................................................. 4

    C.   Plaintiffs' Second Amended Complaint ............................................................ 5

ARGUMENT......................................................................................................................... 6

    I.   *COX* BARS THE MUSIC COMPANIES' ONLY SURVIVING CLAIM ........................ 6

        A.   *Cox* Extinguished The Music Companies' Liability Theory ................................. 6

        B.   The Claim Against X Does Not Fit *Cox*'s Liability Rule ...................................... 8

            1.   *Cox* precludes any inducement claim against X ............................................ 8

            2.   X's alleged conduct bears no resemblance to traditional inducement.......... 11

    II.   THE NEW INDUCEMENT ALLEGATIONS ARE LEGALLY DEFICIENT .............. 14

        A.   Failure To Stop Infringement................................................................................ 14

        B.   General Platform Features .................................................................................... 18

        C.   Public Statements.................................................................................................. 20

CONCLUSION...................................................................................................................... 24

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbey House Media Inc. v. Apple Inc.*,
66 F. Supp. 3d 413 (S.D.N.Y. 2014)..................................................................... 14, 19, 24

*Ahmed v. Uber Tech., Inc.*,
2026 WL 1127460 (S.D. Fla. Apr. 27, 2026) ................................................................ 13, 14

*Aimster Copyright Litig., In re*,
334 F.3d 643 (7th Cir. 2003) ........................................................................................ 11, 12

*Arista Recs. LLC v. Lime Grp. LLC*,
784 F. Supp. 2d 398 (S.D.N.Y. 2011)........................................................................... 11, 12

*Arista Recs. LLC v. Usenet.com, Inc.*,
633 F. Supp. 2d 124 (S.D.N.Y. 2009)........................................................................... 11, 12

*Ark Promotions, Inc. v. Justin.tv., Inc.*,
904 F. Supp. 2d 541 (W.D.N.C. 2012) .............................................................................. 25

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
881 F.3d 293 (4th Cir. 2018) ................................................................................ 4, 8, 9, 16

*Bridgeport Music, Inc. v. WM Music Corp.*,
508 F.3d 394 (6th Cir. 2007) .............................................................................................. 7

*Cengage Learning Inc. v. Google LLC*,
2026 WL 1266265 (S.D.N.Y. May 8, 2026) ......................................................... 15, 16, 17

*Columbia Pictures Ind., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ............................................................................ 11, 12, 20, 21

*Cox Commc'ns, Inc. v. Sony Music Ent.*,
146 S. Ct. 959 (2026)................................... 1, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 20, 24

*Eight Mile Style, LLC v. Spotify USA Inc.*,
745 F. Supp. 3d 632 (M.D. Tenn. 2024)............................................................................. 22

*Hikma Pharm. USA Inc. v. Amarin Pharma, Inc.*,
608 U.S. –, 2026 WL 1593307 (U.S. June 4, 2026) ........................................ 15, 19, 20, 23, 24

*Infinium Builders LLC v. Metropolitan Gov't of Nashville & Davidson Cty.*,
2024 WL 4009874 (M.D. Tenn. Aug. 30, 2024) ................................................................ 10

*Kalem Co. v. Harper Bros.*,
222 U.S. 55 (1911)............................................................................................................. 12

*Karth v. Keryx Biopharmaceuticals, Inc.*,
  6 F.4th 123 (1st Cir. 2021) ................................................................................... 6

*Kremer v. Reddit, Inc.*,
  2022 WL 3702092 (M.D. Tenn. Aug. 26, 2022) ................................................... 22

*Lindke v. Freed*,
  37 F.4th 1199 (6th Cir. 2022) .............................................................................. 23

*MGM Grp. 22 LLC v. Perry*,
  818 F. Supp. 3d 623 (S.D.N.Y. 2026)................................................................... 22

*MGM Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005)................................................. 8, 10, 11, 12, 15, 19, 20, 21, 23

*MGM Studios, Inc. v. Grokster, Ltd.*,
  454 F. Supp. 2d 966 (C.D. Cal. 2006) .................................................................. 12

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .............................................................................. 13

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) ..................................................................... 19, 23, 24

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
  494 F.3d 788 (9th Cir. 2007) .......................................................................... 13, 14

*Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*,
  732 F.3d 645 (6th Cir. 2013) ................................................................................. 6

*Solo v. United Parcel Serv. Co.*,
  819 F.3d 788 (6th Cir. 2016) ............................................................................... 10

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)................................................................................... 6, 18, 20

*Sony Music Ent. v. Cox Comm'cns., Inc.*,
  145 S. Ct. 2844 (Mem.) (2025)............................................................................... 5

*Sony Music Ent. v. Cox Commc'ns, Inc.*,
  93 F.4th 222 (4th Cir. 2024) ............................................................... 5, 7, 9, 10, 15

*Sony Music Ent. v. Cox Comm'cns, Inc.*,
  464 F. Supp. 3d 795 (E.D. Va. 2020) ................................................................... 17

*Takeda Pharmaceuticals U.S.A., Inc. v. West-Ward Pharm. Corp.*,
  785 F.3d 625 (Fed. Cir. 2015)............................................................................... 24

iii

**Other Authorities**

M. Nimmer & D. Nimmer, *Nimmer on Copyright* (4th ed. 2026)...................................... 7, 11, 13

Case 3:23-cv-00606    Document 201    Filed 06/11/26    Page 5 of 31 PageID #: 1594

**INTRODUCTION**

In this case, music companies are suing an online service because some of its users committed copyright infringement. They asserted the same theory against Cox, an internet service provider. But after obtaining a $1 billion jury verdict and winning in the Fourth Circuit, the music companies lost unanimously in the Supreme Court.[1] That ruling should be the end of this lawsuit.

Until recently, Plaintiffs said this case was just like *Cox*. They modeled their legal theory on *Cox*, cited an array of lower-court cases following it, and called the Fourth Circuit's precedent "analogous." They used those cases to pursue a "material contribution" theory of secondary liability, claiming that X Corp. ("X") was liable because it allowed people it knew were infringers to use its platform. This Court accepted that theory at the motion-to-dismiss stage. But the Supreme Court rejected it. *Cox* held that a "provider of a service is contributorily liable for the user's infringement *only if it intended* that the provided service be used for infringement." *Cox*, 146 S. Ct. at 967 (emphasis added). To meet that test, Plaintiffs must allege (and later prove) that X "affirmatively induced the infringement." *Id*. at 964. They do not and cannot.

Inducement cases are rarely brought and even more rarely won. Virtually every successful case involved a "torrenting" site purpose-built to enable illegal file-sharing. None was anything like X. The torrent sites sought to attract users of Napster, perhaps the most egregious infringement-facilitating site ever. Their public marketing highlighted how people could share copyrighted content on their sites. And the sites were dominated by infringement, which typically exceeded 95% of the file-sharing activity. Plaintiffs allege nothing like that here. X is hardly some would-be Napster successor; it is a social-media platform that hundreds of millions of people use every day for lawful purposes. Holding such a platform liable for inducement would be

---

[1] *See Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959 (2026). Unless otherwise stated, all internal quotations and alterations are omitted for readability.

unprecedented. It would also conflict with *Cox*, which held that a service provider's choice to continue serving known infringers does not show the culpable intent that inducement demands.

Plaintiffs now try to plead around *Cox* by injecting "inducement" allegations into their Second Amended Complaint. But for virtually all those allegations, the music companies alleged the same thing (or worse) about Cox. The facts there were extreme – Cox devised a sham "13-strike" policy run by executives who openly cursed the copyright laws – yet the Supreme Court readily concluded that Cox had not induced its users' infringement. The allegations here are weaker. Plaintiffs' theory that X was too slow and too lenient in responding to its users' alleged infringement comes nowhere near meeting the demanding inducement test that *Cox* announced.

Plaintiffs' allegations about Elon Musk's public statements fail for the same reason. Plaintiffs truncate those statements to make them seem incriminating – such as by excising "overzealous" from Mr. Musk's sentiment that "overzealous DMCA is a plague on humanity." Read in context, his statements were innocuous. But even taking the complaint's incomplete quotations at face value, they are milder than the expletive-laden emails the music companies presented to the jury in *Cox*. None plausibly suggests that X encouraged its users' infringement.

If Plaintiffs truly had evidence of inducement, they would have found it by now. The parties just spent 18 months producing documents and taking depositions, which Plaintiffs have mined for any scrap of evidence that might satisfy *Cox*'s liability rule. Yet all they could muster are a handful of documents even less incriminating than the ones that failed to persuade the Supreme Court. Put simply, Plaintiffs' real complaint remains that X's policy under the Digital Millenium Copyright Act ("DMCA") was too lenient. Those criticisms are unfounded, which X will later prove if necessary. But the Court need not reach that question. *Cox* makes clear that such criticisms are no longer the stuff of contributory infringement. This case should be dismissed.

## BACKGROUND

### A. Plaintiffs' Initial Material-Contribution Theory Of Contributory Copyright Infringement

X is a social-media platform that enables users to post a wide array of content. Dkt. 194 ("SAC") ¶¶ 2, 117-31. Plaintiffs are "major and independent music publishing companies." *Id*. ¶¶ 1, 23-100. In December 2021, the National Music Publishers Association ("NMPA") – the "trade association" representing those publishers, *id.* ¶ 1 – began bombarding X with weekly notices (some over 100 pages) demanding that X address instances in which X users posted infringing material. *Id.* ¶ 4. Plaintiffs' notices identified more than 500,000 posts (averaging more than 6,300 per week) for X to review. *Id.* ¶ 160. Plaintiffs admit X responded to their notices by taking down infringing content and suspending repeat infringers. *Id*. ¶¶ 168, 178-79. But Plaintiffs say X failed to act on every notice, and that when it did, it was not fast or aggressive enough. *Id*. ¶¶ 160-84. On that basis, they claim X is liable for the infringement of more than 2,000 songs. *Id.* ¶ 166; Dkt. 194-1. They seek "up to $150,000 with respect to each work infringed." SAC ¶ 206.

Plaintiffs' last complaint asserted three claims: for direct, contributory, and vicarious copyright infringement. Dkt. 115, ¶¶ 199-223. The Court dismissed the direct- and vicarious-infringement claims. Dkt. 90 ("MTD Op.") at 7-13, 18-21. But while it dismissed part of the contributory-infringement claim, it allowed "plaintiffs to proceed" with allegations about "three potentially unlawful practices" it viewed as plausibly contributing to infringement. *Id*. at 17-18. X had moved to dismiss those allegations by arguing that Plaintiffs "must plead and prove that [X] distributed a device or service with the intent of fostering infringement." Dkt. 78 at 9. Plaintiffs disagreed. They disclaimed any need to allege such "intent," arguing it was unnecessary for a "claim for contributory infringement based on material contribution, not inducement." Dkt. 79 at

3

14.  In support, they cited what they called "the analogous Fourth Circuit *Cox* decision."  Dkt. 86 at 3 (citing *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293 (4th Cir. 2018)).

This Court sided with Plaintiffs, following then-existing precedent recognizing liability for those who "materially contributed to infringement."  MTD Op. at 14.  As the Court observed, X's social-media platform was not a "straightforward, intentional infringement facilitation device."  *Id*. at 15.  But it discerned "some specific practices" that "plausibly fall into the category of materially contributing to infringement."  *Id*. at 16.  For one of those practices – X's alleged failure to "take meaningful steps to address the actions of severe serial infringers" – the Court expressly adopted the theory the music companies had pioneered against Cox.  *Id.* at 17 (citing *BMG*).

The parties then conducted extensive discovery.  Plaintiffs served 65 document requests and 25 interrogatories.  They successfully compelled the production of a wide array of documents they said "goes to how Defendant materially contributes to the infringing activity – an element of contributory infringement."  Dkt. 109 at 4.  X produced nearly 150,000 pages of documents.  And the parties took 21 depositions.  The whole process took more than a year and a half.

### B.      *Cox* Rejects The Material-Contribution Theory

After fact discovery closed, but just before opening expert reports were due, the Supreme Court decided *Cox*.  The music companies' cases against Cox began when BMG Rights Management (a music publisher and Plaintiff here) sued Cox for providing internet service to known repeat infringers.  After a jury sided with BMG, the Fourth Circuit held Cox could be liable for providing service to people it "knew" had committed "specific instances of infringement," reasoning that it had materially contributed to their infringement.  *BMG*, 881 F.3d at 311-12.  A host of record labels and publishers (many also Plaintiffs here) then piled on, suing Cox on the same theory.  After another jury issued a $1 billion judgment against Cox, the Fourth Circuit upheld the music companies' contributory-infringement verdict.  *See Sony Music Ent. v. Cox*

*Commc'ns, Inc.*, 93 F.4th 222 (4th Cir. 2024). It applied *BMG* as circuit precedent and accepted the music companies' "material contribution" liability theory. *Id*. at 234-37.[2]

The Supreme Court reversed. It criticized the Fourth Circuit for upholding the verdict based "on its Circuit precedent establishing a new form of contributory liability." *Cox*, 146 S. Ct. at 968. Addressing *BMG* directly, the Supreme Court held that the Fourth Circuit was wrong to find contributory infringement from Cox's "supplying a product with knowledge that the recipient will use it to infringe copyrights." *Id*. The music companies' material-contribution theory, the Court held, "conflicted with this Court's repeated admonition that contributory liability cannot rest only on a provider's knowledge of infringement and insufficient action to prevent it." *Id*. at 969.

### C.     Plaintiffs' Second Amended Complaint

After *Cox*, the parties jointly moved to stay all deadlines. Dkt. 182. Once X indicated its intent to move for judgment on the pleadings, Dkt. 177, Plaintiffs said they would amend their complaint, Dkt. 182 at 1-2. On May 11, they filed a Second Amended Complaint.

The Second Amended Complaint swaps out Plaintiffs' old material-contribution claim for the "inducement" claim they had previously disclaimed. *Compare* Dkt. 79 at 11-12 ("inducement" is not "require[d]"), *with* SAC ¶¶ 199-207 (adding word "Inducement" to title of previous contributory-infringement claim). The new complaint inserts various iterations of the words "encourage," "intends," or "facilitates" throughout the allegations. *E.g.*, SAC ¶¶ 2-3, 6, 9, 155, 191. It also cites a handful of documents Plaintiffs obtained in discovery. *E.g.*, *id.* ¶¶ 144, 167.

---

[2] By contrast, the Fourth Circuit reversed the music companies' vicarious-liability verdict and remanded for a new trial on damages. *See Cox*, 93 F.4th at 229-33, 237. The Supreme Court denied the music industry's cross-petition for certiorari on that question. *See Sony Music Ent. v. Cox Comm'cns., Inc.*, 145 S. Ct. 2844 (Mem.) (2025).

But the basic theory remains the same.  Plaintiffs' core allegation, as before, is that "X refuses to stop the rampant infringement of copyrighted music" by its users.  *Id.* ¶ 188.

**ARGUMENT**

To survive dismissal, Plaintiffs' allegations must support "recovery under a viable legal theory."  *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013).  Although the Court accepts well-pleaded facts, it "need not accept as true legal conclusions or unwarranted factual inferences."  *Id.*  That is especially true now that the parties have completed fact discovery.  Because the Second Amended Complaint comes after full discovery, the Court should "look more closely at the factual allegations to see if they support the legal conclusions pled."  *Karth v. Keryx Biopharmaceuticals, Inc.*, 6 F.4th 123, 134 (1st Cir. 2021).  They do not.

## I. *COX* BARS THE MUSIC COMPANIES' ONLY SURVIVING CLAIM

*Cox* forecloses Plaintiffs' sole surviving theory of copyright infringement.  Because this Court already dismissed the other claims, *see* MTD Op. at 7-13, 18-21, and Plaintiffs elected not to seek reconsideration of that decision, *see* Dkt. 187 (joint proposal giving them that option), only the contributory-infringement claim remains.  The Court should now dismiss that claim.

### A. *Cox* Extinguished The Music Companies' Liability Theory

*Cox* rejected the liability theory that once supplied the premise for this lawsuit.  The Supreme Court began by observing that the "Copyright Act does not expressly render anyone liable for infringement committed by another."  *Cox*, 146 S. Ct. at 967 (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434 (1984)).  "Ordinarily," the Court explained, the statute's text would preclude secondary liability altogether.  *Id.*  *Cox* did not go that far.  But while the Court affirmed the "specific forms of secondary copyright liability" its earlier cases had read into the Copyright Act, it was "loath to expand such liability beyond those precedents."  *Id.*

6

Those recognized forms of liability are narrow. *Cox* held that a "provider of a service is contributorily liable for the user's infringement only if it *intended* that the provided service be used for infringement." *Id.* (emphasis added). Such intent can be shown "only if [1] the party induced the infringement or [2] the provided service is tailored to that infringement." *Id.* Both are difficult for a copyright owner to show. For inducement, the provider must "actively encourag[e] infringement through specific acts," such as by "promot[ing] and market[ing] their [service] as a tool to infringe copyrights." *Id.* For tailoring, the service must "not [be] capable of substantial or commercially significant noninfringing uses." *Id.* No other contributory-liability theory remains viable beyond "[t]hese two forms of contributory infringement." *Id.* at 968.

*Cox*'s inducement-or-tailoring rule forecloses this lawsuit. From the start, Plaintiffs here disclaimed any need to show that X induced or tailored its platform to infringement. Dkt. 79 at 10-13; Dkt. 86 at 3-5. Instead, they pressed a broader theory – then-accepted in the lower courts – that X had "materially contribute[d] to the infringing conduct of another." *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 398 (6th Cir. 2007) (cited in MTD Op. at 14); *see* M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13E.03[B] (4th ed. 2026) (surveying material-contribution cases from before *Cox*). In resolving X's motion to dismiss, this Court adopted that material-contribution theory. *See* MTD Op. at 13-18. So did the Fourth Circuit in upholding the music companies' verdict against Cox on the same theory. *See Cox*, 93 F.4th at 235-37. But the Supreme Court rejected it. Material-contribution liability, the Court held, "would expand secondary copyright liability beyond our precedents." *Cox*, 146 S. Ct. at 968.

Plaintiffs' own arguments highlight the significance of that holding. In opposing dismissal here, they asserted that "inducement and material contribution are separate theories." Dkt. 79 at 10. They disclaimed the former theory, arguing that the Supreme Court had never "require[d]

inducement in all contributory infringement cases." *Id*. at 11-12.  And their only argument about X's intent – imputing "culpable intent" from X's provision of service to known infringers on its platform – rested on the very internet-service-provider cases the Supreme Court has now abrogated.  *Id.* at 13 (citing, *e.g.*, *BMG.*, 881 F.3d at 308).  Indeed, Plaintiffs modeled their whole theory on what they called "the analogous Fourth Circuit *Cox* decision."  Dkt. 86 at 3.

That theory is no longer viable.  For each of the "discrete allegations" the Court upheld, it did so because they "plausibly fall into the category of materially contributing to infringement." MTD Op. at 16; *see id.* at 17-19.  But after *Cox*, that category of contributory infringement no longer exists.  Because the Supreme Court has now clarified the law and abrogated the authority on which Plaintiffs premised their case, the Court should dismiss this lawsuit with prejudice.

**B.      The Claim Against X Does Not Fit *Cox*'s Liability Rule**

After *Cox*, there are only two ways to plead contributory infringement:  inducement or tailoring.  Plaintiffs do not try to plead tailoring, because X's social-media "service was clearly capable of substantial or commercially significant noninfringing uses."  *Cox*, 146 S. Ct. at 968.  So they must allege inducement, which requires "express promotion, marketing, and intent to promote infringement."  *Cox*, 146 S. Ct. at 968 (quoting *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 926 (2005)).  The alleged facts do not plausibly indicate such intent.

**1.      *Cox* precludes any inducement claim against X**

*Cox* itself shows why this case does not meet the Supreme Court's demanding inducement test.  The music companies sued Cox on the same theory they assert against X here.  As in this case (SAC ¶¶ 160-65), the music companies hired a vendor to send hundreds of thousands of "notices" to Cox identifying accounts through which "infringement occurred."  *Cox*, 146 S. Ct. at 965.  As in this case (SAC ¶¶ 188-91), they argued that Cox exhibited an "unwillingness to act"

8

on those notices "in favor of protecting revenue." *Cox*, 146 S. Ct. at 966. And as in this case (SAC ¶¶ 142-49), they claimed that habitual infringers were more lucrative for Cox than other customers. *See Cox*, 93 F.4th at 233 (noting higher revenue from subscribers with 20-plus notices). The Fourth Circuit upheld liability because Cox "chose to continue providing monthly internet access" to known infringers so it could "avoid losing revenue." *Id*. at 236.

*Cox*'s facts were extreme. Cox nominally followed a "thirteen-strike policy" for terminating subscribers who received repeated copyright notices. *Id*. at 228. But the music companies proved that "13 strikes could really mean *thousands* owing to Cox's disinterest in enforcing its unusually lenient policy."[3] Of the millions of infringement notices Cox received, moreover, "it deleted roughly two-thirds of them" without counting them as strikes. Sony Br. at 12. And even when it terminated subscribers, it "directed employees to promptly reactivate infringers' accounts."[4] In fact, "Cox *never* terminated a subscriber for infringement without reactivating them." *BMG*, 881 F.3d at 303. As the Fourth Circuit concluded, "Cox very clearly determined *not* to terminate subscribers who in fact repeatedly violated [its copyright] policy." *Id*.

Throughout, Cox's "emails and chats" revealed its "contempt for laws intended to curb online infringement." *Cox*, 93 F.4th at 236-37. For example, its head of copyright enforcement was "openly contemptuous" of copyright law, "telling his team 'F the dmca!!!'" Sony Br. at 1. In response, another executive wrote: "Sorry to be Paranoid Panda here, but please stop sending out e-mails saying F the law . . . If we get sued, those e-mails are discoverable and would not look good in court." *Id*. at 17. The Fourth Circuit viewed such evidence as suggesting that Cox meant

---

[3] Brief for Respondents at 10, No. 24-171 (Oct. 15, 2025) ("Sony Br."), https://bit.ly/4aOAXJG.

[4] NMPA *Amicus* Br. at 8, No. 24-171 (Oct. 22, 2025) ("NMPA Br."), https://bit.ly/3MLt2VG.

to "ensur[e] that infringement would recur" on its service.  *Cox*, 93 F.4th at 236.  The music companies likewise characterized the conduct as an "*active campaign* to look the other way and permit known and repeat infringing uses and users to continue on its platform."  NMPA Br. at 21.

Yet the Supreme Court held that none of this rose to the level of contributory infringement. Despite the emails, the Court concluded that Cox "did not 'induce' or 'encourage' its subscribers to infringe in any manner."  *Cox*, 146 S. Ct. at 968 (quoting *Grokster*, 545 U.S. at 930).  It noted that Cox "contractually prohibits its subscribers" from committing copyright infringement.  *Id*. at 966.  It further observed that Cox "discouraged copyright infringement by sending warnings, suspending services, and terminating accounts."  *Id*. at 968.  True, those efforts were deficient – egregiously so, according to the jury – but they were not "'evidence of express promotion, marketing, and intent to promote' infringement."  *Id*. (quoting *Grokster*, 545 U.S. at 926).

The same conclusion follows here.  Like Cox, X offers a broad service that people use for a wide array of lawful purposes.  MTD Op. at 1-2; SAC ¶¶ 117-27.  Like Cox, X's terms of service contractually bar its users from committing copyright infringement on its platform.  Ex. 1 at 10.[5] And like Cox, X maintains a repeat infringer policy that "discourage[s] infringement by sending warnings, suspending services, and terminating accounts."  *Cox*, 146 S. Ct. at 968; *see* SAC ¶¶ 10, 168, 178-82.  True, Plaintiffs (mistakenly) allege that X's policy was inadequate.  *Id*. ¶¶ 160-91. But none of that is "evidence of express promotion, marketing, and intent to promote infringement."  *Cox*, 146 S. Ct. at 968.  If a service provider is not even liable for a sham 13-strike policy run by executives who write emails saying "F the dmca!!!," this should be an easy case.

---

[5] "Ex. __" are the exhibits attached to the accompanying declaration of Joshua D. Branson. The Court may consider those exhibits because the complaint incorporates them, *see Infinium Builders LLC v. Metropolitan Gov't of Nashville & Davidson Cty.*, 2024 WL 4009874, at *2 n.1 (M.D. Tenn. Aug. 30, 2024) (Trauger, J.), or because the Court may take judicial notice of their contents, *see Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 794 (6th Cir. 2016).

### 2. X's alleged conduct bears no resemblance to traditional inducement

X's alleged conduct is unlike the behavior other courts have treated as "actively encourag[ing] infringement through specific acts." *Cox*, 146 S. Ct. at 967. The "inducement rule," the Supreme Court has long held, requires "purposeful, culpable expression and conduct." *Grokster*, 545 U.S. at 937. That is a demanding standard: inducement requires a defendant to pursue the "object of promoting" copyright infringement, "as shown by clear expression or other affirmative steps taken to foster infringement." *Id.* at 936-37. The doctrine's seminal application is to "file-sharing software companies." *Cox*, 146 S. Ct. at 967. Indeed, virtually all the cases that have found inducement involved illegal "torrent sites." *Nimmer on Copyright* § 13E.05[A][4].[6] The facts of those torrenting cases highlight why the claim against X falls short.

*First*, copyright infringement was foundational to each file-sharer's business. Infringement was neither incidental to the inducer's platform nor merely one contributor to its revenue; it was the "principal object" of the whole "business model[]." *Cox*, 146 S. Ct. at 967. That was evident from the way the torrent sites intentionally solicited users of Napster, perhaps the most infamous piracy site in modern history. *See Grokster*, 545 U.S. at 939 ("former Napster users"); *Lime Grp.*, 784 F. Supp. 2d at 427 ("plans to attract Napster users"); *Usenet*, 633 F. Supp. 2d at 152 ("former users of other notorious file-sharing services such as Napster"); *Aimster*, 334 F.3d at 645 (known as alternative to "Napster"). A torrent site that positioned itself as Napster's successor, just when

---

[6] *See Grokster*, 545 U.S. at 919-20 ("peer-to-peer networks"); *Columbia Pictures Ind., Inc. v. Fung*, 710 F.3d 1020, 1024-25 (9th Cir. 2013) ("peer-to-peer file sharing protocol"); *In re Aimster Copyright Litig.*, 334 F.3d 643, 646 (7th Cir. 2003) ("service" to "swap files" online); *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 410 (S.D.N.Y. 2011) ("file-sharing program" using "P2P technology"); *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 130 (S.D.N.Y. 2009) ("substantially mimics . . . peer-to-peer file-sharing networks").

11

Napster was being publicly "shuttered" for massive copyright infringement, evinced the clear "infringing purpose" needed for an inducement claim. *Fung*, 710 F.3d at 1035.

*Second*, the file-sharing sites engaged in "express promotion" and "marketing" designed to stimulate infringement. *Grokster*, 545 U.S. at 926. Some "communicated an inducing message to their software users" by distributing articles promoting their "ability to access popular copyrighted music." *Id*. at 937-38. Another posted an online tutorial that gave "as its *only* examples of file sharing the sharing of copyrighted music." *Aimster*, 334 F.3d at 651. Still another "featured a list" of copyrighted movies and "invited" users to pirate them. *Fung*, 710 F.3d at 1036. And yet another "actively assisted" users in "committing infringement" by providing "technical" assistance to facilitate piracy. *Lime Grp.*, 784 F. Supp. 2d at 428. In one way or another, these services "advertis[ed] an infringing use." *Grokster*, 545 U.S. at 936. Such advertisements have long been central to the Supreme Court's inducement cases. *See Kalem Co. v. Harper Bros.*, 222 U.S. 55, 62-63 (1911) (producer "invoked by advertisement" distribution of copyrighted work).

*Third*, the torrent sites served little function beyond infringement. For these Napster copycats, it was no surprise they were seldom "used for any purpose other than to infringe the plaintiffs' copyrights." *Aimster*, 334 F.3d at 653. In *Grokster*, for example, nearly "97% of the files actually requested for downloading were infringing or highly likely to be infringing." *MGM Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 985 (C.D. Cal. 2006). The other cases involved similar proportions. *See Lime Grp.*, 784 F. Supp. 2d at 412 ("98.8% of the files requested"); *Usenet*, 633 F. Supp. 2d at 151 ("97% of the files actually requested for download"); *Fung*, 710 F.3d at 1034 ("between 90 and 96% of the content"). The overwhelming preponderance of infringing activity on each platform – coupled with other evidence of express promotion – showed that the torrent sites were "actively encourag[ing] infringement." *Cox*, 146 S. Ct. at 967.

X's platform exhibits none of these features.  As this Court already observed, X's social-media platform is not "a straightforward, intentional infringement facilitation device, like the peer-to-peer filesharing applications that led to *Grokster* and similar litigations."  MTD Op. at 15.  Plaintiffs do not allege that X positioned its service as a Napster alternative.  They do not allege that X engaged in "express promotion" of infringing uses, such as by publishing tutorials instructing its users how to share pirated music on the platform.  *Cox*, 146 S. Ct. at 968.  Nor do they allege that infringement dominates X's platform like it does the illegal torrent sites.  Although Plaintiffs allege that infringing posts on X surpassed "*8.5 billion views*" across several years, SAC ¶ 148, they never say what percentage of total views that number represents.  For good reason: any percentage they could have alleged would have been tiny.[7]  Having chosen not to compare the alleged infringement to the total activity on X's platform, Plaintiffs cannot analogize X to the "filesharing applications" other courts have found liable for inducement.  MTD Op. at 15.

Those distinctions are fatal to Plaintiffs' claim.  Aside from Napster lookalikes, copyright owners have rarely even brought inducement claims.  *See Nimmer on Copyright* § 13E.05.  And when they tried, they typically failed.  *See*, *e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170 n.11 (9th Cir. 2007) (Google); *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 800-01 (9th Cir. 2007) (Visa and Mastercard); *Ahmed v. Uber Tech., Inc.*, 2026 WL 1127460, at *8 (S.D. Fla. Apr. 27, 2026) (Uber); *Abbey House Media Inc. v. Apple Inc.*, 66 F. Supp. 3d 413, 421 (S.D.N.Y. 2014) (book seller).  That is why the music companies had to rely on their material-

---

[7] For example, public reports estimate that X garnered "8.3 billion video views *per day*" in 2024.  Christophe Asselin, *Twitter at 20: The essential figures on X, the platform that rewrote public conversation*, Onclusive (Mar. 21, 2026) (emphasis added), https://bit.ly/4ohYM2S.  So the total infringing views Plaintiffs allege across a multi-year period equaled roughly *one day's* worth of *video* views alone.  That amounts to an insignificant percentage, even overlooking the immense amount of non-video engagement on X's platform.  *See* SAC ¶¶ 117-24.

contribution theory when suing legitimate companies:  because they could not allege that non-Napster businesses "were engineered, disseminated, and promoted explicitly for the purpose of facilitating piracy."  *Visa*, 494 F.3d at 801.  Nor can they allege it here.

## II.  THE NEW INDUCEMENT ALLEGATIONS ARE LEGALLY DEFICIENT

Because *Cox* rejected their original legal theory, Plaintiffs have tried to morph their allegations into an inducement claim.  *Compare* Dkt. 115 ¶¶ 206-14 (alleging material contribution), *with* SAC ¶¶ 199-207 (swapping out that claim by adding the word "inducement" to it).  The Court should reject that attempted transformation.  To succeed, Plaintiffs must now allege that X "actively encourage[d] infringement through specific acts."  *Cox*, 146 S. Ct. at 967.

Plaintiffs' new allegations do not clear that bar.  Their new complaint mostly recycles the old one, just with new words that "X intend[ed]" or "encouraged" infringement.  SAC ¶¶ 3, 172, 201.  The Court should disregard those labels.  *See Ahmed*, 2026 WL 1127460, at *8 (dismissing similar "intent" labels under *Cox*).  Rhetoric aside, the alleged facts confirm that X "did not intend for [its] service to be used to commit copyright infringement."  *Cox*, 146 S. Ct. at 968.

### A.  Failure To Stop Infringement

Plaintiffs still devote much of their complaint to allegations that X "did not remove" or "refuse[d] to stop" infringing content on its platform.  SAC ¶¶ 8, 188.[8]  Such allegations can no longer support an inducement claim, and the Court should summarily dispose of them.

---

[8] *See also*, *e.g.*, SAC ¶¶ 7 ("chooses not to remove"), 9 ("choosing not to remove"), 13 ("failed to implement any kind of filter to reduce infringement"), 158 ("decided to stop enforcing its repeat infringer policy"), 166 ("ignores known repeat infringers"), 169 ("failed entirely to take down infringing content"), 172 ("choosing not to remove the infringing posts"), 173 (X's "Copyright policy has *not* included a warning"), 177 ("stop enforcing its repeat infringer policy"), 184 (failure to "review and polic[e] terms of service violations").

14

**1.** A failure to stop infringement is not inducement. The Supreme Court rejected an identical theory in *Cox*, stressing its "repeated admonition that contributory liability cannot rest only on a provider's knowledge of infringement and insufficient action to prevent it." 146 S. Ct. at 969. The Court reiterated the point just last week, warning again that "inducement must involve the taking of affirmative, as opposed to passive, steps to bring about the desired result." *Hikma Pharm. USA Inc. v. Amarin Pharma, Inc.*, 608 U.S. –, 2026 WL 1593307, at *6 (June 4, 2026).[9]

That principle forecloses wide swaths of the Second Amended Complaint. Many of the allegations reduce to two criticisms of X's copyright policy: that X took too long to remove infringing content, SAC ¶¶ 160-72, or that X terminated too few users, *id.* ¶¶ 173-91. Neither amounts to inducement under *Cox*. Cox itself could scarcely have done less to police infringement: the courts below viewed its efforts as so deficient that they struck its DMCA safe-harbor defense altogether. *See Cox*, 93 F.4th at 228. Yet the Supreme Court had no trouble reversing the contributory-infringement verdict. The Court's ruling, as the concurrence noted, means that service providers are not contributorily liable even if they serve "every single infringer who wants [service] without . . . lifting a finger to prevent infringement." *Cox*, 146 S. Ct. at 972 (Sotomayor, J.); *see Grokster*, 545 U.S. at 939 n.12 ("failure to take affirmative steps" cannot create liability).

Plaintiffs' claims conflict with that holding. Whatever the merit of Plaintiffs' (inaccurate) criticisms of X's anti-infringement efforts, *see* SAC ¶¶ 4-14, 160-91, they rest on the same flawed theory the Supreme Court just rejected, *see Cox*, 146 S. Ct. at 967-69. As another court recently recognized, *Cox* now bars copyright owners from basing an inducement claim on the "ineffectiveness of a service provider's DMCA policy." *Cengage Learning Inc. v. Google LLC*,

---

[9] Although *Hikma* is a patent case, its holding applies equally to copyright inducement. *See Hikma*, 2026 WL 1593307, at *6-7 (citing *Grokster* and *Cox* for the inducement standard applicable in both contexts); *Cox*, 146 S. Ct. at 964 (noting "historic kinship" between the two).

15

2026 WL 1266265, at *4 (S.D.N.Y. May 8, 2026).  Plaintiffs cannot escape that principle by cloaking the alleged ineffectiveness in active language.  *E.g.*, SAC ¶ 10 ("X takes active steps").  After all, they tried the same semantic trick in Cox.  *See, e.g.*, NMPA Br. at 8 (Cox "actively disparaged the DMCA"); *id.* at 21 ("Cox was engaged in an *active campaign*.").  But the Supreme Court looked past the adverbs and determined that the music companies had shown only "insufficient action to prevent" infringement.  *Cox*, 146 S. Ct. at 969.  The same is true here.

The allegation that X "often reactivates" suspended accounts does not change the calculus.  SAC ¶ 180; *see id.* ¶¶ 11, 178, 181-82.  Accusing X of "reactivating" infringing accounts is just another way of saying that X did not terminate them permanently.  That remains mere "insufficient action to prevent" infringement.  *Cox*, 146 S. Ct. at 969.  Again, *Cox* involved the same allegations, but worse:  "Cox *never* terminated a subscriber for infringement without reactivating them."  *BMG*, 881 F.3d at 303.  The music companies thus argued that Cox was culpable because it "directed employees to promptly reactivate infringers' accounts" after temporarily suspending them.  NMPA Br. at 8.  The Supreme Court disagreed.  *See Cox*, 146 S Ct. at 965-69.

The same point disposes of Plaintiffs' allegation that X's copyright policy omitted "the word 'terminate'" in favor of the word "suspensions."  SAC ¶ 175; *see id.* ¶¶ 173-76.  That too is merely a complaint that X was not harsh enough on repeat infringers.  Telling infringers that X will suspend them (even if only temporarily) is the opposite of "an affirmative intent" to promote their infringement.  *Cox*, 146 S. Ct. at 968.  Although X could have gone further and permanently banned all infringers, the Copyright Act did not require that step to avoid secondary liability.  *Id.*

**2.**     Plaintiffs also extend their failure-to-stop-infringement theory to X's "verified users."  SAC ¶ 12; *see id.* ¶¶ 10, 128, 182.  X allegedly gave those users "preferential treatment," which Plaintiffs characterize as "effectively allowing them to pay to infringe more."  *Id.* ¶ 12.  But

16

this is just another spin on Plaintiffs' theory that X was not harsh enough on repeat infringers – in this case, the subset who were verified users. *Cox* forecloses that theory as well. Plaintiffs do not allege that X *encouraged* verified users to infringe; they claim that X was more "lenient" in assigning them strikes and disabling their accounts. SAC ¶ 182. Relative leniency is not inducement. *See Cengage*, 2026 WL 1266265, at *4 (rejecting argument that Google's "exceptions" to DMCA policy supported inducement). After *Cox*, the alleged "ineffectiveness of a service provider's DMCA policy – whether due to poor execution or to poor design – is relevant only to the DMCA safe harbor." *Id*. It no longer has any bearing on the provider's intent to promote infringement. In fact, X could choose to run its platform "without lifting a finger to prevent infringement" – by verified users or anyone else. *Cox*, 146 S. Ct. at 972 (Sotomayor, J.). So it cannot be liable for merely giving those same users "more lenient treatment." SAC ¶ 182.

*Cox*'s facts again confirm the point. Plaintiffs admit that X's "verified users" remained subject to account suspension, just with "three extra strikes" on top of the six X ordinarily provided. *Id*.; *see id.* ¶ 179. Such a nine-strike policy is stricter than the sham 13-strike policy Cox employed. *See* Sony Br. at 10-12. And the music companies made a nearly identical argument against Cox, complaining that it "looked at customers' monthly payments when considering whether to terminate them for infringement." *Sony Music Ent. v. Cox Comm'cns, Inc.*, 464 F. Supp. 3d 795, 815 (E.D. Va. 2020). But Cox's alleged reluctance to terminate high-value users did not convey the "intent required for contributory liability." *Cox*, 146 S. Ct. at 967. So too here.

To be sure, this Court previously declined to dismiss allegations that X "allow[ed] some users to effectively purchase the right to be able to infringe with less severe consequences." MTD Op. at 16. But *Cox* abrogated that ruling's premise. The verified-user theory was the first of three "discrete allegations" the Court upheld as "plausibly fall[ing] into the category of materially

contributing to infringement." *Id*. *Cox*'s rejection of that whole liability category compels dismissal of the various allegations it encompassed. Indeed, *Cox* makes clear that X could have chosen to allow *all* its users to "purchase the right," *id.*, to receive at least "13 notices" before facing suspension. *Cox*, 146 S. Ct. at 966; *see id*. (Cox did this to "protect[] revenue"). X's decision to subject paying users to a comparatively strict nine-strike policy was not inducement.

### B. General Platform Features

Plaintiffs fare no better in attacking X's "business model" as "fueled by infringement." SAC ¶ 3; *see id.* ¶¶ 117-54. Those allegations criticize various features of X's platform, such as its content hosting, *id.* ¶¶ 118-26; video architecture, *id.* ¶¶ 130, 165; display algorithms, *id.* ¶¶ 131-33; and subscriptions and advertising, *id.* ¶¶ 136-42. In Plaintiffs' telling, these features show that "X's business model" depends on copyright infringement. *Id.* ¶¶ 144-49.

The Court already dismissed this theory once. When Plaintiffs' last complaint alleged the same "supposedly problematic practices," the Court called them "unremarkable features of X/Twitter generally." MTD Op. at 15. "Any feature" that improves X's platform "for all of its users will, by definition, also make the service easier for bad actors." *Id.* But such "general feature[s] of the platform" cannot support contributory infringement. *Id.*; *see Sony*, 464 U.S. at 441-42 (courts cannot impute intent from products "capable of substantial noninfringing uses"). Here, none of the practices Plaintiffs allege make it "easier to post an infringing file than a non-infringing one." MTD Op. at 15. That was fatal to Plaintiffs' platform-feature theory even before *Cox*. *Id.* It is even more so now. *See Hikma*, 2026 WL 1593307, at *6 ("'ordinary acts incident to product distribution' are insufficient to support liability") (quoting *Grokster*, 545 U.S. at 937).

Nor can Plaintiffs fix that problem by alleging "how important music is to X and users of its platform." SAC ¶¶ 143-44. Even if X's platform depended on music generally, that would not

18

suggest that X "clearly expressed an intent to promote infringement." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 672 (9th Cir. 2017) (dismissing inducement claim). Promoting *music* and promoting *illegal infringement* are two different things. *See Abbey House*, 66 F. Supp. 3d at 421 (fostering "noninfringing use" cannot support inducement claim). Plaintiffs have alleged at most the former. SAC ¶¶ 143-50; *see infra* p. 24 (addressing allegations that based on posts by Mr. Musk that show him encouraging artists to share their own music lawfully). And *Cox* would foreclose their attempt to allege the latter regardless: there, illegal "peer-to-peer file sharing ballooned to a whopping *21%* of all traffic on Cox's network." Sony Br. at 12. Yet the massive amounts of infringement suffusing Cox's network did not support an inducement claim. The allegations against X – about music generally, not infringement specifically – are even weaker.

Plaintiffs' sources also refute their characterizations of X's business model. The "marketing, blogs, or posts" they cite (¶ 143) highlight the importance to X of music *discussion*, not music *piracy*. *E.g.*, Ex. 2 (blog excerpted in ¶ 143(a) & (c) discussing "conversation around music").[10] And each "internal analysis" they cite (¶ 144) undercuts their position. Those analyses advocated a license because X wanted to *use* music on the platform – for example, by giving users "playable music links" – not because it encouraged its users' piracy. Ex. 4 at -760 (first analysis in ¶ 144 proposing that X give users "suggested songs in the Composer").[11] Those very analyses concluded that X's users were already "aware of copyright limitations" and had "witnessed punishment" under X's repeat-infringer policy. Ex. 4 at -798. That is the opposite of inducement.

---

[10] *See also* Ex. 3 (post excerpted in ¶ 143(b) exclaiming "I could *talk* about music all day, which is what I do here on the Twitter") (emphasis added).

[11] *See also* Ex. 5 at -786 (second analysis in ¶ 144 discussing new product features X could build based on "[m]usic licensing rights"); Ex. 6 at -993 (third analysis in ¶ 144 discussing how licensing could "unlock new use cases").

19

Plaintiffs' analogy (¶ 144) to competing platforms is inapt for the same reason. Plaintiffs' source confirms that X disliked its status as "the only major platform remaining without music licensing rights." Ex. 6 at -993 (emphasis omitted). That dislike arose not because X tolerated infringement, but because it did not: its lack of a license led X to implement cumbersome "content removal and account suspension[s]" against infringing users. *Id.* If anything, those efforts show that X was discouraging piracy. Nothing in these licensing documents (Exs. 4-6) suggests that X "intended that [its platform] be used for infringement." *Cox*, 146 S. Ct. at 967.

## C. Public Statements

Finally, Plaintiffs try to manufacture inducement from X's "public statements." SAC ¶ 6; *see id.* ¶¶ 155-59. Those allegations are equally deficient. To support an inducement claim, a statement must convey a "clear expression" of culpable intent. *Grokster*, 545 U.S. at 936-37; *see Hikma*, 2026 WL 1593307, at *7 ("[T]he necessary inducement must be clear to the relevant audience."). The rule is strict for a reason. If copyright owners could conjure inducement from equivocal statements, liability could "trench[] on regular commerce" and discourage innovation. *Id.* at *8 (quoting *Grokster*, 545 U.S. at 937); *see Sony*, 464 U.S. at 442 (secondary liability must "balance" the "rights" of innovators to "engage in substantially unrelated areas of commerce"). For that reason, courts cannot find copyright inducement unless the "improper object" is "plain" and "affirmatively communicated through words or actions." *Fung*, 710 F.3d at 1034. Plaintiffs cite four sets of X's public statements, but none even approaches that standard.

*First*, Plaintiffs allege that X "convey[ed] to users that they can infringe without losing their accounts." SAC ¶ 6; *see id.* ¶ 155; Exs. 7-8 (full versions of Plaintiffs' excerpts). The cited statements did not plausibly encourage infringement. They emphasized that X may "ask you to remove content if the legal claim [of infringement] is valid" and will "suspend[]" users for

"pirating / egregious illegal behavior."  Ex. 7; *see* Ex. 8 (X "ask[s] for [infringing content] to be removed" and "suspend[s] users for posting [infringing] content" if "it is clear the user knew the content was illegal").  Telling music pirates that X *will suspend them* is the antithesis of inducement.  Of course, Plaintiffs also wanted X to terminate even unintentional, non-egregious infringers.  SAC ¶ 155.  But X's more restrained approach is hardly a "clear expression" of infringing intent.  *Grokster*, 545 U.S. at 937.  That is especially true because X committed publicly to "remove" even unintentional, non-egregious infringing material on its platform.  Ex. 7.

*Second*, Plaintiffs truncate one of Mr. Musk's posts to pretend that he called "the DMCA" itself a "plague on humanity."  SAC ¶ 155.  In fact, he said that "*Overzealous* DMCA is a plague on humanity."  Ex. 9 (emphasis added).  Plaintiffs' excision is telling.  No reasonable observer could read Mr. Musk's full comment and think he was inciting infringement.  Instead, he was expressing a political opinion – responding to reporting about Senator Hawley's bill to retroactively cap copyright duration at 56 years – because he thought that "[c]urrent copyright law in general goes absurdly far beyond protecting the original creator."  *Id.*  Then, in more colorful language, he observed that excessive DMCA enforcement disserves the public interest:



In the context of the full thread,[12] Mr. Musk's criticism of "overzealous DMCA" enforcement cannot reasonably be construed as encouraging music piracy. In fact, his criticism was well-founded: this Court itself made a similar point in a recent case. *See Eight Mile Style, LLC v. Spotify USA Inc.*, 745 F. Supp. 3d 632, 667 (M.D. Tenn. 2024) (noting that "being the victim of infringement is, in many instances, more remunerative than being an above-the-board licensor"). And this lawsuit illustrates the problem: before filing it, Plaintiffs tried to extract a "partnership" payment by threatening X with a "massive program of notices" they said would overwhelm the platform and "quickly turn many of your most popular users into repeat infringers." Ex. 10 at -838. Mr. Musk's understandable frustration with such tactics was not inducement.

But even looking at Plaintiffs' truncated quote in isolation, Mr. Musk's comment was tamer than the emails in *Cox*. If emails like "F the dmca!!!" and "WE NEED TO CAP THESE SUCKERS!" do not give rise to inducement, *see* Sony Br. at 16, neither does the truncated version of Mr. Musk's post. At least Mr. Musk (unlike Cox) was clear in opposing illegal infringement: through he decried "repeated, egregious weaponization of DMCA," he stressed that "reasonable media takedown requests are, of course, appropriate and will always be supported."[13] None of this constitutes a "clear expression" of infringing intent. *Grokster*, 545 U.S. at 937.

*Third*, Plaintiffs allege (¶¶ 156-58) that Mr. Musk advised "X users how to get away with posting infringing videos." Their only evidence – a single 11-word post – does not support their inference. *See* Ex. 12 (attaching entire thread). Mr. Musk was responding to a long, garbled post

---

[12] Exhibit 9, which is the basis for the screenshot above, is the full thread that Plaintiffs excerpt at ¶¶ 6 and 155. *See MGM Grp. 22 LLC v. Perry*, 818 F. Supp. 3d 623, 627-28, 630 (S.D.N.Y. 2026) (evaluating tweet alleged in complaint "in the context of the entire thread"); *Kremer v. Reddit, Inc.*, 2022 WL 3702092, at *1 & n.4 (M.D. Tenn. Aug. 26, 2022) (similar).

[13] Ex. 11 (attaching copy of Mr. Musk's X post). "When analyzing social-media activity, [courts] look to a page or account as a whole, not each individual post." *Lindke v. Freed*, 37 F.4th 1199, 1203 (6th Cir. 2022), *vacated and remanded on other grounds*, 601 U.S. 187 (2024).

22

that began with a user complaining generally that she "never, ever earn[ed] money from the videos I share!" *Id.* Mr. Musk's suggestion that she "consider turning on subscriptions" was a response to the user's desire to monetize her posts. *Id.* His response made sense. X's subscription program allows users to offer an "extra level of content, access, and conversation for paying subscribers." Ex. 13 at 1. But it does not authorize copyright infringement. Quite the opposite: users may "only monetize content" that they "have the rights to monetize" through "appropriate legal rights." *Id.*

Plaintiffs still twist (¶ 156) Mr. Musk's statement into "advi[ce] on how to get away with posting infringing videos." Their theory posits that the same user had complained that "Copyright holders" were "reporting in bad faith!" and that it was "impossible" for her to "understand that [her] videos are copyrighted." Ex. 12. That latter part of her post, however, does not plausibly transform Mr. Musk's response into inducement. For one thing, the user never expressed an intent to infringe: she admitted that "[c]opyrighted videos can be turned off, that's ok!" *Id.* For another, "turning on subscriptions" would not affect how X handled infringement notices against her anyway. *Id.* Plaintiffs' surmise (¶ 156) that Mr. Musk intended to "make it less likely copyright owners would" detect her infringement is too speculative to support inducement. *See Hikma*, 2026 WL 1593307, at *8 (dismissing "speculation" that statement was "subtle encouragement" to infringe); *Giganews*, 847 F.3d at 672 (rejecting as "entirely inconclusive" advertisements that defendant did "not keep track of subscriber downloads, effectively encouraging infringement").

Patent law, with which copyright law shares a "historical kinship," *Cox*, 146 S. Ct. at 964, reinforces the point. In the "analogous context" of induced patent infringement, courts often consider whether an instruction is clear enough to "infer from those instructions an affirmative intent to infringe." *Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 630-31 (Fed. Cir. 2015). Ambiguous directions are not enough: "inducement cannot be based only on

23

'vague' language 'combined with speculation about how [others] may act'" when reading it. *Hikma*, 2026 WL 1593307, at *8 (quoting *Takeda*, 785 F.3d at 632).[14] That principle is decisive here. *See id.* at *6-7 (drawing rule from *Cox* and *Grokster*). At best, the allegations suggest that Mr. Musk was unclear in responding to one part of one user's post. His suggestion that she turn on subscriptions was an "implausibly roundabout way[] to induce" infringement. *Id.* at *8.

*Fourth*, Plaintiffs allege that Mr. Musk "respond[ed] to artists and songwriters discussing their music." SAC ¶ 159; *see* Exs. 15-16 (full posts). Those posts merely encouraged artists to promote their *own* music on X's platform. *See* Ex. 15 ("recommend[ing]" that Taylor Swift "post[] some music or concert videos directly on the X platform"); Ex. 16 (remarking that Grimes' lawfully posted video was "cool" and that he "hope[d] many others put their music videos on this platform!"). If anything, such posts undercut Plaintiffs' theory. Encouraging artists to lawfully promote their own music on X does nothing to foster copyright infringement. *See Abbey House*, 66 F. Supp. 3d at 421 ("While instructions may suffice in some circumstances to establish an intent to infringe, the instructions must relate to an *infringing* use."); *Ark Promotions, Inc. v. Justin.tv., Inc.*, 904 F. Supp. 2d 541, 552 (W.D.N.C. 2012) ("instructions for use of [defendant's] product for lawful purposes" was not inducement). If Mr. Musk truly wanted to promote illegal infringement, he would not have gone to the trouble of encouraging artists to share their own content.

## CONCLUSION

The Court should dismiss the Second Amended Complaint with prejudice.

---

[14] The "responses to Mr. Musk's post" from the three random commenters Plaintiffs cite (¶¶ 157-58) epitomizes such speculation. Although @elizableu – self-described as "[w]himsymaxxing and just having fun," Ex. 14 – speculated about Mr. Musk's supposedly "problematic" suggestion, Ex. 12 at 2, her speculation does not show inducement. *See Hikma*, 2026 WL 1593307, at *6 n.3 ("[T]he key question is whether a defendant actively encouraged infringement through its statements, not merely how others may understand those statements.").

24

Dated:  June 11, 2026

Respectfully submitted,

<u>*/s/ Joshua D. Branson*</u>

Stephen J. Zralek (No. 18971)
S. Chase Fann (No. 36794)
SPENCER FANE LLP
511 Union Street, Suite 1000
Nashville, Tennessee 37219
Telephone: (615) 238-6300
Facsimile: (615) 238-6301
szralek@spencerfane.com
cfann@spencerfane.com

Joshua D. Branson (*pro hac vice*)
Scott H. Angstreich (*pro hac vice*)
Kellogg, Hansen, Todd,
   Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
jbranson@kellogghansen.com
sangstreich@kellogghansen.com

*Counsel for Defendant X Corp.*

25

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2026, I filed this document with the Court and served it on counsel through the Court's CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system.

John R. Jacobson
Steven Allen Riley
Timothy G. Harvey
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
jjacobson@rjfirm.com
sriley@rjfirm.com
tharvey@rjfirm.com

Kathleen E. Wills
Keith T. Howell
Matthew J. Oppenheim
Meredith E. Stewart
Scott A. Zebrak
Oppenheim & Zebrak, LLP
4530 Wisconsin Ave. NW
5th Floor
Washington, DC 20016
kwills@oandzlaw.com
khowell@oandzlaw.com
matt@oandzlaw.com
mstewart@oandzlaw.com
scott@oandzlaw.com

Alexander Kaplan
Andrew L. Guerra
Carly Rothman
Daryl Lian Kleiman
Oppenheim & Zebrak, LLP
461 5th Avenue, 19th Floor
New York, NY 10017
alex@oandzlaw.com
andrew@oandzlaw.com
carly@oandzlaw.com
dkleiman@oandzlaw.com

*/s/ Stephen Zralek*
Stephen J. Zralek

*Counsel for Defendant X Corp.*

1